IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| PASCHA THOMAS, as | ) | |
| Guardian and next friend | ) | |
| of JANE DOE, a minor, | ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | VERIFIED COMPLAINT |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| CITY SCHOOLS OF DECATUR | ) | |
| DR. DAVID DUDE, individually | ) | |
| and in his official capacity, | ) | |
| MARCIA FOWLER, individually | ) | |
| and in her official capacity | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, Pascha Thomas, as Guardian and next friend of Jane Doe, a minor, by and through her attorneys of record, files her Complaint against City Schools of Decatur ("CSD"), Dr. David Dude, and Marcia Fowler, and in support thereof, alleges as follows:

**INTRODUCTION**

1.     Despite being warned of the risks of permitting children to access restrooms designated for the opposite sex by proclaiming that they identify as that

sex, the City Schools of Decatur ("CSD") Board of Education ("Board") ratified such a policy that CSD Superintendent Dr. David Dude had previously unilaterally enacted without notice to parents. The policy was not included in the student handbook or in the Board's publicly available written policy manual.

2.     About one month after the Board was warned about the policy, but nevertheless proceeded to ratify it, Pascha Thomas' five-year-old daughter, Jane Doe, was sexually assaulted in the girls' restroom by a five-year-old boy who was able to enter the girls' restroom with Jane Doe without adult supervision.  Said assault involved forcibly digitally touching and penetrating Jane Doe's genitals while she protested.

3.     After being informed of the incident, District officials failed to interview the boy or otherwise investigate the incident, failed to provide Jane Doe services, misled parents to believe they did investigate, claimed it did not occur, refused to remove the boy from Jane Doe's classroom, failed to take measures to prevent further assaults, failed to inform Jane Doe's parent of Jane Doe's rights under Title IX, retaliated against Jane Doe's family, denied Jane Doe educational benefits, unreasonably delayed approval of a transfer for Jane Doe, and left the

policy in place unchanged. While the policy has not changed, its effects have forever changed Jane Doe.

## PARTIES

4.      Pascha Thomas is over the age of 18, is the single mother of Jane Doe, and at all times relevant to this Complaint, was a resident of the City of Decatur, County of DeKalb, Georgia. Pascha Thomas is the Guardian and next friend of Jane Doe, a minor resident of Georgia.

5.      Defendant City Schools of Decatur ("CSD") is a governmental entity which provides educational services to residents of the City of Decatur, DeKalb County, Georgia. CSD receives funding from the State of Georgia and the United States Department of Education including pursuant to Title IX. As such it is a funding "recipient."

6.      Defendant Dr. David Dude is the Superintendent of CSD. He is sued in his official and individual capacities.

7.      As Superintendent, Dr. Dude's role is to implement policies established by the Board, as provided in Official Code of Georgia Annotated § 20-2-61. Pursuant to Section 20-2-61, Dr. Dude has authority to execute his duties without

micromanagement by the Board, subject only to being accountable in the overall performance of his duties.

8.      Marcia Fowler was at all times relevant to this Complaint the Principal of Oakhurst Elementary School, which is part of CSD. Plaintiff is informed and believes and, on that basis, alleges that Ms. Fowler is no longer principal of Oakhurst Elementary School but remains employed by CSD. She is sued in her individual and official capacities.

9.      On May 9, 2018, in accordance with Official Code of Georgia Annotated § 36-33-5, Plaintiff, by and through counsel, presented her claim in writing, describing the date and nature of her injury and the acts and omissions of the Board of Education and Superintendent Dude which caused the injury. Plaintiff included a specific amount of monetary damages being sought.  The claim was sent via electronic mail and overnight delivery addressed to the chairman of the Board of Education, as the governing authority of CSD, and to Superintendent Dude. Defendants rejected Plaintiff's claim.

## JURISIDICTION AND VENUE

10.      This action is filed pursuant to Title IX, 20 U.S.C. § 1681 *et. seq.*, and its implementing regulations, and to 42 U.S.C. § 1983 seeking redress of injuries

suffered by Plaintiff Jane Doe from deprivation, under color of state law, of rights secured by the Fourteenth Amendment to the United States Constitution and by the laws of the United States. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a).

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and other applicable law because the events and omissions giving rise to the claims in this action arose in the City of Decatur, DeKalb County, Georgia, which is situated within the district and divisional boundaries of the Northern District of Georgia. Venue is also proper in this Court because the Defendants reside or have their principal place of business in this District.

**FACTS**

12.    On May 13, 2016, the U.S. Department of Education ("DOE") and Department of Justice ("DOJ") issued a guidance document known as a "Dear Colleague" letter which, according to the agencies, provided that "sex" for purposes of Title IX of the Education Amendments Act of 1972 should be interpreted to include "gender identity." ("Obama Guidance Document"). The document further directed that all schools which receive federal funds had to make sex-separate privacy facilities (restrooms, locker rooms, and showers), sports teams and

5

extracurricular activities accessible based on a child's self-proclaimed "gender identity."

13.     On May 25, 2016, thirteen states, including Georgia, filed a lawsuit challenging the Obama Guidance Document as invalid and contradictory of the letter and intent of Title IX. *Texas et. al. v. United States, et. al.,* Northern District of Texas Civil Action No. 7:16-CV-00054-O.

14.     On July 14, 2016, while the federal court challenge to the Obama Guidance Document was under consideration, an article in the *Atlanta Journal-Constitution* quoted Dr. Dude as saying that CSD would retain the status quo regarding trans-identified student access to sex-separate privacy facilities under existing District policy regardless of the Obama Guidance Document. The article quoted Dr. Dude as saying, "We've had transgender students for years. . . . So far we've been able to handle requests, usually made by parents of those students. Mostly they use a faculty restroom or a referee's restroom (in the gymnasium)." The article also quoted Dr. Dude as saying that it was too soon to change the district's policy.

15.     On July 25, 2016, less than two weeks after publicly stating that it was too early to change the district's policy regarding trans-identified students' access to

privacy facilities, Dr. Dude informed the Board via email that he was going to give a directive to CSD staff that would re-interpret existing policy to permit children to access sex-separate privacy facilities and extra-curricular activities, including overnight accommodations, on the basis of their self-proclaimed "gender identity." This would mean that a boy could use a girls' restroom, shower, locker room or share a hotel room with a girl on a school trip by stating that he identified as a girl (and vice versa).[1]

16.    Dr. Dude asked Board members to let him know if he was misrepresenting the Board's intentions regarding interpretation of the District's existing policy.  Dr. Dude also queried the Board about placing this policy guidance on the agenda for an upcoming Board meeting, which would elicit public discussion.

---

[1]    Because Title IX focuses on equal opportunities between the sexes, Plaintiff refers to "sex" as the biological categories of male and female, as determined by the individual's chromosomes, sex organs, and endogenous hormonal profiles. National Institutes of Health, Office of Research on Women's Health, https://orwh.od.nih.gov/sex-gender.  In this Complaint "Boy" is used to refer to a male person determined by the presence of XY chromosomes at conception and throughout life, and then recognized via external genitalia at, or before, birth. "Girl" refers to a female person determined by the presence of XX chromosomes at conception and throughout life, and then recognized via external genitalia at, or before, birth. Plaintiff refers to students who are biologically male as "boys" and to students who are biologically female as "girls," irrespective to how they psychologically identify.

