# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

PASCHA THOMAS, as guardian of
Jane Doe, a minor, as next friend,
Jane Doe,

      Plaintiff,

v.

CITY SCHOOLS OF DECATUR,
DR. DAVID DUDE, individually and
in his official capacity, and MARCIA
FOWLER, individually and in her
official capacity,

      Defendants.

CIVIL ACTION FILE

NO. 1:20-CV-2317-MHC

## ORDER

This lawsuit is brought by Plaintiff Pascha Thomas ("Thomas") on behalf of

her five-year-old daughter, Jane Doe, against Defendants City Schools of Decatur

("CSD"), CSD Superintendent Dr. David Dude ("Dude"), and Oakhurst

Elementary School principal Marcia Fowler ("Fowler") (collectively,

"Defendants"), based on alleged violations of Title IX of the Education

Amendments Act of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"), and violations of

Jane Doe's equal protection rights under 42 U.S.C. § 1983.  See First Am. Compl.

[Doc. 17]. Specifically, Thomas brings Title IX deliberate indifference (Count I) and retaliation (Count II) claims against CSD, and a claim under 42 U.S.C. § 1983 (Count III) based on violations of Jane Doe's equal protection rights against all Defendants. Id. ¶¶ 148-86.

The case comes before this Court on Defendants' Motion to Dismiss First Amended Complaint ("Mot. to Dismiss") [Doc. 22] pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## I.   BACKGROUND[1]

### A.   The Policy[2]

---

[1] Because this case is before the Court on a motion to dismiss, the facts are presented as alleged in the Complaint. Silberman v. Miami Dade Transit, 927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

[2] Portions of the First Amended Complaint contain allegations which are more in the nature of a political discussion about the merits of gender identity educational policies than about the relevant facts in this case. See, e.g., First Am. Compl. ¶¶ 15-16, 32-33, 38. Other portions of the First Amended Complaint discuss purported violations of Georgia's open meetings law committed by public officials. See, e.g., id. ¶¶ 19-25. In ruling on Defendants' Motion to Dismiss, this Court appropriately limits its review to the relevant facts and the applicable law and leaves discussion about the merits of policy to other branches of government and alleged state law violations that have not been raised as additional claims to the Georgia state courts.

On July 25, 2016, Dude informed the CSD Board of Education (the "Board") in a series of private e-mails of his intention to issue a directive to CSD staff that would revise the existing sex-separate bathroom policy to permit children to access certain private facilities such as bathrooms, "on the basis of a self-proclaimed 'gender identity'" (the "Policy").  First Am. Compl. ¶ 18.  According to the First Amended Complaint, "[t]he directive would not require any legal documentation or other proof of medical transition to another gender identity, but merely a statement by a child."  Id.  The Board "privately affirmed, or acquiesced" to Dude's action without notice to the public, and the Policy was in effect at the start of the 2016-17 school year.  Id. ¶¶ 23-24, 26, 31.

The First Amended Complaint alleges that the first time CSD parents became aware of the Policy was from a Facebook posting by Dude on February 27, 2017.  Id. ¶¶ 35-36.  On May 24, 2017, CSD parents attended a meeting with members of a CSD "Equal Opportunity Task Force" and expressed concerns that the Policy created risks to student privacy and safety.  Id. ¶¶ 37-38.  Parents continued to voice their concerns about the Policy to Dude and the Board through letters and other meetings, including at Board meetings conducted on September 12 and October 10, 2017.  Id. ¶¶ 40-43, 46.  Following these Board meetings, the Board members issued statements supportive of Dude but indicating they would

3

continue to gather input from the community and would "consider potential changes [to the Policy] in order to further our goal of ensuring that all students feel safe, supported, and valued." Id. ¶¶ 44, 48.

**B.    The Incident**

Jane Doe began attending kindergarten at Oakhurst Elementary School ("Oakhurst"), a part of CSD, in the fall semester of 2017. Id. ¶ 52. John Doe was assigned to the same kindergarten classroom as Jane Doe. Id. ¶ 55. Thomas alleges that "administrative and teaching staff at [Oakhurst] understood that John Doe sometimes dressed and identified as a boy and sometimes as a girl." Id. ¶ 58. She further alleges that "John Doe had a record of disciplinary problems, including physically assaulting another student," and often had to go to the principal's office. Id. ¶ 59.

On or about November 14, 2017, Jane Doe asked to be excused from the classroom to use the bathroom. Id. ¶ 56. John Doe was permitted to leave the classroom at the same time, and no adult accompanied either child to the bathroom. Id. ¶ 57. As Jane Doe exited one of the stalls in the girls' bathroom, John Doe pushed Jane Doe up against the stall wall, and digitally penetrated her vagina through her leggings (hereinafter referred to as the "Incident"). Id. ¶ 62. Jane Doe resisted and told John Doe that it hurt and to stop, but he continued to assault her

4

before they both returned to the classroom.  Id. ¶¶ 62-63.  On or about November 16, 2017, while at home, Jane Doe told Thomas that she was experiencing discomfort in her private area and related what happened in the girls' bathroom. Id. ¶ 64.

On November 17, 2017, Thomas went with Jane Doe to Oakhurst to report the Incident ("Thomas's Report").  Id. ¶ 65.  Thomas reported the Incident to the school's nurse and counselor, and the Oakhurst instructional coach, but Fowler was not available at that time.  Id.  Jane Doe recounted the Incident to the nurse and counselor.  Id. ¶ 66.  The nurse and counselor appeared to indicate by their facial expressions that there was some known issue regarding John Doe.  Id. ¶ 67. Thomas met with school officials a second time on November 17, 2017, this time with Fowler, a CSD social worker, and the school's nurse.  Id. ¶ 68.  Thomas repeated the Incident as Jane Doe had described it.  Id. ¶ 69.  Thomas asked if there had been any problems with the boys' bathroom, "but the school officials said they could not say."  Id. ¶ 71.  Thomas also asked what disciplinary action would be taken, "but school officials again refused to provide any information."  Id. ¶ 74. Thomas requested for the first time that school officials move John Doe to a different classroom, but her request was denied.  Id. ¶ 75.  A CSD social worker

then made a referral of the case to the Georgia Department of Family and Children Services ("DFCS"). Id. ¶ 80.

On the same day, Thomas took Jane Doe to the hospital and was told that the examination revealed there was redness and irritation in Jane Doe's vaginal area. Id. ¶ 78. The diagnosis entered upon discharge included child sexual abuse. Id. A DFCS caseworker met Thomas at the hospital and interviewed Jane Doe outside the presence of Thomas. Id. ¶¶ 79-80. A City of Decatur police officer also came to Oakhurst, conducted interviews with some of the Oakhurst personnel, and prepared a report that a male classmate "had used his fingers and hands to make nonconsensual sexual contact" with Jane Doe. Id. ¶ 86. Because of John Doe's age, he was not charged with any criminal conduct. Id. ¶ 87.

Neither the social workers, Dude, nor other CSD administrators contacted Thomas to coordinate services for Jane Doe, check on her well-being, or offer support or any other accommodation. Id. ¶¶ 89-90. Thomas did not return Jane Doe to school after the Thanksgiving Break. Id. ¶¶ 92-93. During this time, Thomas tried to contact Fowler, but Fowler was unavailable and never returned her calls. Id. ¶ 93. CSD sent social workers to Thomas's house who thereafter informed Thomas that if Jane Doe was not returned to school, CSD could contact DFCS, "who could have [Thomas's] children taken away." Id. ¶ 94.

On December 5, 2017, Thomas spoke with Fowler by phone, again asking for John Doe to be moved to another classroom, but Fowler refused to respond to the request. Id. ¶ 98. That same day, John Doe's father reported to the assistant principal that John Doe did not feel safe using the boys' bathroom because of an earlier occasion (prior to the Incident) where he was bullied when in the boys' bathroom. Id. ¶ 99.

On December 6, 2017, Thomas attempted to speak with Dude about transferring Jane Doe to a different school because her requests for John Doe to be moved to another classroom remained unanswered. Id. ¶ 102. Thomas wrote a note to Dude, which she gave to his assistant, but Thomas did not receive a response. Id. ¶¶ 104-05. On December 7, 2017, Thomas called Oakhurst and was again told that Fowler was unavailable. Id. ¶ 106.

On December 8, 2017, Thomas met with Fowler in person, again requesting that John Doe be removed from Jane Doe's classroom, but the school officials refused, citing concerns for John Doe's privacy. Id. ¶¶ 107, 112. However, after repeated urging, Fowler agreed to move Jane Doe to a different classroom. Id. ¶ 115. Thomas was not informed of her or Jane Doe's rights under Title IX at any point, nor given contact information for CSD's Title IX Compliance Officer. Id.