17.     Two of the five Board members responded to the email. Board member

Garrett Goebel said: "I do not see anything in your guidance that isn't reasonable or

in line with the policy."

18.     Board member Lewis Jones responded:

My only issue is locker rooms and questions about the degree of
transition that must occur before a transition is recognized—the policy
assumes gender is binary but it is not, which is why this policy is needed
in the first place. This is a problem with the Dear Colleague letter. I
would prefer a more general policy stating that transgender students
will be embraced and supported and made to feel welcome, and that it
is expected that they will be accommodated in accordance with the Dear
Colleague letter (attached), but that special accommodations may be
made to address individual circumstances as appropriate.

I also thought we discussed putting this out for comment, as I can
imagine a fair amount of interest. I do not relish that, but wouldn't it be
the right thing to do?

[Emphasis added]

19.     Dr. Dude responded:

I was informed today of a student who will be "fully transitioned" (not
sure if that is correct terminology) this school year...i.e. Monday
morning our administrators need to be prepared to implement this
policy as it relates to transgender students. Without direction, they'll
have to figure it out on their own. Hence my desire to provide guidance
right away. The point of the task force is to fully review everything, but
that will take some time. But that will take a good bit of time. Given
your concerns, though, I'm not comfortable issuing guidance until the
board can discuss. I'll plan to place on the 8/9 agenda.

8

[Emphasis added]

20.    Dr. Dude, however, did not place this policy directive on the Board's public meeting agenda. Instead, on July 26, 2016, Dr. Dude informed Board members: "Lewis and I spoke further this morning. He does not object to my sending this out. Having heard no other objections, I will be sending this out momentarily."

21.    These private communications involving Superintendent Dude and the entire board discussing and reaching decisions concerning school district-wide policy outside of a school board meeting and without due notice to the public were in violation of the Georgia Open Meetings Act, OCGA § 50-14-1 et seq.

22.    As a result of the affirmation received privately from Board members, Dr. Dude issued the directive to CSD staff via email in which he stated that access to sex-separate privacy facilities, sports teams, and other extracurricular activities, including overnight accommodations, was to be granted on the basis of a student's self-proclaimed "gender identity." He expressly directed:

> As I'm sure you know, our Board policy JAA states that we do not discriminate on the basis of … gender identity (among other things). To be clear, here are some examples of situations related to gender identity and how I expect them to be handled in compliance with this policy. For purpose of these examples, assume this student was assigned the sex of male at birth and now identifies as female.

- This student should be treated the same as any other female student.
- She should not be identified as anything other than female.
- She should be allowed to use the female restroom.
- She should be allowed to use the female locker room
- She should be allowed to try out for "female" sports
- She should be allowed to room with other females on field trips.

23.    Neither Dr. Dude nor members of the Board notified parents or students about the directive that would result in boys who self-identify as girls being present in girls' privacy facilities at the time that it was issued by Dr. Dude.

24.    The last public statement regarding sex-separate privacy facilities and extracurricular activities made by Dr. Dude prior to the beginning of the 2016-17 school year was the statement published in the *Atlanta Journal-Constitution* on July 14, 2016 in which he stated that CSD would not be changing its pre-existing policy in response to the Obama Guidance Document.

25.    Based on Dr. Dude's public statements, parents in CSD reasonably believed that the District was continuing to interpret and implement its policy to protect student privacy and safety by continuing to limit access to sex-separate privacy facilities to students of the same sex while providing individual privacy facilities for trans-identified students who identified as the opposite sex.

26.     However, unbeknownst to parents, Dr. Dude had, with notice to the Board but without notice to parents, re-interpreted the District's policy to permit boys who self-identify as girls to access girls' privacy facilities (and vice versa).

27.     As the 2016-17 school year began with the new directive in place, CSD parents were unaware that boys were permitted to use girls' privacy facilities if they stated that they "identified" as a girl (and vice versa).

28.     On August 21, 2016, the United States District Court for the Northern District of Texas issued a nationwide injunction that prohibited enforcement of the Obama Guidance Document.  *Texas, et. al. v. U.S.*, 201 F. Supp. 3d. 810 (N.D. Tex. 2016).

29.     In addition, the Obama Guidance Document was formally rescinded on February 22, 2017 by the Trump Administration.

30.     Dr. Dude did not publicly reveal that the CSD directive was in place until February 27, 2017, and then only in a Facebook blog post. In the post, Dr. Dude acknowledged that the Obama Guidance Document had been rescinded on February 22, 2017. However, he did not acknowledge that the Obama Guidance Document had been unenforceable since August 21, 2016 when the nationwide injunction was put in place by the Texas federal court.

31.    CSD parents who read that Facebook post on February 27, 2017 learned for the first time that since July 2016 CSD had been permitting boys to use the same restrooms, locker rooms, showers, and hotel rooms as their daughters if the boys proclaimed that they identified as a girl (and vice versa).

32.    On May 24, 2017 parents attended a meeting called "community conversations" with Dr. Dude and members of an "Equal Opportunity Task Force" that they learned had apparently been meeting since summer 2016 to "learn about issues of safety and equity for transgender students, students with disabilities, students of different religious affiliations, race, and sexual orientation."

33.    Plaintiff is informed and believes and based thereon alleges that at the May 24, 2017 meeting parents who had just learned about the privacy facility directive via Facebook questioned the unilateral adoption of such a change without notice to parents and to the public, and without an opportunity to be heard. Parents also described concerns about the risks to student privacy and safety posed by the newly discovered policy, which had been put in place by Dr. Dude and ratified by Board members in July 2016 without public notice or comment, including:

- "I'm concerned about the psychological effect/damage to my child (a female) of being forced to share a bathroom with and possibly made to sleep with a transgender on a field trip."

- "I'm concerned that a new policy to address transgender equity/equality will be intrusive and invade the rights of cisgender students."

- "I'm also concerned about the lack of communication from the district to involve parents in such an important issue...."

- "Serious concerns of the implications of the transgender policy for student privacy, and in particular the privacy of young girls."

- "Serious concerns for the negative impact of the transgender policy on parental rights."

- "How can CSD justify situations where students of opposing gender and possibly exposed genitalia will be in bathrooms, locker rooms and sleeping quarters <u>together</u>?"

- The Superintendent's "transgender guidelines" needs to be withdrawn. We need to start over with public input and dialogue about how to develop a transgender policy.

34.    A Task Force recommendation was prepared after the meeting stating that Task Force members had considered the input presented at the meeting. However, the concerns about the reinterpretation of District's policy related to student privacy and safety and lack of notice to parents were not included in the report.

35.    On June 21, 2017, a group of parents sent a letter to Dr. Dude reiterating the concerns about the lack of transparency and potential discrimination of students'

Title IX and privacy rights that had been presented at the May 24, 2017 meeting and requesting a meeting to discussed questions left unanswered at the May 24, 2017 meeting.