¶ 117. Jane Doe was transferred to a different school on January 8, 2018. Id.

¶ 136.

### C.     OCR Findings[3]

On May 23, 2018, Thomas filed a complaint on behalf of Jane Doe with the

Department of Education's Office of Civil Rights ("OCR") alleging violations of

Title IX. Id. ¶ 139. According to the OCR Report issued on June 19, 2020, OCR

investigators were tasked with determining whether CSD "failed to provide a

prompt and equitable response to a report" of sexual assault and whether CSD

retaliated against Thomas for making the report. OCR Report at 2. The OCR

Report includes the following factual determinations:

- Immediately after Thomas's Report was made to the school, the
  nurse, counselor, and instructional coach briefed Fowler, and each
  completed a written statement regarding Thomas's Report. Id. at 5.
  Fowler notified CSD's executive director of Thomas's Report. Id.

---

[3] Generally, the district court must convert a motion to dismiss into a motion for
summary judgment if it considers materials outside the complaint. FED. R. CIV. P.
12(d); Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005). "However, the district
court may always consider exhibits attached to the complaint on a 12(b)(6) motion,
because exhibits are part of the pleadings." Basson v. Mortg. Elec. Registration
Sys., Inc., 741 F. App'x 770, 770-71 (11th Cir. 2018) (citing FED. R. CIV. P. 10(c);
Thaeter v. Palm Beach Cnty. Sheriff's Office, 449 F.3d 1342, 1352 (11th Cir.
2006)). Here, Thomas attached to the First Amended Complaint the OCR
Complaint No. 04-18-1576 Letter of Findings (the "OCR Report") [Doc. 17-1].
The Court also notes that Defendants do not challenge the authenticity of this
attachment.

- After the executive director was notified, CSD dispatched social workers who reported to the school. Id. CSD's safety resource officer ("SRO") also reported to the school and obtained the written statements of the nurse, counselor and instructional coach which "memorialized" Thomas's Report. Id. The SRO obtained further information to complete an Offense/Incident Report documenting Thomas's Report as well as the Incident as described by school officials. Id.

- Fowler interviewed the teacher and paraprofessional who were working in Jane Doe's classroom on the day of the Incident. Id. They stated that when John Doe went to the bathroom outside of group break times, "he never went without supervision because of his potential for behavior disruption." Id. at 5-6.

- The social workers continued their investigation and completed "mandated reporter forms" for both Jane Doe and John Doe. Id. at 6. At some point, the matter was referred to DFCS. Id. OCR noted, "The Complainant acknowledges that, notwithstanding her assertion that [Thomas] was identified on the DFCS form as a 'responsible party,' DFCS did not investigate [Thomas]'s responsibility for the alleged sexual assault." Id. at 6 & n.7.

- Fowler reported that, given the nature of the allegation, the school's practice was not to interview the children but to notify CSD's central office, which would involve social workers to assess and complete referrals as appropriate. Id. at 6.

- Thomas was encouraged by school staff to take Jane Doe to the hospital to be examined. Id.

- The DFCS case manager visited Jane Doe in the hospital, was informed that the hospital "didn't find anything," believed that Jane Doe and her siblings were "very well coached," and did not believe the Incident happened; however, other than being informed that

DFCS had "screened out the referral" for John Doe, none of the specifics about the DFCS investigation were communicated to Fowler. Id. at 7 & nn.9-10 ("Generally . . . the only information DFCS will share with the school is whether the referral was accepted for investigation and, at most, whether DCFS is providing services to the family.").

- CSD presented no evidence that it obtained information regarding the outcome of the DFCS investigation. Id. at 7 n.10.

- On December 5, 2017, John Doe's father e-mailed the assistant principal, copying Fowler, which memorialized a phone conversation he had with the assistant principal earlier the same day. John Doe's father related that he shared information regarding prior incidents involving John Doe that John Doe revealed to his parents on December 2, 2017. Specifically, John Doe reported that (1) "he wanted to use the girls' bathroom because he did not feel safe using the boys' bathroom"; (2) on one occasion "in the boys' bathroom, two students from his class told him he had a vagina and pulled down his pants"; and (3) on another occasion in the girls' bathroom, a girl "told [John Doe] that he was not supposed to be in the girls' bathroom and grabbed 'the crotch of his pants.'" Id. at 10.

- John Doe's father stated that he thought these occasions may have preceded the Incident, and that John Doe may have been "acting out things that are happening to him." Id.

- CSD did not provide evidence that they began an investigation into these prior incidents, but school staff "did begin monitoring the bathroom, as requested." Id.

Pursuant to these factual findings, OCR concluded that CSD violated Title

IX because, even though it "immediately started to respond to [Thomas's] Report,"

it "took no further steps to determine what occurred" and "never communicated to

the parties the outcome of any investigation" into Thomas's Report. Id. at 12.

OCR determined that CSD "failed to complete an investigation" concerning

Thomas's Report and never took steps to investigate the existence of harassment

involving John Doe. Id. According to OCR, "[CSD] reassigned [Jane Doe] to a

different kindergarten classroom and ultimately granted [Thomas's] request to

transfer [Jane Doe] to another school." Id. However, even though CSD

"provide[d] some interim measures to [Jane Doe], with equitable consideration for

[John Doe]," it did not "assess whether there was any need for interim measures

beyond those [Thomas] requested." Id. OCR further determined that CSD did not

retaliate against Thomas, as the "DFCS referrals were prepared for both [Jane Doe

and John Doe], . . . and both included parent-related information consistent with

the information requested on the form" such that the "referral was not an adverse

action against [Thomas]." Id. at 13.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a

"short and plain statement of the claim showing that the pleader is entitled to

relief." Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed

for failure to state a claim upon which relief can be granted if it does not plead

"enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007).  The Supreme Court has explained this

standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content
> that allows the court to draw the reasonable inference that the defendant
> is liable for the misconduct alleged.  The plausibility standard is not
> akin to a "probability requirement," but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted).  Thus, a

claim will survive a motion to dismiss only if the factual allegations in the pleading

are "enough to raise a right to relief above the speculative level."  Twombly, 550

U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the

plaintiff's complaint as true, as well as all reasonable inferences drawn from those

facts.  McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v.

Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  Not only

must the court accept the well-pleaded allegations as true, but these allegations

must also be construed in the light most favorable to the pleader.  Powell v.

Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011).  However, the court need not

accept legal conclusions, nor must it accept as true legal conclusions couched as

factual allegations.  Iqbal, 556 U.S. at 678.  Thus, evaluation of a motion to dismiss

requires the court to assume the veracity of well-pleaded factual allegations and

"determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

## III. DISCUSSION

### A. Deliberate Indifference Claims Against CSD under Title IX (Count I)

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance."

20 U.S.C. § 1681(a).  The Supreme Court has found an implied private right of

action for individuals to enforce the mandates of Title IX through money damages

actions.  Franklin v. Gwinnett Cnty. Pub. Sch., 503 U.S. 60, 76 (1992); Cannon v.

Univ. of Chi., 441 U.S. 677, 717 (1979).

In Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 633 (1999), the

Supreme Court considered "whether a private damages action may lie against the

school board in cases of student-on-student harassment," and concluded that "it

may, but only where the [Title IX] funding recipient acts with deliberate

indifference to known acts of harassment in its programs and activities."  The

Supreme Court further concluded "that such an action will lie only for harassment

that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Id.

The United States Court of Appeals for the Eleventh Circuit has issued two seminal cases involving lawsuits under Title IX filed against educational institutions based on alleged student-on-student sexual harassment. In Williams v. Bd. of Regents of the Univ. Sys. of Ga., 477 F.3d 1282 (11th Cir. 2007), the court considered a Title IX claim arising from the gang rape of a female student by University of Georgia male student-athletes in a dormitory. The complaint alleged that university officials were personally involved in recruiting one of the perpetrators and knew of his prior disciplinary and criminal history involving harassment of women. Id. at 1289-90. The complaint also alleged that the university failed to ensure that student-athletes received adequate information concerning the school's sexual harassment policy or to enforce that policy against the student-athletes. Id. at 1290.