36.     On July 19, 2017, parents met with Dr. Dude to discuss the unanswered concerns.

37.      On July 24, 2017, parents sent a letter to Dr. Dude following up on the July 19, 2017 meeting. In the letter, they restated their concern for how this policy would violate their students' right to bodily privacy, explaining: "Members of both sexes have come to expect that they will not be exposed to members of the opposite biological sex (regardless of how they self-identify) in areas where they are undressing or engaged in private activities." The parents, several of whom, like Plaintiff, are African-American, further reiterated that Dr. Dude committed to providing a decision on rescission and/or suspension of his directive due to the concerns of establishing new policy without proper authority, disregarding transparency, failing to notify parents, and including an offensively inappropriate analogy to African-Americans. Parents also reiterated Dr. Dude's agreement to share the Task Force recommendation with them and to ensure that the recommendation reflected the parents' concerns expressed at the community conversation.

14

38.     On August 13, 2017, parents sent another letter to Dr. Dude asking for his decision regarding the District's policy change.

39.     At the Board's regular meeting on September 12, 2017, parents informed the Board during a public comment period that they had learned that for more than a year the District's policy had been re-interpreted to permit boys who self-identify as girls to use girls' privacy facilities, compete on sports teams, and room with girls on overnight trips without parents' knowledge. The parents objected to the lack of transparency and described how this policy directive posed risks to student privacy and safety.

40.     Following the meeting, on September 18, 2017, the Board issued a public statement of Dr. Dude's actions regarding the directive:

> The City Schools of Decatur Board of Education is committed to ensuring that all students feel safe, supported, and valued. We support the Superintendent's efforts to interpret Board policy regarding equal educational opportunities for all students.

41.     Despite having corresponded privately via email with Dr. Dude about the policy in July 2016, the Board claimed in its September 18, 2017 statement that: "The Board has not yet had an opportunity to specifically discuss the topic of

transgender students, and we look forward to having that discussion at our October Board meeting."

42.    More than 100 people attended the Board's meeting on October 10, 2017 to comment on the policy change. A significant number of parents and community members expressed concerns that the policy change had been implemented without public notice or opportunity to comment, that the policy change posed risks to the privacy and safety of students, and that the Board had not sought or received balanced information regarding the potential effects of the policy. In particular, one speaker, an attorney who was former Chairman of the Georgia Board of Pardons and Parole, warned the Board that the policy would allow "mischievous boys" to gain access into girls' restrooms for inappropriate purposes.

43.    Prior to the meeting, the Board had received written correspondence from parents' legal counsel which described in detail how the policy was not adopted in accordance with Georgia law, was not mandated by federal law, and posed threats to students' privacy and safety in violation of Title IX and the United States Constitution.

44.     Immediately after the public comments, the Board read the following prepared statement affirming Dr. Dude's implementation of the policy directive and acknowledging that there were privacy concerns that need to be addressed:

> We support the superintendent's instructions to staff regarding transgender students. . . . We also recognize that there are members of our community with questions and privacy concerns that need to be addressed. Over the next several months, we will be participating in community events offering learning opportunities in this area. We will be gathering input from the community on our current policy and we will be reviewing our current policy to consider potential changes in order to further our goal of ensuring that all students feels [sic] safe, supported, and valued.

45.     Plaintiff is informed and believes and based thereon alleges that the Board had no further public discussions about the privacy and safety concerns related to the policy. Neither did Dr. Dude discuss privacy or safety concerns or announce any adjustments to the policy concerning privacy facilities.

**Plaintiff Enrolls in CSD**

46.     Ms. Pascha Thomas and her children, including her daughter Jane Doe, moved to Decatur in July or August 2017.

47.     Jane Doe began kindergarten at Oakhurst Elementary School ("Oakhurst"), part of CSD, in the fall semester of 2017. Her sister was also enrolled at Oakhurst and her other siblings were also enrolled in schools within the District.

17

48.    At the time that Jane Doe began kindergarten and her siblings began the school year in the district, Ms. Thomas was not informed about the policy change that permitted biological boys who claim to identify as girls to be present in girls' privacy facilities, and vice versa. Ms. Thomas enrolled her children in CSD with the reasonable expectation that school personnel would respect and protect her children's safety and privacy.

49.    Ms. Thomas' expectation was based on her understanding that Jane Doe and her other children would use sex-separate privacy facilities only with members of the same sex and that the school would protect the privacy and safety of its students by enforcing the long-standing practice that only biological girls would be permitted to use girls' privacy facilities and only biological boys would be permitted to use boys' privacy facilities. Ms. Thomas' expectation was reasonable in light of the fact that as of August 2017 there had not been any public notice from the Board or Dr. Dude that District policy had been re-interpreted to permit boys who self-identified as girls to use girls' privacy facilities. Also, the policy change was not reflected in the student handbook or in the CSD Board Policy manual at that time.

**Jane Doe Is Sexually Assaulted in Restroom by Male Classmate**

50.     On or about November 14, 2017, Jane Doe asked to be excused to use the restroom. While she was leaving the classroom, she heard a male kindergarten classmate, John Doe, also ask to be excused to use the restroom. He was permitted to leave the classroom at the same time as Jane Doe with no adult accompanying either student.

51.     There were two teachers in the classroom, but neither of them left the room to monitor the children's use of restrooms outside of the classroom, despite the fact that district personnel were aware and required to follow the Superintendent's directive that boys who say they identify as girls are to be permitted to use girls' privacy facilities, which meant that John Doe could enter the girls' bathroom with Jane Doe if he said that he identified as a girl.

52.     Plaintiff is informed and believes and based thereon alleges that administrative and teaching staff at Oakhurst Elementary School understood that John Doe identified as "gender-fluid," which meant that sometimes he identified as a boy and sometimes as a girl. Under the CSD revised policy John Doe would be permitted to use either the boys' bathroom or girls' bathroom, depending on how he identified.

19

53.     Plaintiff is informed and believes and based thereon alleges that John Doe had a record of disciplinary problems, including physically assaulting another student. Jane Doe told her mother that John Doe was often in trouble and had to go to the principal's office.

54.     Yet, when John Doe asked to leave the classroom to use the bathroom at the same time as did Jane Doe, neither of the adults who were aware of the bathroom policy directive and of John Doe's gender identification and behavioral history, accompanied him to ensure that he did not enter the girls' restroom and harass Jane Doe.

55.     John Doe did enter the girls' restroom with Jane Doe. As Jane Doe was exiting the stall John Doe pushed Jane Doe up against the stall wall, put his fingers in her vaginal area through her leggings penetrating her vagina. Jane Doe resisted and told John Doe to stop, that it hurt, but he continued to assault her.

56.     Jane Doe struggled to get away from John Doe. The bathroom was located next to the principal's office, but no one responded to the struggle. Jane Doe and John Doe returned to the classroom.

57.     On or about November 16, 2017, while at home Jane Doe told Ms. Thomas that she was experiencing discomfort in her private area and related to Ms.

20

Thomas what had happened in the bathroom. Ms. Thomas asked Jane Doe to show her where the boy had touched her, which Jane Doe did.  When Ms. Thomas asked Jane Doe whether she told anyone, Jane Doe began to cry and said that she didn't ask John Doe to come into the bathroom with her.