According to the Williams Court, in order to claim a Title IX violation based on student-on-student harassment, a plaintiff must allege four elements: (1) the defendant must be a Title IX funding recipient; (2) an appropriate person must have actual knowledge of the alleged discrimination or harassment; (3) the defendant acted with deliberate indifference to known acts of harassment in its

programs or activities; and (4) the discrimination or harassment must be severe, pervasive, and objectively offensive such that it effectively bars the victim's access to an educational opportunity or benefit.  See Williams, 477 F.3d at 1293 (collecting cases).  With respect to the deliberate indifference standard, the Eleventh Circuit found that the complaint alleged that school officials had knowledge of one of the perpetrator's past sexual misconduct but failed to adequately supervise him.  Id. at 1296.  However, "to satisfy our Title IX precedent, Williams must go further and sufficiently allege that the deliberate indifference subjected her to further discrimination."  Id.  The Eleventh Circuit found that Williams met the standard through her allegations about (1) the school's failure to inform and supervise its student-athletes under the sexual harassment policy and (2) the school's response to the assault because it took eight months for it to sanction the assailants.  Id.  The Eleventh Circuit reversed the trial court's dismissal of the Title IX claim against the university.

In Hill v. Cundiff, 797 F.3d 948 (11th Cir. 2015), a 15-year-old boy raped a 14-year-old girl, both of whom were in the eighth grade.  Prior to the rape, the boy "had accumulated a history of violence and sexual misconduct" and "propositioned female students to have sex with him in the school bathrooms."  Id. at 959-60.  The

school then used the plaintiff as "bait" in a "sting operation" against the perpetrator.  Id. at 961-62.

The Hill Court began "by clarifying the correct legal standard for student-on-student sexual harassment claims under Title IX," which is that "a Title IX plaintiff must prove the funding recipient had actual knowledge [as opposed to 'substantial knowledge'] that the student-on-student sexual harassment was severe, pervasive, and objectively offensive." Id. at 969.  The Eleventh Circuit then held that five separate elements must be proven in order to obtain a recovery: (1) the defendant must be a Title IX funding recipient; (2) an appropriate person must have actual knowledge of the alleged discrimination or harassment; (3) the discrimination or harassment must be severe, pervasive, and objectively offensive; (4) the defendant acted with deliberate indifference to known acts of discrimination or harassment in its programs or activities; and (5) the discrimination or harassment effectively bars the victim's access to an educational opportunity or benefit.[4] Id. at 970.

---

[4] The Hill Court noted that it reclassified the prior four-element test in Williams as five elements and rearranged them "for the sake of clarity."  Id. at 970 n.11.

The Eleventh Circuit stated that "[t]he standard for student-on-student sexual harassment claims is far more rigorous than a claim for teacher-on-student harassment." Id. at 968 (citing Davis, 526 U.S. at 650-53).

> The [Supreme] Court imposed this high standard to guard against the imposition of "sweeping liability." Davis, 526 U.S. at 652. Unlike an adult workplace, children "may regularly interact in a manner that would be unacceptable among adults." Id. at 651. Due to their immaturity, children at various ages will invariably engage in some forms of teasing, shoving, and name-calling that "target differences in gender." Id. at 651-52. Some risk of sexual harassment is inherent to the enterprise of public education, in particular, because public schools must educate even the most troublesome and defiant students.

Hill, 797 F.3d at 969. Like in Williams, the Hill Court indicated that a single-incident of harassment unlikely would be classified as sufficiently severe to deny access to education, but that Hill was "a unique case because the administrators effectively participated in [the plaintiff's] sexual harassment by setting [the perpetrator] up in a rape-bait scheme involving [the plaintiff] in order to 'catch him in the act,'" and that such facts "differ[ed] markedly from the 'rarely actionable, theoretical single incident mentioned in Davis.'" Id. at 972-73 (quoting Williams, 477 F.3d at 1298). The Eleventh Circuit found that there was a genuine dispute of material fact as to whether the school's deliberate indifference subjected the plaintiff to further discrimination, which precluded summary judgment. Id. at 973-76.

17

With respect to Count I, Defendants concede that Thomas has demonstrated the first two elements under <u>Hill</u>:  CSD is a Title IX funding recipient and an "appropriate person" had actual knowledge of the alleged discrimination or harassment.  Defs.' Br. in Supp. of Mot. to Dismiss ("Defs.' Br.") [Doc. 22-1] at 9. Defendants contend that Thomas failed to allege facts sufficient to demonstrate the third, fourth, and fifth elements of her Title IX claim—that the sexual discrimination or harassment was severe, pervasive, and objectively offensive; that CSD was deliberately indifferent to the sexual discrimination or harassment; and that the deliberate indifference to the sexual discrimination or harassment effectively barred Jane Doe's access to an educational opportunity or benefit.  <u>Id.</u> These arguments will be addressed in turn.

### 1.    Does Thomas Sufficiently Allege that the Sexual Harassment Experienced by Jane Doe of Which CSD Had Knowledge Was Severe, Pervasive, and Objectively Offensive?

In <u>Davis</u>, the Supreme Court stated that "[w]hether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships,' including, but not limited to, the ages of the harasser and the victim . . . ."  526 U.S. at 651 (quoting

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998)).  With respect

to whether a single instance of harassment would be actionable, the Court stated:

> Although, in theory, a single instance of sufficiently severe one-on-one
> peer harassment could be said to have such an effect, we think it
> unlikely that Congress would have thought such behavior sufficient to
> rise to this level in light of the inevitability of student misconduct and
> the amount of litigation that would be invited by entertaining claims of
> official indifference to a single instance of one-on-one peer harassment.
> By limiting private damages actions to cases having a systemic effect
> on educational programs or activities, we reconcile the general
> principle that Title IX prohibits official indifference to known peer
> sexual harassment with the practical realities of responding to student
> behavior, realities that Congress could not have meant to be ignored.

Davis, 526 U.S. at 652-53.  See also Hill, 797 F.3d at 972; Hawkins v. Sarasota

Cnty. Sch. Bd., 322 F.3d 1279, 1289 (11th Cir. 2003) ("The behavior must also be

severe enough to have a 'systemic' effect of denying the victim equal access to an

educational program or activity.  We take this to mean that gender discrimination

must be more widespread than a single instance of one-on-one peer harassment and

that the effects of the harassment touch the whole or entirety of an educational

program or activity."); Walker v. Tuscaloosa Cnty. Sch. Bd., No. 7:17-cv-00381-

LSC, 2019 WL 6117616, at *10 (N.D. Ala. Nov. 18, 2019) (finding that a single

incident of sexual harassment where a peer of a special education student "touched

her breasts and . . . between her legs" did not present the unique circumstances

contained in Hill).

19

In <u>Williams</u>, the Eleventh Circuit stated that the student-athlete's gang rape of the female student "differ[s] markedly from the rarely actionable, theoretical single incident mentioned in <u>Davis</u> and <u>Hawkins</u>," because "[t]he incident involved a ringleader who lured the victim to his territory and then conspired with two friends to commit two separate acts of sexual assault and so constitutes a continuous series of events." <u>Williams</u>, 477 F.3d at 1298.  In <u>Hill</u>, the Eleventh Circuit also distinguished the harassment in that case from the "single incident" mentioned in <u>Davis</u>:

> We conclude the harassment here is materially different because the physical act of penetration in the bathroom was (1) preceded by CJC repeatedly propositioning Doe for sex for two weeks and (2) orchestrated by school officials during a botched rape-bait scheme with CJC. Like the rape in <u>Williams</u> where the ringleader conspired with his friends beforehand to commit sexual assault, a jury could find CJC's rape of Doe was the culmination of "a continuous series of events," <u>id.</u>, at 1298, and was therefore pervasive. These are highly unique and extreme facts that will hopefully never again be repeated. A jury could find CJC's rape of Doe was the culmination of CJC's two weeks of harassment and the school's choice to use Doe as bait for CJC's sexual harassment, and thus satisfies the third element.

<u>Hill</u>, 797 F.3d at 973.

In <u>Williams</u> and <u>Hill</u>, the "rare circumstance" where a single incident constituted sexual harassment that was sufficiently severe, pervasive, and objectively offensive by Title IX standards occurred because the incident in

20

question was preceded by other events that further inculpated the Title IX funding recipient and succeeded by other events that aggravated that incident's effects.  See also Stinson v. Maye, 824 F. App'x 849, 853, 857-58 (11th Cir. 2020) (finding the threshold satisfied where a middle school female student was gang-raped by three other male students after the assistant principal "saw the three boys grabbing and dragging [her and] did nothing to stop the boys," the principal made inappropriate remarks to the victim after the incident, and the principal failed to investigate or discipline the boys involved).