58.    On November 17, 2017, Ms. Thomas went with Jane Doe to Oakhurst Elementary School to report the incident. Ms. Thomas reported the incident to Nurse Dawn Durham and Counselor Laura Deming with Jane Doe present. Principal Marcia Fowler was not available at that time.

59.    At this time, Jane Doe told Nurse Durham and Counselor Deming directly that John Doe had come into the girl's bathroom at the same time she did, pushed Jane Doe up against the stall wall and put his finger in her vagina, and that it hurt. Nurse Durham, in particular, appeared to be distressed by what Jane Doe shared with them.

60.    When Ms. Thomas mentioned John Doe's name, Nurse Durham and Counselor Deming's eyes became wide and they looked at each and were seen and heard to whisper to each other "You know who they're talking about," suggesting that there some known issue concerning this student.

61.     Ms. Thomas met with school officials a second time on November 17, 2017, with Principal Fowler, CSD social worker Nicole Jefferson and Nurse Durham present.

62.     In that meeting, Ms. Thomas repeated what Jane Doe had described and that John Doe was the boy who had sexually assaulted Jane Doe.

63.     Ms. Thomas asked why the boy was in the girls' bathroom. No one responded. Instead, school officials said that Ms. Thomas' concern should be about Jane Doe and getting Jane Doe to the hospital.

64.     Ms. Thomas asked if there had been any problems with the boys' bathroom within the last week or anytime in the month of November, but the school officials said they could not say.

65.     Ms. Thomas asked why there was no teacher supervising the children in the bathroom, since there were two teachers in the classroom.  Counselor Deming said that teachers sometimes let the children go to the bathroom by themselves if only one student is going. School officials offered no answer when Ms. Thomas pointed out that there were two students who asked to use the bathroom when Jane Doe was assaulted, yet no teacher was sent to supervise.

66.    Ms. Thomas asked several times whether school officials would question John Doe, but school officials refused to respond to her questions, citing privacy concerns.

67.    Ms. Thomas asked school officials whether and what disciplinary action would be taken against the male student, but school officials again refused to provide any information, citing privacy concerns.

68.    Ms. Thomas specifically asked school officials to move John Doe to a different classroom because of concerns about Jane Doe's safety and mental health if her attacker was allowed to remain in the same classroom and able to again follow her into the girls' restroom without consequences. However, the school officials would not agree to move John Doe to another classroom. Nor would the school officials assure Ms. Thomas that John Doe would no longer be allowed in the girls' bathroom.

69.    The school officials appeared more fixated on the fact that Jane Doe could not be specific about whether the incident occurred on November 14 or 15 than on the facts of the assault.

70.    Ms. Thomas was not informed of her or her daughter's rights under Title IX nor directed to CSD's Title IX Compliance Officer.

71.     That day, Ms. Thomas took Jane Doe to be examined in the Emergency Room at Egleston Hospital, which is part of Children's Healthcare of Atlanta ("CHOA"). Jane Doe complained of pain in her vaginal area to the examining health provider and vaginal discharge was noted. Ms. Thomas was told that the examination revealed that there was redness and irritation in JANE DOE's vaginal area. The diagnosis entered upon discharge included child sexual abuse. Ms. Thomas reported her concerns regarding the school not wanting to acknowledge that something had happened and her fear that the boy would be allowed to remain in her daughter's classroom and to continue to use the girls' bathroom.  Hospital officials encouraged Ms. Thomas to request that school officials move the suspected perpetrator to another classroom (which she did).

72.     A caseworker for the Georgia Department of Family and Children Services (DFCS) came to the hospital and interviewed JANE DOE and her siblings outside the presence of Ms. Thomas.

73.     A DFCS caseworker came to the hospital because the day that Ms. Thomas and Jane Doe reported the sexual assault to school officials a CSD official (on information and belief, one of the officials that met with Ms. Thomas that day)

24

called DFCS and reported the sexual assault, and at the same time made a referral to DFCS concerning Ms. Thomas.

74.    Jane Doe recounted the sexual assault to the DFCS investigator at the hospital, just as she had to her mother and to the school nurse and school counselor, stating that a boy at school had placed his fingers into her vagina while they were in the girls' restroom.

75.    Medical providers at CHOA did not perform a forensic interview of JANE DOE.

76.    On November 17, 2017, a Decatur City police officer assigned as the school resource officer for Oakhurst Elementary School interviewed several school officials and prepared a police report regarding the incident. The police report recounted the facts of the incident from statements from Principal Fowler, Counselor Deming, and Nurse Durham. It stated that Jane Doe reported that a male classmate "had used his fingers and hands to make nonconsensual sexual contact with her, while they were inside the Girls Restroom ("114")." The police report cited no facts to contradict Jane Doe's outcry.

77.    The police report incorrectly stated that the incident occurred on November 10, 2017 based on a statement by Counselor Deming. Ms. Thomas alerted school officials to that error.

78.    According to the report, the police officer told Ms. Jefferson and Dr. Ratcliff that there would be no criminal prosecution of John Doe because of his age.

79.    As a result, the officer did not interview John Doe, the police did not arrange for a forensic interview of Jane Doe, and a thorough police investigation of the matter was not conducted. The officer later told Ms. Thomas that CSD officials said that they were going to handle the matter internally.

80.    When asked about the incident by the news media, the Decatur Police Department again said that they would not charge John Doe because of his age.

81.    Neither Ms. Jefferson nor Dr. Ratcliff contacted Ms. Thomas to coordinate services for Jane Doe.

82.    In fact, neither Principal Fowler, Dr. Dude, nor other CSD administrators contacted Ms. Thomas after the incident to check on the well-being of Jane Doe or to offer services, support, or any accommodations.

83.    At no point was Ms. Thomas ever informed of her or her daughter's rights under Title IX nor directed to CSD's Title IX Compliance Officer.

84.     Ms. Thomas was never contacted by CSD's Title IX Compliance Officer. Plaintiff was never informed, and has significant reason to believe, that CSD did not conduct an investigation of the sexual harassment of Jane Doe by John Doe as required by CSD Administrative Regulation 2.4 (b)(1).

85.     Principal Fowler told Ms. Thomas that she would not remove John Doe from Jane Doe's classroom and did not respond to Ms. Thomas' request for any other measures to protect Jane Doe from further assaults prior to the 2017 Thanksgiving break and did not contact Ms. Thomas during the break.

86.     Without any confirmation that measures were in place to separate Jane Doe from her attacker or keep him from entering the girls' restroom again, Oakhurst Elementary School was unsafe for Jane Doe and Ms. Thomas did not return her to school on November 27, 2017 when Thanksgiving break ended.

87.     Between November 27, 2017 and December 5, 2017 Ms. Thomas made numerous attempts to speak with Principal Fowler to discuss what steps would be taken to protect Jane Doe's safety. She was repeatedly told that Principal Fowler was not available and Principal Fowler did not return the calls.

88.     Since Oakhurst Elementary School remained unsafe for Jane Doe, Ms. Thomas did not return her to school while waiting to speak with Principal Fowler or anyone from CSD.