This case presents a more tenuous situation.  There are no allegations in the First Amended Complaint of participation in the actual offense by CSD.  The First Amended Complaint alleges that there was prior knowledge among Oakhurst personnel that John Doe presented behavioral problems, but there is no apparent indication such behavior was sexually aggressive.  However, the Incident itself involved the purported sexual violation of a five-year-old child, which included physical penetration[5], Jane Doe complained of pain and discomfort afterwards, and there are allegations in the First Amended Complaint that CSD failed to properly

---

[5] See Doe v. Dallas Indep. Sch. Dist., No. CIV.A.3:01-CV-1092-R, 2002 WL 1592694, at *6 (N.D. Tex. July 16, 2002) (citing Davis, 526 U.S. at 652) ("[O]ne single instance of a forced manual penetration of [a five-year old's] vagina seems to qualify as a 'sufficiently severe one-on-one peer harassment.'").

investigate the Incident, to provide Jane Doe with counseling, and to communicate

the outcome of any investigation.  Moreover, the OCR Report details facts which

support some of these allegations:

> In responding to the Parent's allegation of sexual assault, OCR finds
> that District violated Title IX.  Although the District immediately
> started to respond to the Parent's Report by asking staff to memorialize
> the Report in written statements and interviewing the Teacher and the
> Paraprofessional, the District took no further steps to determine what
> occurred.  Instead, the District involved and deferred to the SRO and
> SFCS.  The District did not resume investigating when the SRO
> indicated there would be no further criminal processing due to the age
> of the children, and the District failed to ascertain anything about
> DFCS's findings concerning the alleged incident.  Indeed, as of August
> 5, 2019, the District still did not know the content or outcome of the
> DFCS investigation.  Notably, the District failed to follow its then-
> applicable grievance procedures . . . which required immediate
> notification of the equity coordinator, a thorough investigation by the
> equity coordinator, and report to the principal and parents of the equity
> coordinator's conclusions and recommendations.  Apart from a general
> public announcement made in February 2018, the District never
> communicated to the parties the outcome of any investigation into the
> Parent's Report.

OCR Report at 12.  Even though, as OCR acknowledged, CSD provided "some

interim measures" for Jane Doe, Thomas alleges that the school's response, or lack

thereof, left her with "no choice" but to request a school transfer to ensure the

safety of her child.  First Am. Compl. ¶ 135; see Stinson, 824 F. App'x at 858

(finding the severe and pervasiveness threshold further satisfied because the school

official's actions "engineer[ed] her denial of equal access").  Finally, "OCR found

no evidence that the District assessed the existence of sexual harassment despite the incident reflected in the Report, the concerns of parents expressed in the aftermath of the Report, and the allegations that [John Doe] has been harassed in the boy's bathroom." OCR Report at 12.

Although it is a close question as to whether the single incident in this case rises to the level of conduct that is "severe, pervasive, or objectively offensive," this matter is before the Court on a motion to dismiss, where all reasonable inferences drawn from the facts inure to Thomas's benefit. The First Amended Complaint includes allegations, from which the reasonable inferences could be made, that the Incident itself involved physical contact and vaginal penetration to a five-year-old child and that Oakhurst staff failed to respond or appropriately investigate Thomas's Report, leaving Thomas with no choice but to transfer Jane Doe to a different school. In those cases where Courts in this circuit have found this element has been satisfied, there have been failures of the Title IX recipient to properly investigate the sexual harassment which exacerbated the effects of the harassment. It is inappropriate at this juncture of the proceedings for the Court to "tip the scales" in favor of one side or the other based upon which series of alleged facts is more probable. Consequently, this Court finds that Thomas has satisfied

<u>Hill</u>'s third element by sufficiently alleging that Jane Doe suffered severe, pervasive, and objectively offensive harassment.

**2.  Does Thomas Sufficiently Allege That CSD Was Deliberately Indifferent to the Sexual Harassment and Discrimination Faced by Jane Doe?**

Title IX recipients "are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." <u>Davis</u>, 526 U.S. at 648. In <u>Davis</u>, the Supreme Court reversed the grant of a motion to dismiss where the plaintiff "may be able to show that [the recipient] subjected [the plaintiff] to discrimination by failing to respond in any way over a period of five months to complaints" of misconduct by the plaintiff's classmate from her and other students. <u>Id.</u> at 649. "Based on the <u>Davis</u> Court's language, we hold that a Title IX plaintiff at the motion to dismiss stage must allege that the Title IX funding recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination." <u>Williams</u>, 477 F.3d at 1296.

The First Amended Complaint alleges that CSD was deliberately indifferent in three ways: (1) as to the implementation of the Policy, (2) as to its supervision of John Doe, and (3) as to its response to the Incident and Thomas's Report. <u>See</u> First Am. Compl. ¶¶ 152-56. Defendants contend that Thomas's Title IX claim should

24

be dismissed for her failure to sufficiently allege deliberate indifference as to any of these actions. Defs.' Br. at 10.

The Eleventh Circuit Court of Appeals has stated that, to determine whether a funding recipient has acted with deliberate indifference, the court should "analyze the conduct of the funding recipient, not the alleged harasser . . . to ensure that we hold the funding recipient liable only if the funding recipient's deliberate indifference 'subjected' the plaintiff to discrimination." Williams, 477 F.3d at 1293 (citing Davis, 526 U.S. at 640-41). Deliberate indifference by school administrators can be found "where the [funding] recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. Title IX does not impose an obligation for funding recipients to remedy the harassment, only to respond in a way that is not clearly unreasonable, and a funding recipient does not act with deliberate indifference simply because it fails to adopt the plaintiff's preferred remedy. Id. at 648-49. "A clearly unreasonable response causes students to undergo harassment or makes them more vulnerable to it." Hill, 797 F.3d at 973 (citing Williams, 477 F.3d at 1295-96). Courts "can identify a funding recipient's 'response as not clearly unreasonable as a matter of law' and dispose of the claim

on a motion to dismiss." Williams, 477 F.3d at 1295 (quoting Davis, 526 U.S. at 649).

### a.    Alleged Deliberate Indifference as to the Implementation of the Policy

As to the Policy, Thomas alleges that CSD acted with deliberate indifference in two ways.  First, she alleges that CSD surreptitiously and unlawfully approved the Policy in violation of the school district's own policy and in violation of Georgia's open meetings law by failing to put the Policy on the Board's meeting agenda to solicit public notice and comment prior to implementing it in the summer of 2016.  First Am. Compl. ¶ 152(a)-(b).  Second, Thomas alleges that CSD left the Policy unchanged and failed to implement safeguards after some community members and parents expressed concerns about the Policy.  Id. ¶ 152(c)-(d).

Defendants contend that the Eleventh Circuit's decision in Adams v. Sch. Bd. of St. Johns Cnty., 968 F.3d 1286 (11th Cir. 2020), forecloses Thomas's argument that the implementation of the Policy constitutes deliberate indifference.[6]

---

[6] CSD also relies on Bostock v. Clayton Cnty., 140 S. Ct. 1731 (2020), to support it contention that the implementation of the Policy cannot constitute deliberate indifference. Defs.' Br. at 11.  However, Bostock stands only for the proposition that Title VII's prohibition on sex discrimination in the employment context also forbids discrimination on the basis of someone's transgender status. Id. at 1737.

Defs.' Br. at 11.  In Adams, the court held that Title IX prohibits a school district's

policy that prevents a transgender student who identifies as male from using the

boys' bathroom where he attends school.  Adams, 968 F.3d at 1305.  However,

Defendants here seek a broader application of this limited holding.  Adams does

not stand for the proposition that once a policy is implemented to protect the rights

of transgender students, a school district can never act with deliberate indifference

with regard to that policy; in other words, Thomas may still claim deliberate

indifference as to CSD's implementation of the Policy if she can show that, in light

of known circumstances, the Title IX funding recipient's response to the

harassment was clearly unreasonable.[7]  Davis, 526 U.S. at 648.  See also Sauls v.

---

Adams relied on Bostock to extend the same prohibition to Title IX.  Adams, 968 F.3d at 1305.

[7] On January 18, 2021, Thomas filed a "Notice of Supplemental Authority" in opposition to Defendants' Motion to Dismiss, which attaches a January 8, 2021, memorandum from OCR's Acting Assistant Secretary that discusses, in part, the impact of Bostock on OCR's review of complaints under Title IX and OCR's critique of the Adams decision.  Pl.'s Notice of Suppl. Authority [Doc. 32]; Kimberly M. Richey Mem. [Doc. 32-1].  Because the Court does not rely on Adams in its consideration of whether Thomas's Title IX claim in Count I survives Defendants' Motion to Dismiss, the Court has not considered the arguments in Thomas's Notice of Supplemental Authority, so Defendants' Motion for Leave to Respond to Plaintiff's Notice of Supplemental Authority [Doc. 33] is **DENIED AS MOOT**.