89.     Meanwhile, CSD officials sent social workers for the school district to the Thomas home. The social workers left a note in the door of the home telling Ms. Thomas to contact them. When Ms. Thomas called them, they stated that the school district was going to call DFCS who could have Ms. Thomas' children taken away from her because she was an unfit parent due to Jane Doe and her sister not being in school. Ms. Thomas felt she had little choice but to keep Jane Doe and her sister out of school because she had still not heard from anyone at CSD in response to her request for answers about what would be done to protect Jane Doe's safety.

90.     Ms. Thomas, an African-American single mom, felt deeply disturbed and intimidated by this threat.

91.     On December 5, 2017, Ms. Thomas finally spoke with Principal Fowler by phone. Ms. Thomas again asked about what protections would be put in place for her daughter but received no response. She again asked that JOHN DOE be moved to another classroom to be separated from Jane Doe. Principal Fowler refused to

respond to that request. Principal Fowler asked repeatedly what Ms. Thomas had said to DFCS.

92.     During the time that Ms. Thomas was trying to communicate with Principal Fowler, she also tried to speak to Bruce Roaden, who was in charge of student services at CSD. Ms. Thomas called several times and asked to meet with him, but he did not return her calls. Mr. Roaden never spoke with Ms. Thomas and no one from his department contacted her to follow up on the assault, offer counseling or offer other support services for Jane Doe.

93.     On December 6, 2017, Ms. Thomas went to the CSD administrative offices and asked to speak with Mr. Roaden and Dr. Dude about transferring her daughter from Oakhurst Elementary School to another school because her requests to move her daughter's attacker to another classroom or otherwise address Jane Doe's safety remained unanswered.

94.     Ms. Thomas was told that neither Mr. Roaden nor Dr. Dude were available. She asked for another time they would be available and was told she could not be given any time when they would be available to speak with her.  Instead, Dr. Dude's assistant handed Ms. Thomas a pad and pen and told her to write a note to Dr. Dude.

95.     Ms. Thomas wrote the following note to Dr. Dude:

Dr. David Dude:
I am requesting a transfer for my children [redacted] to another school
other than Oakhurst. I'm requesting a school in the downtown Decatur,
GA area because of the incident that happened to my child JANE DOE.
I tried to meet with Mr. Roaden after several calls with no response. I
requested to meet again today with him or with the Superintendent Dr.
David Dude but was told he also was in a meeting. I was given this pen
and pad not an official document to put my concerns on. So at this point
I have decided to take things a step further and also I'm putting this in
writing that I demand actions be taken ASAP to place my children in
another school as they have not been in school for almost two weeks
and are not being educated.
Sincerely, Pascha Thomas.

96.     Ms. Thomas gave this note to Dr. Dude's assistant, who stated she

would give it to Dr. Dude. Dr. Dude did not respond to Ms. Thomas' note.

97.     On December 7, 2017 Ms. Thomas called Oakhurst Elementary School

again. She was told that Principal Fowler was not available. Ms. Thomas told the

school secretary that the school was denying her daughter an education by refusing

to speak to her and resolve the safety issues. Ms. Thomas said that if Principal Fowler

did not call her back then Ms. Thomas would go to the news media. Principal Fowler

called her back and set up a meeting for December 8, 2017.

98.     Principal Fowler met with Ms. Thomas on December 8, 2017, along

with Assistant Principal Jean Jacque-Credi and CSD social worker Dr. Melvin

30

Ratcliff. Ms. Thomas was accompanied by an advocate in the community. Ms. Thomas again expressed concern about a boy being in her daughter's bathroom. At no point did any of the school officials deny that the boy had been in the bathroom or state that he should not have been there.

99.   By this time, Ms. Thomas had learned about the policy directive implemented in 2016 and asked about it. Principal Fowler stated the bathroom policy allowing boys who identified as girls into girls' bathrooms was a federal mandate under Title IX required by the Obama Administration. She said that the district had to allow any child to go to the bathroom of the gender they identified with.

100.   Ms. Thomas asked the school officials how it was that this boy was allowed in the girl's bathroom, particularly in light of the fact that it was next to the Principal's office. They responded by referring back to the Obama Administration mandate.

101.   Ms. Thomas demanded to know why she and other parents were not informed about this policy allowing biological boys into their daughters' bathrooms. She asked if the policy was stated in the Student Handbook. School officials said that it was not.  One official responded that "it was in the news."  Ms. Thomas stated

that was inadequate and that it was unacceptable for school officials to fail to notify

parents about a policy change that affected the safety and privacy of their children.

102.   Ms. Thomas asked whether John Doe or his parents had been

questioned.  The school officials responded "No, neither child was interviewed."

103.   Ms. Thomas reiterated her request that John Doe be removed from her

daughter's classroom to protect her daughter's safety.  The school officials refused

and again cited concerns about John Doe's privacy.

104.   Ms. Thomas asked that other parents be notified that a sexual assault

had occurred at the school. School officials stated they would not do that.

105.   Ms. Thomas asked if the District office was aware of the assault. The

school officials confirmed that officials in the District central office were aware of

the incident.

106.   After repeated urging from Ms. Thomas that Jane Doe be separated

from her assailant, John Doe, Principal Fowler agreed to move Jane Doe to a

different classroom.

107.   Jane Doe cried when she learned she had to be moved. This was a

further disruption in Jane Doe's first year of education in that she would be required

to return to a different classroom with different classmates, a different teacher (from

the one she had grown to love) and different routine after already being the victim of the assault.

108.   Pursuant to the school district's report of Ms. Thomas, DFCS investigated the Thomas home, interviewed the other children, and questioned other family members and friends.

109.   Ms. Thomas learned from the DFCS caseworker that there had not been an investigation of John Doe's home.

110.   In fact, the DFCS documents make clear that DFCS never conducted an investigation of Jane Doe's sexual assault by John Doe. This is not unexpected because DFCS has no authority to hold school districts accountable for student-on-student assaults; but rather, DFCS's mandate and jurisdiction is over parents and guardians where there are suspicions of abuse or neglect of a child in their custody.

111.   The only actual investigation conducted by DFCS was concerning the school district's allegations against Ms. Thomas concerning her financial ability to care for her family's needs.

112.   On January 3, 2018, DFCS sent a letter to Ms. Thomas indicating that the allegations brought by CSD staff regarding Ms. Thomas' ability to care for her children were unsubstantiated. In the documents created during the investigation,

DFCS officials stated that Ms. Thomas had responded appropriately to Jane Doe's report of the sexual assault by taking Jane Doe to the hospital to be examined and by requesting that John Doe be removed from the classroom.

## Defendants Deny Sexual Assault Happened

113.   Although no forensic interview had been done, no one had interviewed the male student, the police had not conducted a thorough criminal investigation, DFCS had not investigated the assault, and no one in CSD administration had contacted Ms. Thomas about any investigation, Principal Fowler issued the following Oakhurst Safety Update in January 2018:

> Oakhurst Families:
>
> It has come to my attention that a rumor is circulating about an alleged incident at Oakhurst Elementary. The rumor purports that one student assaulted another student in a restroom this fall. Although an incident was alleged, a thorough investigation involving Oakhurst administrators, central office staff, law enforcement and social service agencies led us to confidently determine that the allegation was unfounded.
>
> I can imagine how alarming such a rumor would be to anyone who might have heard it or for those of you who are hearing this now for the first time. I can assure you that we have a strong plan in place that keeps our students' safety as top priority. If you have any questions or concerns, please contact me directly.