Pierce Cnty. Sch. Dist., 399 F.3d 1279, 1285 (11th Cir. 2005) ("[T]he relevant inquiry is not whether the measures taken were effective in stopping discrimination, but whether the school district's actions amounted to deliberate indifference.").

Nevertheless, Thomas's contention that CSD acted with deliberate indifference because of certain procedural violations in adopting the Policy is without merit. Pretermitting the question of whether the alleged violation of a state's open meetings laws can be used to challenge a school's action under Title IX, it is clear that administrative or procedural flaws in a policy do not compel a finding of deliberate indifference for the purposes of finding a Title IX violation. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 291-92 (1998) ("We have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of [Department of Education administrative requirements related to adopting and publishing an effective grievance procedure]," as the "failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX."); see also Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist., 647 F.3d 156, 169-70 (5th Cir. 2011) ("[J]ust because [the school administrator] allegedly failed to follow district policy does not mean that her actions were clearly unreasonable."). Consequently, the

allegation that the Policy was adopted in violation of state law or the school district's own policy does not support a finding of deliberate indifference.

Thomas also alleges that CSD acted with deliberate indifference by "creat[ing] the foreseeable risk of harassment and creat[ing] an unsafe, intimidating, and hostile sex environment for girls in particular" through a failure to implement "safeguards" in the Policy. First Am. Compl. ¶ 152. But this allegation is limited to the "wisdom" of the Policy or CSD's awareness of parental objections to it, neither of which support a finding of deliberate indifference. Thomas fails to allege that CSD was aware of actual incidents of sexual harassment which occurred during the implementation or applicability of the Policy prior to the Incident. In the absence of any actual reports of sexual harassment or abuse, a "foreseeable risk of harassment" is not the standard for demonstrating deliberate indifference.

> [A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has <u>actual knowledge of discrimination</u> in the recipient's programs and fails adequately to respond. We think, moreover, that the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official <u>who is advised of a Title IX violation refuses to take action</u> to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation.

See Gebser, 524 U.S. at 290 (emphasis added).  In other words, in order to find

deliberate indifference, there must be an alleged violation and the decision-maker

must be aware of it.  It is true that the notice of a violation need not be particular to

the plaintiff or that the prior violation need be of the same nature as the alleged

conduct; however, this circuit requires that there be notice in some form of a

violation that would "alert the decision-maker to the possibility of sexual

harassment."  J.F.K. v. Troup Cnty. Sch. Dist., 678 F.3d 1254, 1256 (11th Cir.

2012); see also Doe v. Sch. Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1257 (11th

Cir. 2010) (citations omitted) ("[N]o circuit has interpreted Gebser's actual notice

requirement so as to require notice of the prior harassment of the Title IX plaintiff

herself . . . .  Notably, we have held in a Title IX student-on-student harassment

case that the plaintiff sufficiently alleged actual notice where the primary substance

of that notice differed significantly from the circumstances of the plaintiff's

harassment."); see also Baynard v. Malone, 268 F.3d 228, 238 n.9 (4th Cir. 2001)

("We note that a Title IX plaintiff is not required to demonstrate actual knowledge

that a particular student was being abused.  We believe that the actual notice

requirement could have been satisfied, for example, if [the school official] had had

actual knowledge that [the teacher] was currently abusing one of his students, even

without any indication of which student was being abused.").

The First Amended Complaint contains no such allegations of notice provided to CSD of Title IX violations by any student that occurred during the time the Policy was effective.  With respect to John Doe, as previously discussed, there is no allegation of any instances of sexual harassment perpetrated by John Doe during the applicable period; the only allegation is a belief that John Doe "had a record of disciplinary problems, including physically assaulting another student." First Am. Compl. ¶ 59.  Thus, Thomas has not sufficiently alleged deliberate indifference as it relates to the implementation of the Policy.

> **b.    Alleged Deliberate Indifference as to Supervision of John Doe**

Thomas alleges that CSD acted with deliberate indifference by allowing John Doe to enter the girls' bathroom unaccompanied by adult supervision when he had a known history of disciplinary problems, including violent behavior.  First Am. Compl. ¶¶ 59, 152(e)-(g).  Thomas also alleges that when she mentioned John Doe's name to the school nurse, the nurse reacted in such a way that indicated "some known issue," but Thomas does not allege what the underlying issue was much less what the nature of it was.  Id. ¶ 67.  Defendants contend that Thomas failed to allege that CSD had any actual knowledge of a prior assault and, even assuming John Doe had prior behavioral problems, Thomas made no allegations

that CSD knew that John Doe presented a risk of sexual harassment such that its

failure to supervise him constituted deliberate indifference.  Defs.' Br. at 13.  In

response, Thomas focuses more on CSD's actions after the Incident with respect to

her deliberate indifference claim.  Pl.'s Opp'n at 14-15.

Once again, a Title IX recipient is deliberately indifferent "only where the

recipient's response to the harassment or lack thereof is clearly unreasonable in

light of the known circumstances."  Davis, 526 U.S. at 648.  None of Thomas's

allegations, nor any reasonable inference therefrom, show that CSD was

sufficiently alerted "to the possibility of [Jane Doe's] sexual harassment."  J.F.K.,

678 F.3d at 1256; see also Williams, 477 F.3d at 1293 ("[The school officials']

preexisting knowledge of [the harasser's] past sexual misconduct . . . are relevant

when determining whether [the plaintiff] alleged acts sufficient to survive the

defendants' motion to dismiss her Title IX complaint.").  The allegations regarding

John Doe's disciplinary record prior to the Incident are: (1) John Doe had a record

of "disciplinary problems, including physical[] assault[]," First Am. Compl. ¶ 59;

(2) upon hearing about the Incident, the nurse and school counselor "looked at

each other and were seen and heard to whisper . . . suggesting that there [sic] some

known issue concerning John Doe," Id. ¶ 67; and (3) John Doe's teacher and

paraprofessional stated that John Doe normally went to the bathroom with

supervision because of his potential for "behavior disruption," OCR Report at 6.

While these allegations establish that John Doe was a disruptive child, the Court

finds that these allegations do not establish a potential ground to establish student-

on-student sexual harassment, as Thomas fails to allege specifically that CSD was

put on notice that John Doe's previous actions placed Jane Doe at risk of sexual

abuse.

　　The OCR Report documents much of John Doe's conflicting behavioral

history, indicating that John Doe's father notified school officials via an e-mail that

John Doe himself may have been harassed at least twice in both the boys' and

girls' bathrooms and that these incidents may have occurred prior to the Incident.

OCR Report at 10.  However, the OCR Report also indicates that John Doe's

father sent this e-mail on December 5, 2017, which was several weeks <u>after</u> the

Incident.  <u>Id.</u>  There is no allegation that school officials were aware of sexual

assaults or other disruptions in the school's bathrooms prior to the Incident, that

John Doe was somehow involved, or that John Doe's behavioral issues were sexual

in nature; in other words, Thomas's allegations do not indicate the existence of a

"risk of such conduct that the Title IX recipient has the duty to deter."  <u>Broward</u>

<u>Cnty.</u>, 604 F.3d at 1258 (distinguishing the allegations against teacher misconduct

in <u>Gebser</u>, which "consisted solely of comments made to a group of students

during class time" based on the fact that in <u>Broward Cnty.</u>, the students'
complaints consisted of a teacher's "overtly sexual conduct with both a verbal and
physical component, directed at them individually, occurring while the students
were alone with [the teacher] in his classroom"). Thus, the allegations of the First
Amended Complaint are insufficient to support Thomas's claim that CSD acted
with deliberate indifference as to its supervision of John Doe.

        **c.**    **Alleged Deliberate Indifference as to CSD's Response
to the Incident**

Thomas has alleged that CSD failed to "conduct an impartial, reliable, and
adequate investigation" of Thomas's Report, including, in part, failing to interview
John Doe or his parents, identify and interview other relevant witnesses, remove
John Doe from Jane Doe's classroom during the investigation, or report the
Incident to the Title IX Compliance Officer. First Am. Compl. ¶ 155. Defendants
contend that, once the Incident was reported, CSD initiated actions that were not
"clearly unreasonable" in light of its understanding of the situation nor does what
CSD did amount to an "official action" not to remedy the alleged sexual
harassment. Defs.' Br. at 14. Defendants contend that its "not clearly
unreasonable" actions were: (1) referring the case to DFCS, (2) later sending social
workers to Thomas's home after she refused to return Jane Doe to her classroom,

(3) moving Jane Doe to a different classroom three weeks after the incident, and (4) approving Thomas's request to transfer Jane Doe to a different school. Id. As an alternative, Defendants argue that there is an "obvious alternative explanation" because CSD "performed a sufficient investigation to determine that Jane Doe's allegation was false," which is why John Doe was not moved to another classroom. Id. at 15. Based on the current allegations, supplemented by the findings of the OCR Report, the Court cannot as a matter of law conclude that CSD's actions were not clearly unreasonable at this stage of the litigation.