114.   On November 29, 2017, a parent of a CSD student asked Dr. Dude via email about a report of a sexual assault in a bathroom at Oakhurst Elementary

School. Dr. Dude apparently knew about the assault and responded that the rumor was not true.

115.   On January 6, 2018, that same parent emailed Dr. Dude and said "Is it not true that on November 17, 2017 at 9:15 a.m. Decatur Police Department filed a report on a sexual assault that occurred in a girls' restroom at Oakhurst Elementary Decatur Georgia. A young boy who attends Oakhurst with access to the girls' restroom attacked a 5 year old girl. Please advise me if this is true. Thank you very much a concerned Father of a little girl who attends Decatur schools."

116.   Later that day, Dr. Dude responded, "I'm not aware of any such report but you could check with the police department on that. As you likely know, a police report doesn't indicate anything actually occurred, only that someone chose to claim it did. As I shared previously, the rumors you referenced regarding an assault are untrue."  The parent replied, "So are you denying an incident occurred at all?" The parent received no further response from Dr. Dude.

117.   Dr. Dude has never spoken to or met with Ms. Thomas. Neither has the Title IX Compliance Officer or student services director.

118.   After the assault Jane Doe returned to Oakhurst Elementary having to re-start her kindergarten program in a new classroom with new classmates and a new

teacher. School officials had not changed the privacy facilities policy, even as to John Doe, refused to remove John Doe from the classroom, and did not otherwise offer to help Jane Doe. On top of that, Principal Fowler publicly denied the sexual assault occurred and Dr. Dude echoed the same denial, actually calling it an "unfounded rumor" to other parents.

119.   Even with a new classroom assignment, Oakhurst Elementary was not a safe learning environment for Jane Doe who was still encountering her attacker in the halls. Also, since the school refused to modify the bathroom policy to prevent John Doe from re-entering the girls' bathroom again, Jane Doe still faced the possibility of another assault. Jane Doe was being denied the benefits of a safe and effective education.

120.   Because Jane Doe was still being denied a safe educational environment, Ms. Thomas was left with no choice but to request that her daughter, (and her sister who also attended Oakhurst Elementary) be transferred. Ms. Thomas was told only Superintendent Dude could approve the transfer.

121.   On January 8, 2018, Jane Doe and her sister (who was in the second grade) were transferred to Winona Park Elementary School. Because of CSD officials' deliberate indifference to the foreseeable injuries caused by abandoning

sex-separate privacy facilities and their refusal to appropriately respond, Jane Doe suffered a third disruption in her educational program in less than three months. It is well established that continuity of learning is critical at all ages, but this is particularly true at the earliest years when a student is adjusting to the public education system.

122.   Since the assault in November 2017, Jane Doe has suffered nightmares and other symptoms of emotional distress. At times she cries in her sleep and can be heard saying "stop, stop."  Jane Doe has also said several times that she "doesn't want someone to touch 'her hole'." Jane Doe's sister also experienced distress over having to be moved. Jane Doe felt she was to blame for their sense of dislocation, as she and her sister were the ones to be disrupted after Jane Doe reported what another student did to her.

123.   On January 23, 2018, Jane Doe underwent a forensic evaluation with a trained psychologist at the Medlin Clinic. During the interview, Jane Doe recounted the same events involving John Doe in the school bathroom. The forensic interviewer concluded that the results of the testing were consistent with a sexual assault.

124.   On May 23, 2018, Ms. Thomas filed a complaint with the Office of Civil Rights of the Department of Education on behalf of Jane Doe alleging violations of Title IX. The Department opened an investigation which is ongoing.

125.   The Board proceeded to add the change to the District policy to the Board Policy manual in December 2018, over a year after Jane Doe was assaulted.

## FIRST CAUSE OF ACTION

## VIOLATION OF TITLE IX (20 U.S.C. § 1681, et seq.)

## (Deliberate Indifference to Sexual Harassment / Hostile Sex Environment)

## (Against Defendant CSD)

126.   Plaintiff incorporates all of the preceding allegations by reference as if set forth in full.

127.   Title IX of the Education Amendments of 1972 provides, with limited exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

128.   Title IX damages liability arises against a Title IX recipient when school officials with authority to take corrective action are deliberately indifferent

to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school. The "deliberate indifference" must, at minimum, cause students to undergo harassment or make them "vulnerable" to it.

129.   CSD is a recipient of federal financial assistance for purposes of Title IX.

### Deliberate Indifference Prior to the Assault

130.   CSD officials with authority to take corrective action, in particular the CSD Board and Superintendent Dude, and with prior knowledge, were deliberately indifferent to exposing and causing Jane Doe to undergo sexual harassment and to the creation of an unsafe, sexually hostile environment that was severe, pervasive, and objectively offensive, in violation of Title IX in a variety of ways, including as follows:

a.   By adopting a policy directive that permitted biological boys (who psychologically identify as girls) to enter girls' restrooms, locker rooms, and other privacy facilities, CSD deprived Jane Doe of her

constitutionally protected right to bodily privacy, and created an unsafe and sexually hostile environment for Jane Doe.

b.  By adopting and reaffirming a privacy facilities policy, and leaving the policy unchanged, after being warned by parents, parents' counsel, and community members that the policy would violate students' rights to bodily privacy, create the foreseeable risk of harassment, and create an unsafe, intimidating, and hostile sex environment for girls in particular, such as Jane Doe, and, which in fact, directly and foreseeably resulted in the sexual assault of Jane Doe.

c.  By failing to put in place any safeguards to mitigate against the very concerns for girls' safety and bodily privacy raised by parent, parents' counsel, and members of the community, CSD acted with deliberate indifference and subjected Jane Doe to sexual harassment and to a sexually hostile environment.

d.  By allowing a biological boy, known to identify a "gender fluid" and known to have a prior history of disciplinary problems and violent behavior, to enter the girls' restroom with Jane Doe without adult

supervision, subjecting Jane Doe to sexual harassment, and creating an

unsafe sexually hostile environment.

e.  Defendants' failure to properly monitor John Doe's use of the restroom

at the same time as Jane Doe when Defendants were forewarned that

the policy of permitting boys who self-identify as girls to use girls'

restrooms posed a risk to the privacy and safety of young girls;

f.  Defendants' failure to properly monitor John Doe's use of the restroom

at the same time as Jane Doe when Defendants were aware that John

Doe had a record of disciplinary problems, including physical assault,

and that under the CSD policy John Doe could access the girls'

restroom if he said he identified as a girl;

g.  Defendants' failure to impose any disciplinary consequences against

John Doe for entering into the girls' bathroom and thereby having

access to Jane Doe and failing to inform the victim's parent.

**Deliberate Indifference After the Assault**

131.   Officials with authority to take corrective measures in response to the

student-on-student sexual harassment in CSD and Oakhurst Elementary School, Dr.

David Dude, and Principal Marcia Fowler in particular, acted with deliberate

indifference to the severe, pervasive and objectively offensive sexual harassment that Jane Doe suffered and that she and her mother reported to CSD officials.