As discussed above, the standard for assessing whether a funding recipient has acted with deliberate indifference is whether its "response to the harassment or lack thereof is clearly unreasonable in light of known circumstances. Davis, 526 U.S. at 648; see also Garrett v. Univ. of S. Fla. Bd. of Trs., 448 F. Supp. 3d 1286, 1301 (M.D. Fla. 2020) (quoting Davis, 526 U.S. at 648) ("Title IX affords a victim of student-on-student sexual misconduct no right 'to demand a particular remedy' and affords the university 'flexibility' and deference in deciding the appropriate response to student-on-student sexual misconduct."). Defendants contend that, immediately upon receiving Thomas's Report, "the school nurse and counselor turned their attention immediately to the wellbeing of Jane Doe" and then referred the case to DFCS. Defs.' Br. at 14. OCR indicated that at the time of the Incident,

35

CSD's harassment policy provided that "the equity coordinator was responsible for conducting a thorough investigation of the complaint, including interviewing any individual who may have knowledge of the allegations or may assist in resolving the complaint." OCR Report at 5 n.4. Rather than undertake this procedure, CSD referred the case to DFCS and "later sent social workers to Plaintiff's home after Plaintiff refused to return her daughter to school." Defs.' Br. at 14.

While Title IX requires "funding recipients to designate an employee to coordinate its Title IX enforcement efforts, notify its students and employees of that individual's name and contact information, and 'adopt and publish grievance procedures for providing for prompt and equitable resolution of student and employee complaints,'" noncompliance with these requirements is not dispositive in establishing deliberate indifference. Ross v. Corp. of Mercer Univ., 506 F. Supp. 2d 1325, 1353 (M.D. Ga. 2007) (quoting 34 C.F.R § 106.8). "[T]he Supreme Court has held that a funding recipient's failure to comply with the regulation 'does not establish the requisite actual notice and deliberate indifference for a private right of action . . . .'" Id. at 1353 (quoting Gebser, 524 U.S. at 292). Where OCR and the Department of Education decide to impose penalties based on such procedural violations, they do not consider whether the school district has engaged in conduct constituting deliberate indifference. See S.D. ex rel. Davis v.

Houston Cnty. Sch. Dist., No. 5:12-CV-228(MTT), 2013 WL 4505897, at *6

(M.D. Ga. Aug. 22, 2013) (citing Ross, 506 F. Supp. 2d at 1353); see also Saphir v.

Broward Cnty. Pub. Schs., 744 F. App'x 634, 639 (11th Cir. 2018) (finding no

deliberate indifference in the school's response to the sexual harassment of a

student where the principal conducted an informal investigation, discussed

allegations and the appropriate response with three other school officials, and

directed the offending teacher to stay away from the student, even though plaintiffs

argued that the principal failed to interview certain eyewitnesses, report the

Incident for formal investigation, or put the offender on administrative leave).

Nevertheless, the problem with Defendants' argument is that they ask this

Court to accept their version of the facts as true when the allegations of the First

Amended Complaint and certain facts as reported by OCR indicate otherwise.  In

this case, accepting the allegations in the First Amended Complaint and the facts as

reported by OCR and all inferences therefrom as true, as this Court must do on a

Motion to Dismiss, CSD did not conduct its own investigation nor review the

results of any other investigation as to the veracity of Thomas's Report.  The facts

as outlined in the OCR Report (made a part of the First Amended Complaint)

reveal that written statements "memorializing [Thomas's] Report" were made by a

nurse, counselor, and instructional coach, and the nurse spoke with Jane Doe (who

repeated the same details that were relayed by Thomas). OCR Report at 5. The principal then learned from a teacher and paraprofessional that when John Doe went to the bathroom outside of group breaks, "he never went without supervision because of his potential for behavior disruption." Id. At that point, CSD referred the matter to DFCS. The DFCS case manager did not believe the Incident took place. Id. at 7 n.9. Apparently, according to Defendants, this led to CSD concluding that the allegations about the Incident were false. Specifically, they contend that it "performed a sufficient investigation to determine that Plaintiff's allegation was false, and [CSD] responded accordingly." Defs.' Br. at 15. However, CSD "presented no evidence nor did any witness establish that [CSD] obtained information regarding the outcome of the DFCS investigation." OCR Report at 7 n.10. So, accepting the allegations of the First Amended Complaint and all inferences therefrom in Thomas's favor: (1) CSD confirmed Thomas's Report by interviewing Jane Doe, (2) CSD referred the case to DFCS for investigation, (3) DFCS concluded the Incident never occurred, (4) CSD never reviewed the DFCS investigation, and (5) CSD declined to move John Doe to another classroom because it believed there was no threat to Jane Doe despite not receiving the DFCS investigation results. That scenario, if proved true, and without any other facts that would show that CSD was more involved in the

investigation and review of the Incident, is arguably "clearly unreasonable" in light

of the known circumstances surrounding the Incident.[8]  See Stinson, 824 F. App'x

at 859 (citing I.F. v. Lewisville Indep. Sch. Dist., 915 F.3d 360, 378 (5th Cir.

2019)) (reversing district order's dismissal of Title IX case where a reasonable

inference from the allegations was that the school principal referred a case of

student-on-student rape to the police department, which concluded there was

consensual sex, but the principal never inquired into the investigation nor

conducted any separate investigation).

"The Title IX inquiry is contextual: it does not require school districts to

simply do *something* in response to sexual harassment; rather, they must respond in

a manner that is not 'clearly unreasonable in light of the *known* circumstances.'"

Broward Cnty., 604 F.3d at 1263.  It is possible that additional facts will establish

---

[8] Defendants point out that after the case was referred to DFCS, it "later sent social workers to Plaintiff's home after Plaintiff refused to return her daughter to school." Defs.' Br. at 14.  But investigating whether Thomas was wrongfully keeping her daughter out of school is not necessarily related to the investigation of the Incident. The OCR Report indicates that one of the social workers believed that the DFCS case manager's assessment that Thomas "coached" Jane Doe and that the Incident had not occurred "was based on having had prior history with the family."  OCR Report at 7 n.9.  Once again, the Court notes that it does not appear that CSD was ever made aware of these conclusions.  Moreover, the Court cannot determine which version of alternative alleged facts are correct in deciding a motion to dismiss.

that, based on CSD's review of the investigation or its own independent findings, CSD was entitled to rely on the DFCS investigation that concluded that the Incident did not actually occur.  But these are not the allegations in the First Amended Complaint.

Based upon the cumulative events contained in the allegations in this case, Thomas sufficiently alleges that CSD was deliberately indifferent to allegations of Jane Doe's sexual harassment based on CSD's response to the Incident, therefore satisfying the fourth Title IX element at the pleading stage.

### 3.   Does Thomas Sufficiently Allege That CSD's Deliberate Indifference to the Harassment and Discrimination Effectively Barred Jane Doe's Access to an Educational Opportunity or Benefit?

In the context of student-on-student harassment, the fifth element requires a plaintiff to show that the harassment she suffered was "severe enough to have a 'systemic' effect of denying the victim equal access to an educational program or activity." Hawkins v. Sarasota Cnty. Sch. Bd., 322 F.3d 1279, 1289 (11th Cir. 2003).  This means that "gender discrimination must be more widespread that a single instance of one-on-one peer harassment and that the effects of the harassment touch the whole or entirety of an educational program or activity." Id.

A demonstration of physical exclusion, however, is not the sole means by which a plaintiff can demonstrate deprivation of an educational

> opportunity. . . . Rather, a plaintiff can satisfy this element by showing that the behavior so undermined and detracted from the victim's educational experience, that the student has effectively been denied access to an institution's resources and opportunities.

Doe v. Sch. Bd. of Miami-Dade Cnty., 403 F. Supp. 3d 1241, 1262 (S.D. Fla. 2019) (quoting Hawkins, 322 F.3d at 1289). Thus, Thomas must allege that the alleged sexual harassment of Jane Doe was so severe, pervasive, and objectively offensive that it effectively denied her access to Oakhurst's educational resources and opportunities. See also Hill, 797 F.3d at 975 (concluding that a funding recipient's clearly unreasonable response to a sexual assault, which resulted in the victim's decision to unenroll and move to another school district in another state, satisfied this element).