132.   Upon being notified of the sexual assault that 5-year-old Jane Doe suffered at the hands of class-mate John Doe, who was permitted to enter the girls' restroom unaccompanied by an adult, despite a history of disciplinary problems, and as a direct result of CSD's policy, the actions and inaction of CSD officials constituted sex discrimination and deliberate indifference to sex discrimination by failing to conduct an impartial, reliable, and adequate investigation of the sexual assault, including as follows:

a.  Failing to interview John Doe or his parents;

b.  Failing to remove John Doe from the classroom he shared with Jane Doe while they conducted an investigation;

c.  Failing to report the incident to the Title IX Compliance Officer for further investigation;

d.  Failing to otherwise meaningfully investigate the assault in order to determine what actually occurred and its impact on Jane Doe;

  e. Telling parents and the public that they had conducted a thorough investigation of the allegations when no such investigation was conducted;

133. Defendants were recklessly and deliberately indifferent to the known sexual assault of Jane Doe and subjected her to further discrimination that was severe, pervasive, and objectively offense in that their response to the harassment, and lack thereof, was clearly unreasonable in light of the known circumstances, including as follows:

  a. Defendants' refusal to move John Doe to another classroom to provide a safe classroom environment for Jane Doe;

  b. Defendants' refusal to respond to Ms. Thomas' repeated requests for information on what disciplinary actions Defendants would take concerning John Doe;

  c. Defendants' refusal to respond to Ms. Thomas' repeated requests for information concerning measures that Defendants would take to protect her daughter from further harassment by John Doe;

d.  Defendants' refusal to take any action to prevent John Doe from entering the girls' restroom at the same time as Jane Doe and commit another sexual battery;

e.  Defendants' refusal to follow up with Ms. Thomas to offer services and support for Jane Doe to ensure her return to a safe school environment;

f.  Defendants' failure to respond to Ms. Thomas' request for timely return phone calls and a meeting to discuss the safety of her daughter thereby delaying her daughter's return to school;

g.  Defendants' failure to provide safety measures to keep Jane Doe separate from John Doe, except to move the victim to another classroom at the insistence to her parent when left with no other option;

h.  Defendants making a referral against Ms. Thomas, an African-American single mother, to DFCS;

i.  Defendant Dude's refusal to even speak to or meet with Ms. Thomas to investigate the incident, respond to her questions and concerns, inquire about Jane Doe's well-being, offer services or assistance, put safety measures in place, respond to her request for a transfer, or provide Ms. Thomas even the most basics of common courtesy;

j.  Defendants' failure to inform Ms. Thomas of her rights under Title IX, including her right to file a complaint for sexual harassment on behalf of her daughter, or provide contact information for the district's Title IX Compliance Officer;

k.  Defendants' failure to report the incident to the district's Title IX Compliance Officer;

l.  Defendants' failure to re-examine the bathroom access policy which permitted an unescorted 5-year-old biological boy (regardless of subjective identification) to enter into a girls' bathroom and assault a 5-year-old girl;

m.  Defendants' unreasonable delay in approving Ms. Thomas' request for a transfer from an unsafe school.

n.  Defendants' twice disrupting Jane Doe's learning environment, at a critical early learning stage, by transferring her to a different classroom and then both Jane Doe and her sister to a different school, rather than removing her assailant from the classroom, at least pending a legitimate investigation.

o.  Defendants' misrepresentation to parents that they had conducted a thorough investigation of the incident when no such investigation was conducted;

p.  Defendants' telling parents and the public that the sexual assault was an unfounded rumor.

134.   At all relevant times CSD, the Board, and Superintendent Dude, exercised substantial control and authority over the policy directive that exposed Jane Doe to sexual assault and a hostile sex environment despite being repeatedly, amply, and loudly warned, yet wholly failed to take any action to rescind or make appropriate changes to the policy or to put in place measures to mitigate against the risks it posed.

135.   At all relevant times CSD, Superintendent Dude, and Principal Fowler exercised substantial control over the sexual harasser, John Doe, who was a student enrolled in CSD, yet wholly failed to take any action to prevent the initial harassment and further sexual harassment.

136.   At all relevant times, CSD, Superintendent Dude, and Principal Fowler exercised substantial control over the response, and lack of response, to Jane Doe's report of being sexually assault at school.

137.   The sexual harassment of Jane Doe consisting of digital penetration of her vagina while held against a bathroom stall by a male classmate who was permitted to enter the girls' bathroom unsupervised as a direct consequence of the District's bathroom access policy was so severe, pervasive and objectively offensive that it deprived her of equal access to the educational opportunities and benefits provided by Defendant CSD.

138.   This single incident of actual physical penetration of the genitals of a 5-year-old girl by a male classmate who was permitted to enter into the private space of a girls' bathroom by the District policy was sufficiently severe to create a hostile sex environment under Title IX. *U.S. Department of Education, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, Or Third Parties Title IX.*

139.   A single act of physical touching or penetration of the genitals of a minor under the age of sixteen is severe and objectively offensive in that it constitutes a felony under Georgia law. "A person commits the offense of sexual battery when he or she intentionally makes physical contact with the intimate parts of the body of another person without the consent of that person." "A person

convicted of the offense of sexual battery against any child under the age of 16 years shall be guilty of a felony...." Official Code of Ga. Ann. § 16-6-22.1(d).

140.   Moreover, the many deliberately indifferent actions, and inactions, of CSD and Defendants' Dude and Fowler in response to the report of this sexual assault were so severe, pervasive, and objectively offensive that it additionally deprived Jane Doe of equal access to the educational opportunities and benefits provided by CSD.

141.   Defendants' grossly inadequate and deliberately indifferent response to the sex harassment, discrimination, and hostile environment effectively barred Jane Doe's access to CSD's educational opportunities and benefits, in that:

  a.  Defendants' refusal to remove John Doe from Jane Doe's classroom following the assault made Oakhurst Elementary School an unsafe environment for Jane Doe to return to after Thanksgiving break, thus depriving her of her right to learn in a safe environment;

  b.  Defendants' refusal to meet with or even respond to telephone calls from Ms. Thomas until threatened with exposure in the press, depriving Jane Doe of any educational services for nearly two weeks as she had

no alternative available to returning to an unsafe classroom environment;

c. Defendants' refusal to take any measures to prevent John Doe from accessing the girls' restroom deprived Jane Doe of her right to a safe educational environment in her kindergarten classroom;

d. Defendants' refusal to take any measure except to move Jane Doe, the victim, effectively deprived Jane Doe of the ability to continue her education at Oakhurst Elementary School, compounding the stress she suffered from the Assault by depriving Jane Doe of the benefits of continuity in classroom, classmates, teacher, and instructional environment for her kindergarten year abruptly after a traumatic event.

e. Defendants' refusal to meaningfully investigate the assault of Jane Doe, misrepresentation to Oakhurst Elementary School parents that an investigation had been conducted and that Jane Doe's assault was an unfounded rumor deprived Jane Doe of her right to a safe educational environment in Oakhurst Elementary School where her safety had been wholly dismissed and disregarded and she still faced the risk of encountering her assailant who had faced no disciplinary action or other

consequences for his conduct and thereby posed a continuing risk to Jane Doe;

142.   As a direct and proximate result of Defendants' deliberate indifference to the severe, pervasive and objectively offensive sexual harassment suffered by Jane Doe, she has suffered physical and psychological trauma, educational disruption, and emotional distress.  Jane Doe was excluded from participating in and denied the benefits of Defendant School Board's education program as a further result of its deliberate indifference to the sexual harassment she suffered.