Defendants contend that Thomas fails to allege facts that Jane Doe was being denied a safe educational environment or that John Doe was a continuing threat to her safety. Defs.' Br. at 17-18. Moreover, Defendants assert that Jane Doe was moved to a different classroom and ultimately a different school. Id. at 18. However, the allegations of the First Amended Complaint are that from the date of the Incident until December 7, 2017, Thomas continually sought protections for her daughter and asked for John Doe to be placed in another classroom, but was denied such remedy or received no response. First Am. Compl.

¶¶ 75, 90-91, 93, 98, 101.  Thomas then allegedly requested a transfer of Jane Doe to another school because her requests for John Doe to be removed from Jane Doe's classroom had not been granted.  Id. ¶¶ 102-104.  At that point Jane Doe had been held out of school for two weeks.  Id. ¶ 104.  On December 8, 2017, Fowler offered to move Jane Doe to another classroom and she resumed her attendance that day.  OCR Report at 7-8; First Am. Comp. ¶ 115.  Thomas alleges this caused Jane Doe trauma because of having to be in a different classroom with a different teacher and classmates.  First Am. Comp. ¶ 116.  After moving to a new classroom, Thomas alleges that Jane Doe still was encountering John Doe in the halls and feared another assault.  Id. ¶ 134.  Feeling like she had "no choice," Thomas then requested a transfer and, on January 8, 2018, Jane Doe was transferred to another school within CSD.  Id. ¶¶ 135-36.

Once again, taking the allegations of the First Amended Complaint as true and construing the allegations in the light most favorable to Thomas, she has plausibly alleged that the sexual harassment of Jane Doe effectively denied her daughter access to Oakhurst's educational resources and opportunities.  Consequently, because Thomas has set forth a plausible showing of entitlement to relief for sexual harassment of Jane Doe in violation of Title IX under all five

elements as set forth in <u>Hill</u>, Defendants' Motion to Dismiss Count I of the First Amended Complaint is **DENIED**.

### B.      Retaliation Claim Against CSD Under Title IX (Count II)

The First Amended Complaint alleges that CSD retaliated against Thomas for reporting Jane Doe's sexual assault and harassment by, in summary: (1) failing to properly investigate and respond to the Incident, and (2) referring Thomas to DFCS and threatening to report her a second time.  First Am. Compl. ¶ 167(a)-(h). Defendants seek to dismiss Count II arguing that, in primary part, Thomas has failed to allege facts to demonstrate that Defendants' failure to comply with procedural requirements of Title IX or Defendants' referral of her case to DFCS were done because of Thomas's Report of sexual harassment.  Defs.' Br. at 19-20. Defendants also note that the OCR Report determined that CSD did not retaliate against Thomas.  <u>Id.</u> at 20.

"Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex."  <u>Jackson v. Birmingham Bd. of Educ.</u>, 544 U.S. 167, 178 (2005). The Eleventh Circuit has applied the framework for Title VII retaliation claims to such claims brought under Title IX.  <u>Bowers v. Bd. of Regents of Univ. Sys. of Ga.</u>, 509 F. App'x 906, 911 n.7 (11th Cir. 2013).  Thus, to succeed on a Title IX

retaliation claim, a plaintiff must show that "(1) [s]he engaged in statutorily

protected expression; (2) Defendants took action that would have been materially

adverse to a reasonable applicant; and (3) a causal link existed between the two

events." Id. at 911 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S.

53, 67-68 (2006) and Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th

Cir. 2001)). With respect to causation, because "[r]etaliation claims under Title IX

are analyzed under the framework for claims under Title VII," a plaintiff claiming

retaliation under Title IX must establish causation "according to the traditional

principles of but-for causation, which requires 'proof that the desire to retaliate was

the but-for cause of the challenged . . . action.'" Kocsis v. Fla. State Univ. Bd. of

Trs., 788 F. App'x 680, 686 (11th Cir. 2019) (quoting Univ. of Texas Sw. Med.

Ctr. v. Nassar, 570 U.S. 338, 352 (2013)). "If the plaintiff establishes a prima facie

case, the burden shifts to the defendant to 'articulat[e] a legitimate, non-

discriminatory reason for the adverse' action." Garrett v. Univ. of S. Fla. Bd. of

Trs., 824 F. App'x 959, 966 (11th Cir. 2020) (quoting Bryant v. Jones, 575 F.3d

1281, 1308 (11th Cir. 2009)). "If the defendant does so, the plaintiff must present

evidence that the defendant's proffered reason was merely a pretext to mask

discriminatory action." Id. (internal quotation marks and citation omitted).

Assuming that Thomas has satisfied the first two factors to establish a prima facie case of retaliation (engagement in protected activity and an action by CSD that was materially adverse), Thomas posits no allegation that shows a causal link between the two events.  Thomas attempts to somehow link the alleged failure to properly investigate the Incident with Thomas's Report, but offers no such facts to do so.  With respect to CSD's reporting the matter to DFCS, CSD was merely following Georgia law.  See O.C.G.A. §§ 19-7-5(b)(4) & 19-7-5(c)(1) (requiring school teachers to report suspected child abuse, which includes sexual abuse of a child, upon reasonable cause to believe it has occurred).  Indeed, CSD referred both John Doe's and Jane Doe's cases to DFCS, and both stated that the individual who touched Jane Doe was a student without any indication that the report was generated to investigate either parent as the source of the abuse.  OCR Report at 13.[9]

Because there are no allegations in the First Amended Complaint which demonstrate that the desire to retaliate was the "but-for cause" of the alleged

---

[9] Although not binding on this Court, it is noteworthy that "OCR's investigation did not substantiate [Thomas's] allegation that [CSD] retaliated" against her in connection with the DFCS referral.  Id.

adverse action, Thomas has failed to state a claim for Title IX retaliation.

Defendants' Motion to Dismiss Count II is, therefore, **GRANTED**.

### C.    Section 1983 Claims for Violation of Equal Protection (Count III)

The First Amended Complaint alleges that Jane Doe's constitutionally

protected right to be free from sexual harassment was violated "as the obvious

consequence of Defendants' secret implementation of the privacy facilities policy

and continued adherence to the policy" after receiving warnings of the potential for

misconduct under the Policy.  First Am. Compl. ¶ 177.

#### 1.    Section 1983 Claim Against Dude and Fowler in Their Official Capacities

Defendants contend that the § 1983 claim against Dude and Fowler in their

official capacities should be dismissed because they are duplicative of the claims

against CSD.  Defs.' Br. at 22 n.8.  A § 1983 suit against an official of the

government in his official capacity is deemed to be a suit against the entity that

employs the official.  Ky. v. Graham, 473 U.S. 159, 165-66 (1985); see also Mann

v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009) (citing Brown v.

Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999)).  Thus, the equal protection

claims against Dude and Fowler in their official capacities are the functional

equivalent of the claim against CSD.  See, e.g., Higdon v. Fulton Cnty., 746 F.

App'x 796, 799 (11th Cir. 2018) (dismissing official capacity claims against a

county commissioner as they are "redundant and unnecessary" because they are

essentially claims against the county).

> Because local government units can be sued directly—and because
> suits against a municipal officer sued in his official capacity and direct
> suits against municipalities are functionally equivalent—there is no
> need to bring official capacity actions against local government
> officials as well.  Thus, officers sued in their official capacity should be
> dismissed, as keeping suits against both the municipality and the
> officers plainly would be redundant.

Higdon v. Tusan, 746 F. App'x 805, 814 (11th Cir. 2018) (citing Busby v. City of

Orlando, 931 F.2d 764, 776 (11th Cir. 1991)).  Accordingly, Defendants' Motion

to Dismiss the official capacity equal protection claims against Dude and Fowler in

Count III is **GRANTED**.

### 2.    Section 1983 Claim Against CSD

"It is well established that [42 U.S.C. §] 1983 itself creates no substantive

rights; it merely provides a remedy for deprivations of federal rights established

elsewhere." Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1032

(11th Cir. 1987) (citing City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985)).  To

sustain a cause of action based on § 1983, a litigant must establish two elements:

(1) that she suffered a deprivation of a right, privilege, or immunity protected by

the U.S. Constitution or federal law, and (2) that the act or omission causing the

deprivation was committed by a person acting under color of state law.  Livadas v.

Bradshaw, 512 U.S. 107, 132 (1994); Arrington v. Cobb Cnty., 139 F.3d 865, 872

(11th Cir. 1998).  Accordingly, "[i]n any § 1983 action, a court must determine

'whether the Plaintiff has been deprived of a right secured by the Constitution and

laws of the United States.'"  Glenn v. Brumby, 663 F.3d 1312, 1315 (11th Cir.

2011) (quoting Baker v. McCollan, 443 U.S. 137, 146 (1979)).  "Absent the

existence of an underlying constitutional right, no section 1983 claim will lie."