## COUNT II

## VIOLATION OF TITLE IX (20 U.S.C. §§ 1681, *et seq.*)

## (Retaliation under Title IX)

## (Against Defendant CSD)

143.   Plaintiff incorporates all of the preceding allegations by reference as if set forth in full.

144.   Defendants were recklessly and deliberately indifferent to a known sexual assault of Jane Doe and subjected her to further discrimination that was severe, pervasive, and objectively offense in violation of Title IX by retaliating against Plaintiff for reporting the sexual assault and harassment of Jane Doe by:

a.  Failing to refer her complaint for investigation by the CSD Title IX Compliance Officer;

b.  Failing to tell Ms. Thomas about her rights under state law, CSD board policy and Title IX;

c.  Failing to protect Jane Doe from further harassment by John Doe;

d.  Failing to contact Ms. Thomas and provide her and Jane Doe with proposed safety measures to prevent further harassment, support services, counseling, or medical follow up treatment;

e.  Threatening to report Ms. Thomas to DFCS when she kept Jane Doe and her sister out of school due to Defendant's deliberate indifference to the sexual assault endured by her daughter.

f.  Making an unfounded referral to DFCS when Ms. Thomas reported Jane Doe's sexual assault to school officials, resulting in Ms. Thomas and her family being investigated;

g.  Failing to timely transfer Jane Doe to another school with a safer environment away from John Doe when requested;

h.  Failing to comply with other responsibilities as mandated by Title IX.

145.   As a direct and proximate result of Defendants' retaliatory actions, Plaintiff has suffered physical and psychological trauma, emotional distress, and educational disruption.  Plaintiff was excluded from participating in and denied the benefits of Defendant CSD Board's education program as a further result of its retaliatory conduct.

## COUNT III

## VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983

## (Violation of the Right to Equal Protection)

## (Against all Defendants)

146.   Plaintiff incorporates all of the preceding allegations by reference as if set forth in full.

147.   Beginning in July 2016, CSD Superintendent Dude, with the knowledge and approval of the CSD Board, issued and began implementing its privacy facility access directive to permit boys who self-identified as girls to use girls' privacy facilities, and vice versa.

148.   On September 18, 2017 and again on October 10, 2017, the Board explicitly in writing and verbally during its public board meeting ratified the policy

of permitting boys who self-identify as girls to use girls' privacy facilities, and vice versa.

149.   At the Board meeting on October 10, 2017 and in written correspondence prior to the meeting, the CSD Board and Superintendent were informed that the policy permitting boys who self-identify as girls to use girls' privacy facilities and vice versa posed threats to the privacy, safety, and Title IX rights of students, particularly young girls and that these concerns should be addressed. The Board and Superintendent were specifically warned by a former Chairman of the Georgia Board of Prisons and Parole that the policy could be used by "mischievous boys" to young girls for inappropriate purposes.

150.   Despite these parental, and their counsels', objections and warnings, the Board ratified the policy on October 10, 2017.

151.   Approximately one month later, a boy with a history of disciplinary problems including assault was permitted to follow Jane Doe into the girls' bathroom unaccompanied by teachers who had been directed that boys who self-identify as girls can use the girls' restroom and, as the Board and Superintendent Dude were forewarned, the boy sexually assaulted Jane Doe.

152.   The Equal Protection Clause in the 14th Amendment to the United States Constitution confers a federal constitutional right to be free from sex discrimination.

153.   Under 42 U.S.C. § 1983, either an individual state official or a state entity may be held liable if the sexual harassment resulted from the state entity's policy, practice, or the actions of an official fairly deemed to represent government policy, and the state entity or official acted with deliberate indifference, resulting in the deprivation of this constitutional right.

154.   Jane Doe's constitutionally protected right to be free from sexual harassment at school, and particularly in girls-only privacy facilities, was violated as the plainly obvious consequence of the District's policy.

155.   CSD and Dr. Dude deliberately disregarded the obvious and fore-warned consequence of the policy and as a result Plaintiff suffered a severe and objectively offensive deprivation of her constitutional rights.

156.   Defendants Dr. Dude's and Marcia Fowler's discriminatory actions after Ms. Thomas reported the sexual assault additionally violated Plaintiff's clearly established legal rights protecting her against sex discrimination and were done with reckless disregard of the Plaintiff's federally protected civil rights.

157.   Dr. Dude was aware that the Obama Guidance regarding Title IX had been rescinded in February 2017. Yet Dr. Dude continued to instruct CSD staff that opening girls' privacy facilities to boys who self-identified as girls was mandated by the "Obama policy".

158.   Dr. Dude and Principal Fowler, as experienced educators with training in sexual harassment prevention and Title IX, could not reasonably believe that doing nothing in response to the sexual harassment of Jane Doe was lawful.

159.   At the time of Jane Doe's sexual assault, Dr. Dude and Principal Fowler would have understood that deliberate indifference to sexual harassment of one student by another student, particularly where the District's policy played a significant role in exposing Jane Doe to the sexual harassment, violated Jane Doe's Equal Protection rights.

160.   Despite clearly established law to the contrary, CSD, Dr. Dude and Principal Fowler acted and failed to act in the manner set forth above, displaying deliberate indifference to the sexual harassment of Jane Doe resulting from the implementation of the CSD policy permitting boys to access girls' privacy facilities if they self-identified as a girl and from their actions and inactions following the assault.

161.   As a direct and proximate result of Defendants' actions and inactions and violations of Plaintiff's clearly established constitutional rights, Plaintiff sustained and continues to sustain injuries, including emotional distress, psychological trauma, and academic harms, for which she is entitled to be compensated.

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against all Defendants on all counts as follows:

1)  Compensatory damages for Plaintiff's physical, psychological and emotional distress, and loss of educational opportunities and benefits in an amount to be proven at trial;

2)  Interest on damages at the full legal amount allowed by law;

3)  Costs;

4)  Reasonable attorneys' fees pursuant to 42 U.S.C. § 1985; and

5)  Such other and further relief, including equitable relief, that this Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury.

Dated May <u>29</u>, 2020.

<u>s/  Vernadette R. Broyles</u>
Vernadette R. Broyles (GA Bar No. 593026)
Joel Thornton (GA Bar No. 640343)
Mary E. McAlister (VA Bar No. 76057)*
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
vbroyles@childparentrights.org
jthornton@childparentrights.org
mmcalister@childparentrights.org
*pro hac vice application pending

<u>Verification</u>

I declare under penalty of perjury, pursuant to 28 U.S.C Section 1746, that I have

read the foregoing Verified Complaint, and the factual allegations thereof, and that

to the best of my knowledge the facts alleged therein are true and correct.

Executed this _____26_ day of May, 2020

Pascha Thomas, as parent and next friend of Jane Doe, Plaintiff