Wideman, 826 F.2d at 1032.  A court's resolution of Title IX claims does not

dictate the result of the court's § 1983 analysis.  See Hill, 797 F.3d at 976

(concluding that the school board may be held liable under Title IX but not under §

1983).

   Moreover, a plaintiff seeking to hold a municipal entity such as CSD liable

under § 1983 cannot rely upon the theory of *respondeat superior*; instead, liability

must stem from the "execution of a government's policy or custom, whether made

by its lawmakers or by those whose edicts or acts may fairly be said to represent

official policy . . . ."  Monell v. Dep't of Soc. Servs. of the City of New York, 436

U.S. 658, 694 (1978); see also Denno ex rel. Denno v. School Bd. of Volusia

Cnty., 218 F.3d 1267, 1276 (11th Cir. 2000) (citing Monell, 436 U.S. at 694).

Because a municipality is "liable under section 1983 only for acts for which the

local government is actually responsible," Marsh v. Butler Cnty., 268 F.3d 1014,

1027 (11th Cir. 2001) (en banc), a plaintiff "must identify a municipal policy or

custom that caused . . . injury." Grech v. Clayton Cnty., 335 F.3d 1326, 1329 (11th

Cir. 2003) (citation and internal punctuation omitted).

> To establish a policy or custom, it is generally necessary to show a
> persistent and wide-spread practice. Moreover, actual or constructive
> knowledge of such customs must be attributed to the governing body
> of the municipality. Normally random acts or isolated incidents are
> insufficient to establish a custom or policy.

Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986). A plaintiff

must show that the municipal custom or practice is "the moving force behind the

constitutional violation." City of Canton v. Harris, 489 U.S. 378, 389 (1989)

(internal punctuation and citation omitted).

> "[I]t is not enough for a § 1983 plaintiff merely to identify conduct
> properly attributable to the municipality." Bd. of Cnty. Comm'rs of
> Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404 (1997). The plaintiff
> "must show that the municipal action was taken with the requisite
> degree of culpability and must demonstrate a direct causal link between
> the municipal action and the deprivation of federal rights." Id. The
> Supreme Court has noted the "deliberate indifference" standard under
> § 1983 is a "stringent standard of fault, requiring proof that a municipal
> actor disregarded a known or obvious consequence of his action." Id.
> at 410. A court must "carefully test the link between the policymaker's
> inadequate decision and the particular injury alleged." Id. at 410. The
> evidence must show the deprivation of the constitutional right is a
> "plainly obvious consequence" of the municipal action. Id. at 411.

Hill, 797 F.3d at 977 (emphasis added).

Defendants contend that Thomas's § 1983 claim against CSD for the violation of Jane Doe's equal protection rights should be dismissed because Thomas has failed to identify a single incident of harassment flowing from the Policy after it was implemented in the summer of 2016. Defs.' Br. at 22. This Court agrees. While Thomas alleges that CSD failed to consider and remediate parents' concerns regarding the Policy or put in place any safeguards that could mitigate the potentiality for some type of harm, there are no allegations in the First Amended Complaint that CSD knew of any prior instances of sexual harassment in either the boys' or girls' bathrooms as a result of the Policy. Without any known incidents, CSD cannot be said to have implemented a Policy with deliberate indifference to the known consequences of its changes. See Hill, 797 F.3d at 978 ("While the Board's policies may have made a violation of Doe's rights 'more likely' by motivating [the harasser] to engineer the rape-bait operation, that alone does not give rise to an inference that the policies 'produced a specific constitutional allegation.'"). Liability under § 1983 does not lie based on the allegation that the alleged harm was a "foreseeable" result of a policy under which there were no prior instances of harm. Thomas has failed to allege facts that show that the Policy was the "moving force" behind the purported constitutional violation.

Consequently, Defendants' Motion to Dismiss Count III against CSD is

**GRANTED**.

### 3.      Section 1983 Claim Against Dude and Fowler in Their Individual Capacities

The First Amended Complaint alleges that Dude is liable under § 1983 for

violations of Jane Doe's equal protection rights because, as the superintendent of

CSD, he improperly implemented the Policy and failed to establish safeguards to

prevent the foreseeable harm that would occur under the Policy.  First Am. Compl.

¶¶ 170-73.  It also alleges liability under § 1983 because both Dude's and Fowler's

responses to the Incident as to the care of Jane Doe and the investigation were

deliberately indifferent.  Id. ¶¶ 180-84.  Defendants argue that the § 1983 claim

against Dude and Fowler in their individual capacities should be dismissed because

Thomas has failed to allege that they acted with deliberate indifference and, even if

they had, they are entitled to qualified immunity.  Defs.' Br. at 22-25.

"Qualified immunity offers complete protection for individual public

officials performing discretionary functions 'insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable

person would have known.'"  Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir.

2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To claim

qualified immunity, a defendant must first show that he or she was performing a discretionary function.  Moreno v. Turner, 572 F. App'x 852, 855 (11th Cir. 2014) (citing Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009)).  Thomas does not dispute that Dude and Fowler were engaged in the performance of such discretionary functions.

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply."  Edwards v. Shanley, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009)).  A plaintiff demonstrates that qualified immunity does not apply by showing: "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation." Whittier, 581 F.3d at 1308.

A constitutional right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right.'"  Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "When we consider whether the law clearly established the relevant conduct as a constitutional violation at the time that [the government official] engaged in the challenged acts, we look for 'fair warning' . . . that the conduct at issue violated a constitutional

right." Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)).

With respect to the implementation of the Policy by Dude, Thomas fails to adequately allege a violation of equal protection. The Policy itself is not obviously violative of Jane Doe's equal protection rights, regardless of the previously expressed concerns by certain parents about their children's privacy in sex-separate bathrooms. On its face, the Policy did not encourage, foster, or obviously lead to sexual harassment and abuse or contain "glaring inadequacies" like the policy did in Hill, which permitted and incentivized a rape-baiting scheme to catch perpetrators in the act.[10]  See First Am. Compl. ¶ 18; Hill, 797 F.3d at 978-79. Moreover, even if the Policy arguably violated Jane Doe's constitutional rights, Thomas has failed to cite any Supreme Court or Eleventh Circuit authority clearly establishing the unconstitutionality of the implementation of such a policy, meaning that Thomas cannot meet her burden to show that qualified immunity

---

[10] Notably, there is no allegation that John Doe ever actually identified as female, such that his use of the girls' bathroom was even technically allowed by the Policy. See First Am. Compl. ¶ 58; OCR Report at 9-10 (identifying the conflicting information regarding John Doe).

would not apply to protect Dude from an equal protection claim based on that policy.

However, as previously discussed, this Court cannot as a matter of law at this stage of the proceedings hold that neither Dude nor Fowler was not deliberately indifferent to Jane Doe's purported sexual harassment by failing to respond to the Incident. "A governmental official may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." Hill, 797 F.3d at 978 (alterations accepted) (quoting Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1250 (10th Cir. 1999)) (citing Williams, 477 F.3d at 1300-02; Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)).  It is clearly established that a school official who "effectively did nothing" in response to a claim of sexual harassment violates equal protection and, if such facts are proved, would be subject to liability under a § 1983 equal protection claim.  Hill, 797 F.3d at 979 (citing Broward Cnty., 604 F.3d at 1261).  At this stage of the proceedings, the Court must accept the allegations as asserted by Thomas as true, which means there is the potential that Dude and Fowler violated clearly established law by effectively "doing nothing" in response to Jane Doe's claim of sexual harassment (i.e., relying upon the results of the DFCS inquiry without reviewing that investigation or conducting their own investigation).

Thus, Defendants' Motion to Dismiss Count III is **GRANTED** as to the § 1983 claims against CSD and Dude and Fowler in their official capacities, but **DENIED** as to the § 1983 claims against Dude and Fowler in their individual capacities.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss First Amended Complaint [Doc. 22] is **GRANTED IN PART and DENIED IN PART**.  The motion is **GRANTED** as to Count II of the First Amended Complaint, and as to Count III of the First Amended Complaint against Defendants City School of Decatur and Dr. David Dude and Marcia Fowler in their official capacities, which claims are **DISMISSED**.  The motion is **DENIED** as to Count I of the First Amended Complaint and as to Count III of the First Amended Complaint against Defendants Dr. David Dude and Marcia Fowler in their individual capacities, which claims remain in the case.

It is further **ORDERED** that Defendants' Motion for Leave to Respond to

Plaintiff's Notice of Supplemental Authority [Doc. 33] is **DENIED AS MOOT**.

**IT IS SO ORDERED** this _18th_ day of March, 2021.

MARK H. COHEN
United States District Judge