1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3

PASCHA THOMAS, as Guardian  )
4  and next friend of JANE DOE,)
   a minor,                    )
5                              )
        Plaintiff,             )
6                              ) CIVIL ACTION FILE
   vs.                         )
7                              ) NO: 1:20-cv-02317-MHC
   CITY SCHOOLS OF DECATUR,    )
8  DR. DAVID DUDE,             ) VOLUME I
   MARCIA FOWLER,              )
9                              ) CONFIDENTIAL
        Defendants.            )
10
                              - - -
11
12          Zoom Video Conference Deposition of PASCHA

13     THOMAS, taken on behalf of the Defendants, pursuant

14     to the stipulations agreed to herein, before

15     Michelle Fuller, Certified Court Reporter, on the

16     2nd day of December 2021, commencing at the hour of

17     10:05 a.m.

18                            - - -

19            Thompson Reporting Services, Inc.
              Georgia Certified Court Reporters
20                    P.O. Box 792
              Powder Springs, Georgia 30127-0792
21             www.thompsonreportingservices.com
          scheduling@thompsonreportingservices.com

22

23

24

25

1                    INDEX TO EXAMINATION

2                                                    Page

3

4   Examination by Ms. Ware  .......................   5

5   Examination by Ms. Broyles  .................... 191

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX TO EXHIBITS

2

3

4          (No exhibits were marked and/or admitted.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  APPEARANCES OF COUNSEL:

2      On Behalf of the Plaintiff:

3          VERNADETTE R. BROYLES, ATTORNEY AT LAW
           MARY E. McALISTER, ATTORNEY AT LAW
4          CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
           5805 State Bridge Road
5          Suite G310
           Johns Creek, Georgia 30097
6          (770) 448-4525
           E-mail: vbroyles@childparentrights.org
7                  mmcalister@childparentrights.org

8          ERNEST G. TRAKAS, ATTORNEY AT LAW
           EVANS & DIXON, LLC
9          211 North Broadway
           Suite 2500
10         St. Louis, Missouri 63102
           (314) 552-4188
11         E-mail: etrakas@evans-dixon.com

12     On Behalf of the Defendants:

13         KERI P. WARE, ATTORNEY AT LAW
           ANDREW W. YATES, ATTORNEY AT LAW
14         WILSON, MORTON & DOWNS, LLC
           125 Clairemont Avenue
15         Suite 420
           Decatur, Georgia 30030
16         (404) 377-3638
           E-mail: kware@wmdlegal.com
17                 ayates@wmdlegal.com

18     Also present: Mamie Kimbrell, Thompson Reporting
                      Services, Zoom Host
19                          - - -

20              MS. WARE:  This will be the deposition of

21         Pascha Thomas, who is the plaintiff in this

22         case.  It is being taken pursuant to Notice and

23         agreement of counsel for all purposes allowed

24         under the Federal Rules of Civil Procedure.

25              Ms. Broyles, I propose that we reserve all

1              objections except those going to the form of

2              the question and the responsiveness of the

3              answer.  Is that agreeable?

4                   MS. BROYLES:  That's agreeable.  If we

5              feel the need to preserve any objections in a

6              timely manner, we will do so on the record.

7                             EXAMINATION

8    BY MS. WARE:

9         Q    Good morning, Ms. Thomas.  My name is Keri

10   Ware.  I am counsel for City Schools of Decatur.  The

11   gentleman here is Andy Yates, Mr. Andy Yates.  He's also

12   working with me on this case.  And this is the first

13   time we're meeting you this morning.

14             So before we get started, I just kind of want

15   to go over a few ground rules.  Have you ever been

16   deposed before?

17        A    No, ma'am.

18        Q    So I'll be asking you questions, and you'll be

19   responding.  And during that process, it's easy to get

20   into conversation mode and sometimes talk over the top

21   of each other.  So I will do my best not to talk over

22   you or start a new question while you're still

23   answering, and I would ask vice versa, that you allow me

24   to finish my question completely before you start your

25   answer.  And that way we're both very clear and the

**Confidential**                                                      6

```
 1   court reporter, Ms. Fuller, can get down a very clear
 2   transcript.
 3          If at any time you need a break, let me know,
 4   and we can take a break so long as there's no question
 5   pending.  And if there's anything that I ask you that
 6   isn't clear or doesn't make sense to me, please -- I
 7   mean sense to you, please feel free to ask me to clarify
 8   or repeat the question.  Does that all sound good?
 9        A    Yes, ma'am.
10        Q    Okay.  So we'll start with just a little bit of
11   your background and history.  And   Jane   is your
12   daughter; correct?
13        A         Jane
14        Q         Jane   is how you pronounce that?
15        A    Correct.
16               MS. WARE:  Also, Ms. Broyles, I'm assuming
17          this entire deposition is going to be subject
18          to the protective order given that we're using
19          actual names --
20               MS. BROYLES:  Yes.
21               MS. WARE:  -- and the sensitivity.
22               Okay.  So I wanted to let you know, Ms.
23          Fuller, that you'll need to mark this
24          deposition as confidential.
25   BY MS. WARE:
```

**Confidential**                                          7

```
 1        Q    Okay.  And how old is  Jane    now?

 2        A       Jane    is 9 years old now.

 3        Q    Okay.

 4        A    I'm sorry.  No, she's 10.  ████████████

 5   ████████████████████████████  I'm sorry.  10.  I'm sorry.

 6        Q    Okay.  And do you have other children?

 7        A    Yes, ma'am, I do.

 8        Q    How many other children do you have?

 9        A    I have three girls and a --

10              MS. BROYLES:  No.  No.  No.  I'm fine.

11         I'm good.  Go ahead.

12              THE WITNESS:  Okay.  Yes, ma'am,  Jane

13         has two other siblings, two girls and also a

14         brother, so four kids.

15   BY MS. WARE:

16        Q    And the two girls, what are their names?

17        A    Jane's younger sister.

18        Q    Okay.

19        A    And also  Jane's older sister  .  And also I

20   have two other adult children.

21        Q    Okay.  Who are they?

22        A    It's going to be Naujae, N-A-U-J-A-E, Phillips.

23        Q    Okay.

24        A    And I can't think right now I'm so nervous.  I

25   can't think of my own child's name.
```

**Confidential**                                                                        8

```
 1              MS. BROYLES:  Your daughter.

 2              THE WITNESS:  Niagara --  I'm sorry.  I'm

 3         nervous -- N-I-A-G-A-R-A, Thomas.

 4  BY MS. WARE:

 5     Q    Okay.  And you had mentioned a little boy as

 6  well.

 7     A    Yes,  Jane's older brother  .

 8     Q    And how old are younger sister ,  older sister , and  older brother ?

 9     A    Older sister  is 11.  Older brother  is 14.

10     Q    Okay.

11     A    And younger sister is 9 years old.

12              MS. BROYLES:  Have you had some water?

13         Take a sip of water.

14  BY MS. WARE:

15     Q    And Naujae and Niagara, how old are they?

16     A    28 and 22.

17     Q    Naujae is 28, and Niagara is 22?

18     A    Yes, ma'am.

19     Q    Okay.  And do they live here or with you?

20     A    No, ma'am.

21     Q    Where are they?

22     A    They live out of state.

23     Q    What state are they in?

24     A    Tennessee.

25     Q    Okay.  Have you ever gone by any other name
```

1    other than Pascha Thomas?  In other words, is that your

2    maiden name or married name?

3         A    That's my married name.

4         Q    Okay.  Have you -- are you currently married?

5         A    I'm separated.

6         Q    And who was your -- who is your partner that

7    you are separated from?

8         A    Tyrone Thomas.

9         Q    Do you know where he is?

10        A    No, ma'am.

11        Q    All right.  Have you ever been married before

12   Mr. Thomas?

13        A    No, ma'am.

14        Q    When did you marry Mr. Thomas?

15        A    May of 1996.

16        Q    So  younger  older  , and  older  have the last name
                   sister  sister          brother

17   ▋.  Is that ▋ name, or is that ▋

18   ▋ name?

19        A    That's ▋ name.

20        Q    Okay.  And who is their father?

21        A    David Jackson.

22        Q    Do you know where Mr. Jackson is?

23        A    No, ma'am.

24             And also that's  Jane's  dad's name as well.

25   He just wasn't there to sign the birth certificate as

```
 1   well.
 2       Q    Okay.  So   Jane's   dad is David Jackson?
 3       A    Yes, ma'am.  All four have the same father,
 4   yes, ma'am.
 5       Q    Okay.  But you said Mr. Thomas, Tyrone Thomas,
 6   who is your current husband signed the birth certificate
 7   for   Jane  ?
 8       A    No, ma'am.  When you're married in the state of
 9   Georgia, if the father's not there, ▮▮▮▮▮▮▮▮▮▮▮▮
10   ▮▮▮▮▮  becomes the child's last name.  So that's how
11    Jane    became ▮▮▮▮▮▮.
12       Q    Got you.  Okay.
13            All right.  And when was the last time that you
14   were living with Mr. Thomas?
15       A    1998.
16       Q    Okay.  So you separated in 1998?
17       A    Yes, ma'am.
18       Q    Okay.  And at any time since separating from
19   Mr. Thomas, did you live with Mr. Jackson, the
20   children's father?
21       A    Yes, ma'am.  We stayed together from 2004 till
22   2012.
23       Q    And what was the reason that you separated from
24   Mr. Jackson?
25       A    Verbal domestic violence towards me, not the
```

1    kids.

2        Q    And what about Mr. Thomas?  What was the reason

3    you separated or -- that you, yeah, separated from him?

4        A    No reason.  We just grew apart.

5        Q    Fair enough.

6             The two children that live in Tennessee, Mr. --

7    I mean Naujae Phillips and Niagara Thomas, do they --

8    are Mr. Jackson or Mr. Thomas their father?

9        A    Tyrone Thomas is Niagara's father.

10       Q    Okay.  And what about Mr. Phillips, Naujae?

11       A    No, he has another father.

12       Q    Okay.  What's his name?

13       A    Jonathan McKinney.

14       Q    Jonathan McKinney?

15       A    Yes.

16       Q    All right.  And do you know where Mr. McKinney

17   is?

18       A    No, ma'am.

19       Q    Did y'all ever live together at any time?

20             MS. BROYLES:  Counsel --

21             THE WITNESS:  Briefly.

22             MS. BROYLES:  -- I'm going to -- hold on a

23        second.

24             I'm going to ask about the relevance of --

25        of the remainder of this line of questioning,

```
 1              the relevance to the case at hand.
 2                  MS. WARE:  Well, I think that if they
 3              lived together at any point in time during
 4              Jane's   life that it would be relevant.
 5                  MS. BROYLES:  Well, you can certainly ask
 6              if they lived with  Jane  , but they didn't.
 7              So we're kind of getting far afield.
 8   BY MS. WARE:
 9       Q    You don't know where Mr. McKinney is now?
10       A    No, ma'am.  My son is 28 years old, so it was
11   28 years ago.  Jane   or my other kids have never met
12   him before.
13       Q    Okay.  And so he never lived in the house with
14     Jane  ?
15       A    No, ma'am.   Jane   is only 10 years old.
16   That was 28 years ago.
17       Q    Okay.  And what about Mr. Thomas?  Did he live
18   in the house ever with   Jane  ?
19       A    No, ma'am.
20       Q    Okay.  And Mr. Jackson, he lived in the house
21   with   Jane  ?
22       A    Yes, ma'am.
23       Q    And he lived in the house from -- until 2012?
24       A    Yes, ma'am.
25       Q    And how old was   Jane   at that time?
```

1      A      She would be one years old.

2      Q      Okay.  Where are you currently living?  What is

3  your current address?

4      A      I live in ███████ County.

5      Q      What is your address there?

6      A      In ███████, Georgia.

7      Q      Do you know your specific address?

8              MS. BROYLES:  Well, at this time I'm

9          instructing the witness not to answer that

10         question for the -- for the sake of privacy.

11         She has been harassed tremendously as a result

12         of this litigation and has -- had also been

13         fleeing from a domestic violence situation.  So

14         we're asking that her specific address, which

15         is not relevant to what happened back in

16         November 2017, be not responded to.

17             MS. WARE:  So I am going -- I'll just note

18         for the record that this is subject to the

19         confidentiality order, so there's no danger of

20         it being shared publicly.  But if Ms. Thomas is

21         going to follow your advice not to answer, then

22         I'll move on to the next question.

23             MS. BROYLES:  Okay.  So, Ms. Thomas, you

24         can come back.  She put her phone away.  It was

25         beeping and was becoming a distraction.

Confidential                                    14

1              THE WITNESS:  Yes, ma'am.

2              MS. BROYLES:  Okay.  So go ahead.

3    BY MS. WARE:

4         Q    Prior to living in ███, where did you live?

5         A    In ███ County as well.

6         Q    All right.  And what address was that?

7              MS. BROYLES:  So we're -- I'm instructing

8         my client not to be -- again, this is beyond

9         the scope of what is relevant to this

10        particular case, so where she had lived

11        previously and where she's living now

12        specifically is beyond the scope of discovery.

13             MS. WARE:  It is absolutely not,

14        Ms. Broyles.  Actually, current and former

15        addresses are very standard discovery questions

16        that are asked.  And particularly where

17        Jane   has lived is relevant, and so I'm

18        going to ask that Ms. Thomas provide me with

19        the addresses of everywhere she has lived since

20        Jane's   birth.

21             MS. BROYLES:  Okay.  So I'm instructing

22        the witness not to answer that question.  And

23        we'll just note the objection on the record

24        that it is beyond the scope of discovery, not

25        relevant to the events that are at issue in

**Confidential**                                    15

```
 1              this case, and we have concerns that it
 2              would -- a variety of different concerns.  And
 3              so we can take that up at some appropriate
 4              time.  And you're certainly welcome to ask that
 5              in interrogatories.
 6                   MS. WARE:  Well, I'm going to ask the
 7              questions, and I will allow you to assert your
 8              objection to each of my questions because if we
 9              have to go before the court I want to make sure
10              it's clear what my questions would have been
11              that she refused to answer.
12    BY MS. WARE:
13       Q    So, Ms. Thomas, what is the address of where
14    you lived prior to the current address where you're
15    living now?
16                   MS. BROYLES:  That was the question you
17              had just asked, and so I had just instructed
18              the witness not to answer that.  And let me
19              just say this:  At some point I'm imagining
20              you'll get to where she was living at the time
21              of the incident, and of course that would be --
22              I would instruct her to answer that question.
23    BY MS. WARE:
24       Q    Are you going to follow your counsel's advice
25    not to answer my question, Ms. Thomas?
```

```
 1        A    Yes, ma'am.
 2        Q    All right.  So am I correct then that you --
 3   prior to living in ██████ , you lived at a different
 4   address in ██████ County?
 5        A    Yes, ma'am.
 6        Q    How long ago was that?
 7             MS. BROYLES:  Okay.  Again, the same
 8             objection.
 9             MS. WARE:  So you're not going to tell me
10             how long ago she lived at a different address.
11             MS. BROYLES:  No.
12   BY MS. WARE:
13        Q    All right.  Prior to living in the undisclosed
14   ██████ County location, where did you live prior to
15   that?
16        A    I lived in ██████ , Georgia.
17        Q    I'm sorry?
18        A    Yes, ma'am.  ██████ , Georgia.
19        Q    ██████ .  Okay.  And this was before you moved
20   to ██████ County?
21        A    Yes, ma'am.
22        Q    And what was your address there?
23             MS. BROYLES:  Same objection.
24   BY MS. WARE:
25        Q    Are you following your counsel's advice not to
```

**Confidential**                                    17

1    answer my questions?

2        A    Yes, ma'am.

3        Q    Okay.  Prior to living in the ████████, Georgia,

4    location, where did you live prior to that?

5                    MS. BROYLES:  Counsel, can you explain the

6                relevance to the incident -- a November of 2017

7                incident to go down this series of questions

8                where my client was living after the November

9                2017 event?  What is the relevance to the

10               events that occurred that day?

11                   MS. WARE:  These are standard discovery

12               questions.

13                   MS. BROYLES:  I know.  Just because

14               they're standard doesn't make them relevant.

15                   MS. WARE:  And they're relevant -- first

16               of all, relevance isn't the standard,

17               Ms. Broyles.  The standard under the federal

18               rules is likely to lead to the discovery of

19               admissible evidence.  I think you're going to

20               have a hard time convincing the judge that me

21               knowing -- first of all, that me knowing her

22               address is somehow protected and, B, that it is

23               not relevant.  Because what I suspect is that

24               there's something she doesn't want me to know

25               about where she's living.  And if it goes to

1         damages, I'm entitled to know that.

2              MS. BROYLES:  Well, I understand what the

3         standard is; however, there's nothing about

4         where she -- the specific address of where

5         she's living beyond ████, Georgia -- you have

6         to understand, it's not simply the general

7         public, but it's also the -- the school

8         district has been -- has been very abusive

9         towards Ms. Thomas after the event.  We do not

10        trust this situation, this dynamic here to

11        protect her privacy in terms of specifically

12        where she's living or the places that she had

13        lived since the time of this event.

14             And because -- how it's designed to lead

15        to discoverable evidence is beyond logic to me.

16        There's no allegation about -- about  Jane

17        after this event.  If it goes to damages, well,

18        we can take that up with the court.

19             We have a lot to cover today in a

20        relatively short amount of time.  So

21        understanding our objection, perhaps you can

22        move on to questions that will give you

23        information.

24             MS. WARE:  Well, your objection is noted.

25        As I stated, I'm going to ask my questions for

**Confidential**                                        19

```
 1              the record, and you can make your objection.
 2              And if we continue down this path where you
 3              object to very routine questions, then we will
 4              be here all day.  I am going to get eight
 5              hours' worth of deposition if that's what it
 6              takes because I'm allowed under the rules to
 7              have that.  I'm trying to move as quickly as
 8              possible, but if you continue to be
 9              obstreperous, I can't move forward.
10                   So your objection is noted.
11                   MS. BROYLES:  Thank you.
12    BY MS. WARE:
13         Q    Ms. Thomas, what is    Jane's    birthday?
14         A    ██████████.
15         Q    Where was she born?
16         A    In ██████████████████
17         Q    What hospital was she born at?  Or was she born
18    in the hospital?  Or where was she born?
19         A    ████████   ███████████████████
20         Q    Where were you living at the time that she was
21    born?
22         A    ████████████, Georgia.
23         Q    And what was your address?
24                   MS. BROYLES:  Again, this is way beyond
25              the scope of discovery.  I'm -- I'm --
```

```
 1            objection.
 2                 MS. WARE:  Are you instructing her not to
 3            answer?
 4                 MS. BROYLES:  Yes.
 5   BY MS. WARE:
 6        Q    Ms. Thomas, are you going to follow your
 7   attorney's advice not to answer where you were living
 8   when    Jane    was born?
 9        A    Yes, ma'am.  I don't feel that that's relevant.
10                 MS. BROYLES:  Or designed to lead to
11            relevant information.
12   BY MS. WARE:
13        Q    How long did you live at the address in
14   ████████    where    Jane    was born?
15        A    Ten years.
16        Q    And from the time she was born until you moved
17   from that address, how long did you live there?
18        A    I stayed at that address approximately two or
19   three years.  Two or three years maybe.
20        Q    So two to three years since    Jane    was born you
21   lived at that address --    Jane   ?
22        A    No, I lived there prior to    Jane    being born
23   for ten years.
24        Q    Right.  But I'm saying -- I'm trying to
25   understand -- maybe I should ask it this way:  How long
```

**Confidential**                                        21

```
 1   did   Jane      live at that address with you?
 2        A    Oh, okay.  Yes, ma'am.  For two -- two years.
 3        Q    Okay.  And after living in that address in
 4   ████████, Georgia, where did you move?
 5        A    We moved to Tennessee.
 6        Q    Okay.  Where did you live in Tennessee?
 7        A    ██████████████████.
 8             MS. BROYLES:  What city?  Just give her
 9        the city.
10             THE WITNESS:  Okay.  ████████████████.
11   BY MS. WARE:
12        Q    █████████████████?
13        A    Yes.
14        Q    All right.  And how long did you live at the
15   ██████████████   address in Tennessee with   Jane  ?
16        A    A year.
17        Q    Okay.
18        A    A year or two.
19        Q    I'm sorry?
20        A    Approximately a year or two.
21        Q    Okay.  After you lived in the ████████████
22   address, where did you move then?
23        A    ████████, Georgia.
24        Q    Okay.  Where did you live in ████████?
25        A    I don't want to answer that question.
```

**Thompson Reporting Services, Inc.**
**(678) 483-0600**

**Confidential**                                                    22

```
 1              MS. BROYLES:  Just again, we're -- we're
 2          fine with the city and the -- and the state.
 3          The specific address, we think -- again, same
 4          objection.
 5  BY MS. WARE:
 6      Q    Okay.  So the address in -- the place where you
 7  lived in ████████ after you moved from Tennessee, how
 8  long did you live there?
 9      A    A year.
10      Q    And after you left the -- moved from the
11  ████████ address, where did you move?
12      A    To ██████ County.
13      Q    Okay.  And how long did you live at that
14  address in ██████ County after you moved from ██████?
15      A    I'll say roughly six months.
16      Q    All right.  And at the time of this -- well,
17  let me keep moving forward.  After the ██████ County
18  address, the first ██████ County address after moving
19  from ██████, you were there for about six months, and
20  then where did you move?
21      A    To ██████ County.
22      Q    So would that be the second address in ██████
23  County that we discussed in ██████?
24      A    Yes.  The first address is the address of where
25  the incident happened at.  That's the first Decatur --
```

Confidential                                    23

1    █████████  County address where the incident happened at.

2                    MS. BROYLES:  When the incident.

3                    THE WITNESS:  When -- I mean, I'm sorry.

4           Not where, when the incident -- wait.  Where,

5           not when.  Oh, gosh.  When the incident

6           occurred.

7    BY MS. WARE:

8       Q    All right.  And what part of ████████ County was

9    that?  Was that Decatur?

10      A    Yes, ma'am.

11                   MS. BROYLES:  I'm instructing the witness

12          to give that specific address which is already

13          known in the -- in the documents that have been

14          produced.  So if you'd like to, Ms. Thomas.

15                   THE WITNESS:  It was ██████████████.

16   BY MS. WARE:

17      Q    How long had you lived at this address at the

18   time the incident happened?

19      A    Two or three months.

20      Q    Who was living with -- well, who was living

21   with you, if anyone, at the ██████████ address?

22      A    Myself, *Jane's younger sister*, *older sister*, and *older*

23   *brother*.

24      Q    Anyone else?

25      A    No.

1      Q     Okay.  And the ███████ address that you lived

2  immediately prior to that, who all lived with you there?

3      A     The same people.

4      Q     I'm sorry?

5      A     The same people, just me and my kids.  The same

6  people.

7              MS. BROYLES:  Ms. Ware, can I ask for

8          clarification?  Did I hear you say -- was

9          Jane   there with you as well?

10             THE WITNESS:  Yes.

11             MS. BROYLES:  Okay.  I just wanted to be

12         clear.  Okay.

13  BY MS. WARE:

14     Q     All right.  And then the Tennessee address, who

15  lived with you at that address?

16     A     The same people: myself, my three girls, and my

17  son.

18     Q     All right.  No one else?

19     A     No, ma'am.

20     Q     And then the ███████ address, who all lived

21  with you there?

22     A     Briefly it was the kids' father, David Jackson.

23     Q     How long did he live there with you?

24     A     Actually it wasn't briefly.  It was from 2005

25  to 2012 as I stated before.

```
 1      Q    Where all has  Jane    attended school from the
 2   time she was born?
 3      A    In Tennessee it was --
 4               MS. BROYLES:  Take your hands down.
 5               THE WITNESS:  Oh, I'm sorry.  I'm trying
 6           to think.
 7               MS. BROYLES:  It's okay.  You're doing
 8           good.
 9               THE WITNESS:  She attended a ████████████
10           ██████████.  Right now I can't think of the name
11           of it.  She attended ██████████████████.
12           And also, she -- I think it's ████████
13           ████████████████████.  And then it's
14           going to be Oakhurst Elementary and then
15           Winnona Park, ████████████████████████
16           ████████████████.
17   BY MS. WARE:
18      Q    Is she attending ████████████████████
19   ████████████?
20      A    ████████████.
21      Q    ████████████████████████?
22      A    Yes, ma'am.
23      Q    How long has she been in ████████████████?
24      A    I think for ████████████████████████.
25      Q    And how long has she been ████████████████
```

```
 1    ███████?
 2        A    ████████████████████████████████████
 3    ████████████████████████.
 4        Q    So ████████████?
 5        A    Yes, ma'am.
 6        Q    Has she ever been ██████████████████?
 7        A    Yes, ma'am, ██████████████.
 8        Q    Okay.  Was Oakhurst her first school that she
 9    attended in Georgia?
10        A    Yes, ma'am.
11        Q    And do your other children also attend
12    ████████████?
13        A    ████████████
14        Q    At the time of this incident, were you working?
15        A    No, ma'am.
16        Q    Were you homeschooling children or anything
17    like that?
18        A    No, ma'am.
19        Q    Are you currently working?
20        A    Yes, ma'am.
21        Q    When did you first obtain employment after the
22    incident occurred?
23        A    I've been working, I'd say, about -- a couple
24    of months after that I started doing home health,
25    private duty home health.
```

1      Q      And what are you doing now?  Are you doing the

2  same thing?

3      A      Home health, yes, ma'am.

4      Q      Who is your employer?

5      A      I'm self-employed, ma'am.

6      Q      Okay.  So what is your education background?

7      A      I have a GED, and also I have some college

8  credits.  I actually need like 15 credits to get my

9  associate's degree.

10     Q      And what type of home health do you do?

11     A      I work with the elderly.

12     Q      So do you go into their homes?

13     A      Yes, ma'am, I go into their homes.  I feed

14  them.  Anything that they're needing, bathing them.

15  Anything that they're needing me to do.

16     Q      And how do you get clients or patients that you

17  go and visit?  Is it through a company, or is it just

18  word of mouth they find --

19     A      It's usually word of mouth, and, you know,

20  someone would refer me.

21     Q      Okay.  Do you have a company that you use that

22  you've created or anything like that?

23     A      No, ma'am.  It's just more word of mouth, like

24  you was saying.

25     Q      All right.  Okay.  Have you ever -- prior to

```
 1    filing this lawsuit ever filed a lawsuit before?

 2         A    No, ma'am.

 3         Q    Have you ever been a party in a lawsuit prior

 4    to this one?

 5         A    No, ma'am.

 6         Q    When   Jane   began attending Oakhurst, did she

 7    ever come home and talk to you about her friends or

 8    people that she met in her class or things like that?

 9         A    Yes, ma'am, she told me that she loved the

10    school.

11         Q    Do you remember who she would come home and

12    talk about, any particular friends?

13         A    No, ma'am.  She just told me she had several

14    friends, and there was always a story, a little friend

15    story here and there.  But she just loved ███ her

16    teacher, and I forgot her main teacher's name.  I forgot

17    her name, but, you know, she was happy there.  She had

18    several friends.

19         Q    ███

20         A    That's what she --

21              MS. WARE:  Ms. Broyles, are you passing

22              notes to --

23              MS. BROYLES:  I was -- I was -- the name

24              of her teacher, she just told me the name of

25              her teacher a little while ago.
```

```
1              THE WITNESS:  Okay.  ████████████.  I was
2         trying to remember ████ name.  █████ is like the
3         assistant teacher.  And I never really got ████
4         name, but he was just -- ████████████████████
5         ██████████
6   BY MS. WARE:
7         Q     And Ms. ██████████ was her -- and what about
8   any -- did she have any students that she didn't like in
9   her class that she ever talked to you about?
10        A     No, ma'am.
11        Q     She never came home and complained that kids
12  were mean to her or that she didn't like so-and-so or
13  anything like that?
14        A     No, ma'am.  Jane   has never met a person --
15  she's a happy soul -- that didn't like her.
16        Q     So you first reported this incident to Oakhurst
17  on November 17, 2017; correct?
18        A     Yes, ma'am.
19        Q     Tell me what happened that -- prior to you
20  coming to report that to the school.  How did you find
21  out about it?
22        A     I was laying in my bed, and   Jane   was at the
23  other end of the bed.  And   Jane   was touching
24  herself.  And I watched for a second to make sure I was
25  seeing what I was seeing.  And I said,   Jane  , what's
```

1    wrong?  I said, Are you itching or something or

2    something wrong?  I said, Why are you doing that?  Has

3    someone touched you down there?  And she was like, Yes,

4    ma'am.  And I said, Who?  And she told me that the boy

5    in her class touched her down there.

6            And I asked her what happened, and so she was

7    explaining to me that she needed to go to the bathroom

8    and that her teacher told her she can go to the

9    bathroom.

10           And she was in the bathroom, and she was

11   pulling up her pants trying -- she was leaving out.  She

12   had pulled up her pants -- you know, in the process of

13   pulling up her pants and leaving out when the little boy

14   pushed her up against the wall or the stall or something

15   or another, and he stuck his fingers -- and he tried

16   to -- she had on some leggings.  And he stuck his

17   fingers like between her vagina like trying to -- in

18   that manner like.

19           And she kept telling him to stop, and he

20   wouldn't stop.  And he kept on.  And she said, Momma, it

21   was hurting me, it was hurting me bad, and I told him to

22   stop.

23           Then she started crying and saying that, Momma,

24   I didn't tell him to come in the bathroom.  I didn't

25   know he was going to be in there.

**Confidential**                                      31

1         And she was like, Don't be mad at me, Momma.

2    Please don't.  I didn't tell him to do that to me.

3         I said,   Jane  , it's not your fault.  It's

4    not your fault.  First of all, honey, it's not your

5    fault.  You didn't do anything.  I'm not mad at you.  I

6    can't be mad at you.

7         For some reason she felt like she caused what

8    to happen -- to happen to her.  So I reassured her that

9    it wasn't her fault.  And I just laid there and I held

10   her because I was just not in a good place at that

11   moment in my mind right there.  I just was like blank.

12        So the next day is when I took her to school.

13   Q    Okay.  So I need to ask a little bit more

14   specific questions about when   Jane   reported it to

15   you.  You said she was touching herself.  When you say

16   that, was she touching herself like holding herself or

17   like feeling on herself?  Can you be more specific about

18   what that was?

19   A    Like touching her vagina, like in the center of

20   her vagina like that.

21   Q    Okay.  Had she ever done that before?

22   A    No, ma'am.

23   Q    And then she told you the little boy came in

24   the restroom.  Did she tell you his name?

25   A    Yes, ma'am, but I can't remember his name.  And

1    honestly, I try not to remember his name.

2        Q    But you recall that that night she did tell you

3    his name?

4        A    Yes, ma'am.

5        Q    Okay.  And then did she tell you how many times

6    he touched her in the restroom?

7        A    No, ma'am.  I didn't ask like specifically like

8    how many.  She just was showing me what he was doing,

9    and she was -- it was too much for me.  No, ma'am, I

10   didn't ask her.

11       Q    And I realize that was very traumatic and you

12   were not in a place to ask a lot of specific questions.

13   So this is not criticism.  I just have to get the

14   specifics --

15       A    Yes, ma'am, I understand.

16       Q    -- as you know them.

17            So she tells you the little boy's name, and

18   she -- you said she started crying?

19       A    (Nods head.)

20       Q    Okay.  This is one thing I didn't say at the

21   beginning.  If you could give me verbal responses.

22       A    Oh.  Yes, ma'am.  Yes, ma'am.

23       Q    Because the court reporter can't pick up your

24   nod.

25       A    Oh.  Yes, ma'am.

1      Q    Did she tell you anything else that night?

2      A    No, ma'am.  I was just -- it was just too much

3   for me.  That was just enough because my mind was racing

4   with so much in my mind that I had to keep trying to

5   just, you know, get a grip on that this happened.  Like

6   I was basically just not in a good place right there.

7      Q    Right.  Did she tell you when she came out of

8   the stall was he already in the bathroom?

9      A    Yes, ma'am.

10      Q    And did she say why he came in the bathroom, or

11   did she know why?

12      A    She said she didn't know why.  I did ask her

13   that question.  I said, But he came in the bathroom, did

14   he think he was in the wrong bathroom.

15           She was like, No, Momma, he came to me and

16   started doing what he did to me.  Because I was trying

17   to understand -- like, I was trying to understand -- I

18   thought maybe it was a accident, like maybe did he come

19   to the wrong bathroom by mistake, but, no.  She was

20   saying, No, Momma, he came in there and started doing

21   what he did.  So I don't know.

22      Q    Okay.  And at that time did she tell you which

23   bathroom it was that she was in?

24      A    The girls' bathroom.

25      Q    Did she know which bathroom in the school it

1    was that she was in?

2         A     She just said the girls' bathroom.

3         Q     Okay.  And that night did she sleep?

4         A     She slept besides me.  I just loved up on her

5    all night long and just rubbed her head.

6         Q     Okay.  And did she sleep through the night?

7         A     We stayed up for a while and kind of like in

8    silence for a couple of hours without saying anything.

9    I just held her hand and just, you know, tried to make

10   her feel comfortable and assure her that it wasn't her

11   fault.

12        Q     So the next morning you got her up.  And did

13   she get up as normal the next morning?

14        A     Yes, ma'am.

15        Q     And when you told her that you were going to

16   school, she was going to school, was she okay with that?

17        A     Yes, ma'am.  I told her that I was going to --

18   I explained to her that I was going to go in there and

19   speak with some -- with the principal and the people

20   about the situation that -- that occurred and I need for

21   her -- I explained to her that no one's going to be mad

22   at her, that I need her to -- and it's not her fault, no

23   one's going to get angry with her, I would be there, and

24   that I need her to tell them exactly what happened and

25   don't be ashamed about it, just, you know, tell the

```
 1   truth.  And she was okay with it.
 2       Q    She didn't express any fear of going to school
 3   that morning?
 4       A    No, what she feared was that they're going to
 5   think that she did something wrong.  And I said, No,
 6   that's not case.
 7       Q    Okay.  So you took her to school that morning.
 8   Did the other kids go as well?
 9       A    Yes, ma'am.
10       Q    And remind me which other children were at
11   Oakhurst with her.
12       A    It was  Jane's older sister.
13       Q    Okay.  And  younger sister , was  younger sister  old enough to go to
14   school at that time?
15       A    No, ma'am, she was at ████████████
16       Q    Okay.  ████████████████████████████████
17   ██████
18       A    ██████████████████
19       Q    Okay.  And when you took the girls to school --
20   and  older brother , where was he in school at that time?
21       A    He was at  ████████ , I believe.
22       Q    Okay.  So when you got to Oakhurst, you had
23   older sister , and you had  Jane .  Was  older brother with you as well?
24       A    Yes.
25       Q    Okay.  And then tell me what happened after you
```

1    arrived to Oakhurst.

2        A    I remember driving, and it's kind of a blur.  I

3    was sad, and I just was trying to get through the

4    traffic to speak with someone.  So I went into the

5    school, and the first person I saw was the nurse.  I

6    think her name was Nurse Durham, and the first thing

7    I -- she was asking me about older sister, how was older sister

8    feeling because she wanted to take older sister's temperature

9    because older sister prior to that had had a cold.  And, you

10   know, if you have a fever, you can't come into the

11   school.

12           So I said, That's fine.  You can take her

13   fever, and I appreciate that.  But I need to talk to you

14   guys.  I need to talk to you, and I need to speak with

15   the principal.

16           And she said, Is everything okay?  I said, No.

17   And I told her exactly what I just told you.  I told her

18   what    Jane    said to me.    Jane    is standing there,

19   older sister s standing there as I'm telling her this.  The

20   counselor is there as well.  She happened to be there.

21       Q    All right.  Where are you guys standing when

22   you first say to Nurse Durham, No, it's not okay, I need

23   to talk to you?

24       A    It's like the nurse's -- this is -- like the

25   nurse's station is to your left and over towards your

1  right.  It's kind of combined together.  It's like the

2  principal's office, if that makes any sense, like in

3  this space.  And the counselor just -- I forgot the

4  counselor's name, but she just so happened to be there.

5        And so when I told them this, their eyes just

6  got really big, and it was like a silence.  So the nurse

7  whispered over to -- oh, no.  No.  Let me back up.

8        The nurse asked  Jane  like more specific

9  questions, asking who did this and what happened.  So

10  Jane  told the nurse -- and the counselor was right

11  there -- the same story as far as what happened.  And

12  the nurse asked  Jane  who the little boy was that did

13  it.  And  Jane  stated the little boy's name.

14        So their eyes, like I said in the beginning,

15  got really big when  Jane  was telling the story, and

16  then when  Jane  said the name, their eyes got even

17  bigger.  And so the nurse whispered over to the

18  counselor and said, You know, that's such and such.  But

19  I don't know his name or whatever.  But they whispered

20  something back and forth with each other.  I couldn't --

21  you know, I don't want to, you know, say that I could

22  hear everything, but it was like, you know -- she said,

23  You know, the one that something something.  But I

24  couldn't hear the one that did whatever.  I don't know.

25  You know, I couldn't hear because she was whispering.

1          So at that point in time, I said, I need to

2     speak with the principal about this matter, and they was

3     like, Oh, yes, okay, no problem, no problem.  And they

4     were -- they went into the principal's office, closed

5     the door up, and came back out, and I was told that the

6     principal is busy and can I come back.

7          And I said, No, I'm not coming back.  What do

8     you mean she's busy when my daughter has been assaulted?

9          Well, she's on a phone call.

10          I said, Well, I'll just wait.

11          So I'm waiting and waiting and waiting.

12     Q    Where you were waiting?

13     A    Still in the nurse's part.

14     Q    In the nurse's office?

15     A    Yes, ma'am, which is like right across from --

16     it's like adjacent to the principal's office.  So I

17     could see the principal's door, you know, them going in

18     and out.  So I was there for a while.  I was there.  I

19     was waiting and waiting.  And   Jane   was there and

20     older sister as well.  And I was again told to come back.

21          By this time I think that day -- I'm sorry.  I

22     think that day I had a job interview with the Postal

23     Service that I had already set up.  And so they was

24     like, Well, she's saying can you come back.  I didn't

25     want to leave, but I needed to go there.  And I think it

1  was something that I needed to do that was very

2  important, like I had a housing appointment, I mean, set

3  up as well, something like that.  It's been five years

4  now, ma'am, so I don't want to -- you know, I'm trying

5  to jog my memory here.

6       But either way it goes it was an appointment.

7  And so they were like, Well -- I said, Well, I need to

8  speak with her because I need to get this solved because

9  I have a very important appointment, but this is more

10 important.

11      So the nurse and the counselor said, Well, she

12 keeps saying that she is busy, so Ms. -- Principal

13 Flowers is saying that she's busy, so would you feel

14 comfortable -- and we assure you that the kids will be

15 okay.  Will you go ahead and go to your appointment then

16 come right back afterwards?

17      And I said, Well, I really don't feel

18 comfortable.  But they were like, We are assuring you

19 that   Jane   and   older
                       sister  will be in good hands.  And I

20 felt assured because I had become -- basically, I did

21 the report up with the nurse and the counselor.  They

22 were very helpful towards me and my kids.  And they're

23 both women, and they're, you know, understanding saying

24 that, Hey, we're not -- we're going to make sure that

25 they're okay.  We promise you nothing will happen.  We

1    promise you.

2             So I said, Okay, I'm going to go to my

3    appointment, and then I'm going to come back.

4             So do you want to discuss anything, or do you

5    want me to go ahead and go into when I came back or any

6    questions?

7        Q    No.  So I want to follow up on a couple of

8    things.

9             So you're in the nurse's office, and you tell

10   them what occurred.  And then you asked to speak with

11   the principal.  They go -- you saw them physically go

12   into Ms. Fowler's office?

13       A    Yes, ma'am.

14       Q    And you said they closed the door?

15       A    Yes, ma'am.

16       Q    And about how long were they in there?

17       A    About 10 -- about 10 -- about 10 to 15 minutes.

18       Q    Okay.  They came back out and told you

19   Principal Fowler was busy?

20       A    On a call, yes, ma'am.

21       Q    Okay.  She was on a call.  Okay.  And they

22   asked you to come back?

23       A    No, they said that she was on a call, but I can

24   see her.  She wasn't on a phone call at all, ma'am, but

25   they were telling me she was busy on a call.  And --

1        Q      But you could see in her office?

2        A      Yes, ma'am.

3        Q      Okay.  And you said she was not on a call?

4        A      She was not on a call, ma'am, and I felt

5   insulted right then and there.  So I said, no -- they

6   were basically saying, Well, she's busy, she's on call.

7   And I said, Well, okay, I'll wait.  So I waited -- I

8   waited longer.

9        Q      How long do you believe you waited for?

10       A      This time I waited about 30 minutes.  Because

11   it's -- I think it was like a bench or something in

12   there or either on the out part of the nurse's station

13   where we were sitting at.

14       Q      Uh-huh.

15       A      And I asked again to speak with the principal

16   about it.

17       Q      Okay.  So you waited 30 minutes.  Ms. Fowler

18   didn't come out.  Now, tell me where this bench was

19   again.

20       A      It's either in the nurse's station or either

21   outside of it.  I'm trying to think.  I don't know if

22   it's --

23       Q      Like in the reception area where the

24   receptionist sits?

25       A      No, ma'am.  It's like -- I want to say it's

1    maybe in between.  I can't be for sure.  I just know

2    that it's like where the kids would sit like before they

3    go into the nurse's station.  Like, they would have the

4    kids sit right there.  So it may be beside of it.  But I

5    just know that I could see.

6             Because basically from where the nurse's

7    station is at, if I'm not mistaken, the section that I

8    was in, you got the receptionist up there, and Ms. --

9    Ms. -- Principal Fowler -- the best I -- is behind

10   the -- is behind the receptionist.  So I may have it

11   mixed up where I was in the nurse's part, and then I sat

12   on the bench part.  Because I know that I could see the

13   receptionist and I could see Ms. -- Principal Fowler.  I

14   know that.

15       Q     Okay.  And were you looking like past the

16   receptionist to see Ms. Fowler in her office?

17       A     No, ma'am.  The receptionist's office is --

18   it's like -- it's right here basically, and Ms. Fowler

19   is right there.  It's like it's just a space in between

20   them.  It's not a big, you know, gap in between them.

21   So I could see both at the same time.

22       Q     Okay.  So the reception was sitting at her

23   desk?

24       A     Yes, ma'am.

25       Q     And do you remember who the receptionist was?

1      A     No, ma'am.  I just know it was African American

2   woman.

3      Q     Okay.  So you waited about 30 minutes.  You

4   were sitting on the bench.  You could see Principal

5   Fowler.  She did not come out.  And then you asked them

6   again to see Principal Fowler?

7      A     I told them that I needed to speak with her

8   about this matter before leaving because I have to take

9   care of this matter.  Because like I said, I was

10  going -- it's not easy to get interviews with the Postal

11  Service.  And I had a housing appointment as well.  But

12          was more important.  I needed to, you know,

13  speak -- speak with her about this.

14          And that was the -- I think it was either Nurse

15  Durham or either the counselor went in there and came

16  back out and said she still said she's busy, and that's

17  when -- that's when I was like -- they were saying that

18  do you want us -- do you feel comfortable if we assure

19  you that won't nothing happen to the girls if you can go

20  ahead and take care of your business and come back, but

21  will you trust us.

22          And like I said, I had did the report with

23  those two ladies, and so I said, Yes, ma'am.  I said,

24  But I really don't want to go.  But I said, But I need

25  to handle this.

1           I said, But when I get back, I said, I want --

2    I expect for Ms. -- Principal Fowler to speak with me.

3    I don't want any exceptions, so could you tell her to

4    make sure that whatever she, you know, is doing that she

5    can set that -- set that aside and treat this as an

6    important matter.  And I left.

7        Q    So about how long do you think total that you

8    were in the office from the time you came in and had

9    *older sister* 's temperature taken until the time that you left

10   the office?

11       A    Easily a hour, at least a hour.

12       Q    Was *older brother* with you in the office too?

13       A    No, ma'am.

14       Q    Where was he?

15       A    He was at school.  I think he was at ███████ at

16   the time.

17       Q    So you had already dropped him off --

18       A    Dropped him off, yes, ma'am.

19       Q    -- at ███████?

20            All right.  And then where did you go after you

21   left Oakhurst?

22       A    I went to the postal office -- I mean to the

23   postal place for the -- the job.  I went to try to see

24   about that, but I was late, so I tried to call the

25   person, the -- I forgot who the staffing agency was at

1    that time to let them know.  But I was told that I was
2    too late.  And then --
3        Q    What time was your interview scheduled for?
4        A    I think it was going to be at -- at 9:00.  9:00
5    sharp I think it was.
6             So I left there, and then I went to the
7    downtown Decatur housing.  And I went and asked them
8    questions down there about -- they were doing some type
9    of housing or something or another that I had heard
10   about.  And then I left there, and then I went back to
11   the school.  So I think I was gone about maybe a hour or
12   so.
13       Q    So you were gone from the school about an hour?
14       A    About a -- traffic was bad, so it was a hour or
15   two.  I can't remember.
16       Q    All right.  So you think -- did you actually go
17   to the postal interview, or did you just call the agency
18   and they said it's too late so you didn't go?
19       A    I didn't go because I called while I was
20   driving.  And I was stuck on the highway in the traffic,
21   and they were like, No, you was supposed to been here at
22   9:00 on the dot.  So, yes, ma'am.  So I just got out of
23   traffic, and then I went to the City of Decatur downtown
24   to the housing thing.
25       Q    All right.  And do you recall who you spoke

1    with or met with at Decatur Housing?

2        A    No, ma'am.  I was just asking questions from

3    the receptionist down there about something that I had

4    heard about about the apartments down there, that they

5    were opening or something.  I just went to ask

6    questions.

7        Q    Okay.  So you say it was approximately one to

8    two hours that you were gone, so what time do you think

9    you got back to the school?

10       A    I would say it was around lunchtime probably,

11   probably like 11:00 or 12:00, probably like 12:00 or

12   something or another like that.

13       Q    Okay.  Do you recall going anywhere else other

14   than the postal interview or getting on the highway to

15   go to your postal interview and the Decatur housing?

16              MS. BROYLES:  Ms. Ware, let me just

17          briefly interrupt.  I see, I believe, my

18          co-counsel, Mr. Trakas is joining us.

19              Ernie, is that you?

20              MR. TRAKAS:  Yes, I'm here.  I'm trying

21          to -- you should be able to see me now, I

22          think.  Maybe not.  I'm in a car obviously, so

23          I'm probably going to stop the video just so

24          it's not distracting.

25              MS. BROYLES:  Okay.  And, Ms. Ware, I've

**Confidential**                                                    47

| | |
|---|---|
| 1 | been meaning to ask you -- but you were on a |
| 2 | flow and I didn't want to interrupt you -- |
| 3 | there's something Thomas Royter (phonetic) that |
| 4 | I cannot see.  Do you know who that is or what |
| 5 | that is? |
| 6 | MS. WARE:  Thomas -- |
| 7 | MS. BROYLES:  Thompson and then R-E. |
| 8 | MS. WARE:  Oh, that's Thompson Reporting |
| 9 | Service.  That's the person who's making the |
| 10 | Zoom happen. |
| 11 | MS. BROYLES:  And, Ms. Ware, at about -- |
| 12 | if we could, I just wanted to stop for a |
| 13 | bathroom break maybe at 11:15 for just a |
| 14 | five-minute bathroom break. |
| 15 | MS. WARE:  Sure, we can go ahead and break |
| 16 | now if you'd like and -- |
| 17 | MS. BROYLES:  Okay. |
| 18 | MS. WARE:  -- come back at 11:15? |
| 19 | MS. BROYLES:  Okay.  11:15.  Very good. |
| 20 | MS. WARE:  Thank you. |
| 21 | (Recess from 11:07 a.m. through 11:17 a.m.) |
| 22 | MS. BROYLES:  Ms. Ware, I've consulted |
| 23 | with co-counsel.  I'm instructing the witness |
| 24 | to give you her current address.  I do believe |
| 25 | you're entitled to that, and then we can move |

1         on to the rest where you had dropped off with

2         your questions.  So if you would like to reask,

3         that would be fine.

4    BY MS. WARE:

5         Q    Ms. Thomas, what is your current address?

6         A    ███████████████████████████████████████,

7    ████████    ███████████████████.

8         Q    Okay.  Okay.  So we were talking about the

9    morning when you reported to the school.  When you first

10   told Nurse Durham --

11            MS. BROYLES:  You there?  Okay.

12   BY MS. WARE:

13        Q    Okay.  Back on the record.

14            So when you first told Ms. Durham that morning

15   about what happened, was the counselor already in the

16   room when you told her, or did she call her in?  Or did

17   the counselor walk in during the middle of the story?

18        A    I'm thinking that -- let me think.  Nurse

19   Durham said, Hold on a second.  And she went and got --

20   I don't know who this other person is, but she -- but

21   they -- I don't know what their position is there.  But

22   it's like when there's a issue you basically go to that

23   person.  And that person -- I cannot think -- either

24   went and got the counselor or either she walked in.  I

25   can't exactly remember, but I know that all three of

1   them were talking.

2      Q    Okay.  So there was Nurse Durham, the

3   counselor, and then this third person?

4      A    Yes, ma'am.

5      Q    Was it Ms. Alderidge?

6      A    No.  This is -- it's someone that I don't know,

7   I mean.

8      Q    You had never seen this person before?

9      A    No, ma'am.  You have to understand that this

10  was a unique situation, so Nurse Durham didn't know what

11  to do, I guess.  So she, I guess, went to talk with

12  someone, you know, to see how to handle this.

13     Q    All right.  Do you remember what the person

14  looked like?  Were they white, black, another race?

15     A    It was a -- it was -- I think it was a white

16  lady there.

17     Q    Do you remember what color her hair was?

18     A    No, ma'am.  Everything just -- it was so much.

19  No, ma'am.

20     Q    Right.  Okay.

21          All right.  So during that meeting, you said

22  that you saw Nurse Durham and the counselor whispering.

23  After you finished telling them the report, what did

24  Nurse Durham say, if anything?

25     A    After I told it, Nurse Durham asked   Jane

1    questions about it, and that's -- and that's when she

2    asked for the little boy's name.  And then the counselor

3    was standing there, and she looked over there.  She

4    said, you know -- she whispered over and said, That's

5    the one that -- I don't know what else she said about

6    it.  I don't know exactly what else she said about it,

7    but that's what -- so I can't say exactly what -- what

8    she said to the lady or whatever.

9            But that's when I was asking about speaking to

10   the principal, and they went into the principal's

11   office, her and the counselor.

12   Q    All right.  And so did the third person stay in

13   the office with you?

14   A    No, ma'am, she walked off.  I don't know who

15   the person was.

16   Q    All right.  And during the meeting when the

17   three of you were in the room, did the third person say

18   anything?

19   A    They -- she was over -- went over there and

20   spoke with the counselor and -- and Nurse Durham.  They

21   had a conversation, but I don't know.  I couldn't hear

22   that one either.

23   Q    When you said they went over there, where did

24   they go?

25   A    Over in a corner like kind of.

**Confidential**                                        51

```
 1        Q     Okay.
 2        A     I guess they couldn't discuss whoever the
 3   little boy's business is basically.  You know, like they
 4   can't -- just like    Jane   , they can't, you know, just
 5   start having a conversation about another child or
 6   something.  So they, you know, got to another side so
 7   that they can talk without me hearing it.
 8        Q     Got ya.
 9              Okay.  Did you ask them anything about, you
10   know, what's going to happen next or anything like that?
11        A     No.  I was still under the assumption that I
12   was going to speak with the principal.
13        Q     Did you ask them whether    Jane    would be
14   interviewed?
15                    (Phone interruption.)
16              MS. BROYLES:  Let me turn that off.
17   BY MS. WARE:
18        Q     Or the boy would be interviewed?
19        A     Would    Jane    be interviewed?  No.  No, ma'am.
20   I don't think I asked -- I mean, they had already
21   interviewed    Jane    in front of me.  You know, she told
22   them what happened in front of me, so there was no
23   reason to ask about her being interviewed because she
24   had already given the -- given, you know, her statement
25   already, so --
```

1              MS. BROYLES:  I'm handing her her phone so

2         she can --

3              THE WITNESS:  Excuse me one second,

4         please, so I can turn my phone off.

5              MS. BROYLES:  Just turn it off, yeah.

6         Pascha, just turn it off and leave it here.

7              THE WITNESS:  Yes, ma'am.  I apologize.

8   BY MS. WARE:

9       Q    Okay.  So you don't recall asking them are you

10  going to interview   Jane   ?

11      A    No, I don't recall.

12      Q    And you don't recall asking them, Well, are you

13  going to interview the boy?

14      A    I asked for the principal.

15              MS. BROYLES:  Pause, Ms. Thomas.  I have

16         to admit, I'm a little confused, Ms. Ware.  Are

17         you asking about before she met with -- with

18         the principal?

19              MS. WARE:  Correct, in the meeting on the

20         morning when she brought the kids to school.

21              MS. BROYLES:  Is this the meeting with

22         Principal Fowler or before meeting with

23         Principal Fowler?

24  BY MS. WARE:

25      Q    This is before meeting with Principal Fowler

1  when you were with Ms. Durham and the counselor and this

2  third person.

3      A    No, ma'am, I don't recall that.  I just recall

4  asking for the principal.

5      Q    Okay.  Do you recall anyone explaining to you

6  that a social worker would have to be contacted about

7  the incident?

8      A    No, ma'am, none of that took place.

9      Q    Do you recall explaining -- or them explaining

10 or saying anything about a DFCS report being made at

11 that time?

12     A    No, ma'am, I don't recall that.

13     Q    All right.  Did anyone at that point tell you

14 to take   Jane   to the doctor?

15     A    No, ma'am, that came later on.  No, ma'am.

16     Q    Okay.  Okay.  So then you left the school.  Did

17 the girls go to their classes?

18     A    Yes, ma'am.  The counselor and Nurse Durham

19 said, you know, that they're in good hands, to go ahead

20 and take care of my business, yes, ma'am.

21     Q    And you were gone for about two hours, one to

22 two hours you believe; correct?

23     A    Yes, ma'am.

24     Q    Where was the postal interview supposed to be?

25     A    It was going to be, goodness, off of Fulton

1    Industrial, somewhere out thataway.  I can't remember
2    the address.  It's been a long time ago.
3         Q    And so you said you had gotten on the highway.
4    Which highway were you taking to get there?
5         A    20.
6         Q    And then there was traffic so -- and you were
7    calling the staffing agency?
8         A    To let them know that I was stuck in traffic
9    because it was a accident.
10        Q    I'm sorry?
11        A    I think it was a accident or something that
12   went on, so I was stuck in traffic.
13        Q    Okay.  And then during the one to two hours
14   that you were gone, do you recall getting any phone
15   calls from the school trying to reach you?
16        A    No, ma'am.  I actually made a call to -- I
17   think I made a call then to the person -- the
18   McKinney-Vento that's over the school, McKinney-Vento.
19   Her name was Ms. -- I think it was Robinson or something
20   or another.  I can't remember her name.  She's -- she's
21   no longer employed there.
22             But I told her, I said -- I said -- I was
23   letting her know basically what -- what went on.  And
24   she was like, Oh, I didn't -- you know, she was like,
25   you know, like, Wow.  I said, Yes.

1            The reason I called her was because I felt

2    insulted that Principal Fowler, you know, wouldn't see

3    me.  So I was letting her know like, Hey, this happened,

4    and, you know, I'm upset about it.  I was vexting.  So

5    that was the only call that I can remember that I

6    called.

7        Q    Okay.  So you did not get a phone call from the

8    school, from Oakhurst?

9        A    Oh.  Yes, ma'am.  Okay.  By this time I'm

10   finding a parking spot, and the school -- and the school

11   does call.  I'm sorry.  I just have to remember

12   everything.  But I'm in the parking lot, so I'm telling

13   them that I'm already here and I'm just finding a

14   parking spot and I'm going to walk in in a second.  Yes,

15   ma'am.

16       Q    Do you recall who called you?

17       A    I can't remember, ma'am.

18       Q    Did you get a call from a social worker during

19   that one to two hours that you were away?

20       A    No, ma'am.

21       Q    All right.  So you said you got a call from

22   someone at the school, and you told them, I'm parking,

23   I'm on the way in?

24       A    Yes, ma'am.

25       Q    And you think it was around lunchtime, noonish;

1    correct?

2        A     Yes, ma'am.

3        Q     So you go in the school.  Tell me what happened

4    when you got back into the school.

5        A     The receptionist told me that I can go into

6    Principal Fowler's office, and when I got in there, I

7    was expecting to speak with Principal Fowler.  Instead

8    it was like -- ma'am, it was a lot of people in the

9    room.  So I was surprised to see that, you know, because

10   I didn't even know what was going on.  I mean, I think

11   it was like seven people maybe in there besides

12   Principal Fowler, and one of them being the lady I told

13   you from the McKinney-Vento that's over it -- I think

14   her name at the time was Robinson or something like

15   that.  She was there.

16           I didn't know who that was at the time, what

17   her name is, but I found out later on her name was

18   Ms. Jefferson.  I think she's the school social worker

19   or something like that.

20       Q     Uh-huh.

21       A     I think Nurse Durham was there.  I think the

22   counselor was there.

23               MR. TRAKAS:  Pascha, may I interrupt for a

24           minute?  I'm going to just tell you that I

25           don't want you to guess or assume.  I want you

1              to tell Ms. Ware what you remember with respect
2              to who was there, but I don't want you to
3              guess.  I don't think she wants you to guess
4              either.  Okay?  So just answer the question as
5              factually and as accurately as you can, but
6              don't assume or guess.  Thank you.
7    BY MS. WARE:
8         Q    Okay.  So you said Ms. Robinson was there,
9    Ms. Jefferson, Ms. Durham, the counselor, Ms. Fowler.
10   Anyone else that you can recall?
11        A    No, it was some more people in there, but I
12   don't want to -- you know, I don't know.
13        Q    Okay.  Do you remember if they were male or
14   female?
15        A    I'm sorry?
16        Q    Do you remember if they were male or female?
17        A    I think it was one male there and maybe two
18   more females.
19        Q    And you didn't recognize the male?
20        A    No.  And -- hold on one second.  I may be wrong
21   because I don't want so say anything that's wrong, but I
22   think I found out that the male that was in there -- I
23   want to say that I found out later on when I go back to
24   meet with Ms. Fowler that that was the assistant
25   principal.

**Confidential**                                        58

1     Q    Okay.  Mr. Credi?  Does that --

2     A    Maybe.

3     Q    Okay.

4     A    Maybe.

5     Q    Okay.  So there were these people.  Did you

6  recognize that any of the people in the room was the

7  person that had called you on the phone from the school

8  and said come back?

9     A    No, ma'am.

10    Q    All right.  Tell me -- so from there, now tell

11 me what happens in that meeting.

12    A    So I'm talking with the principal, and of

13 course I was upset because I felt like -- I felt

14 disrespected because you wouldn't take the time out to

15 speak with me, and now that I'm in there instead of you

16 speaking with me there's all these other people.  So and

17 I didn't really feel comfortable, you know, having this

18 discussion about my child in front of all these people

19 that I really didn't even know a lot of these people.

20         So we discussed the situation, and I asked

21 them, I said -- I asked Principal Fowler, I said, So

22 what's going to happen?  I said, Did you question the

23 little boy?  They said that they -- that they wasn't

24 allowed to discuss anything about the little boy.  I

25 said, So you mean -- I said, Okay, but are you going to

1   question him?  I asked again.

2           And I was told by Ms. Jefferson that what I

3   need to do is take  Jane  -- worry about  Jane  and

4   take her to the hospital.  I said, Ma'am, I'm going --

5   that's no problem.  But I said, I still want to address

6   the situation about what happened in the classroom

7   because right now my daughter's in the classroom and

8   you're not telling me anything, like what -- I said,

9   What is your policy to do in a situation like this -- I

10  mean your protocol?  I'm sorry.

11          And, again, Ms. Jefferson told -- Ms. Fowler

12  said, This is a school matter and that -- Ms. Jefferson

13  said I just need to worry about -- focus on  Jane  ,

14  get her to a doctor, and let them handle -- handle --

15  handle it in-house, this is a school matter.

16          And so I said -- it was coming up to the

17  holiday time, and I want to say that I explained to them

18  that I was not going to let -- I asked them, Are you

19  going to take -- take him out of the classroom at least?

20  Because in my -- my mind I'm thinking that if he's done

21  this to my child he could be a danger to somebody

22  else's, you know, child as well, like.  And, again, I

23  was told that I needed to go and worry about  Jane  .

24              MS. BROYLES:  Let me just clarify to make

25          sure it's clear on the record.  You asked them

```
 1              to take whom out of the classroom?
 2                   THE WITNESS:  The little boy --
 3                   MS. BROYLES:  Okay.
 4                   THE WITNESS:  -- that had assaulted my
 5              child because I was worried about not just
 6                Jane   , other kids.
 7                   And I was just told basically mind your
 8              business, you take your child to the doctor, we
 9              got this, basically.
10   BY MS. WARE:
11      Q    All right.  So and that was from Ms. Jefferson
12   you said?
13      A    Ms. Jefferson said it twice.  And Principal
14   Fowler said, This is a school matter.  And I kept
15   asking, So you're not going to take him out of the
16   classroom, you're not going to -- this is a school
17   matter.
18      Q    Did you ask if   Jane   could be moved out of
19   the classroom at that time?
20      A    I think so.  I know the second time I came back
21   I specifically asked that, but I think I told them
22   that -- no, that's what I told them, either he goes or
23    Jane   goes, either you're going to take him out of
24   the classroom or put   Jane   in another classroom then.
25      Q    All right.
```

1       A     And I was going to go to the hospital.

2       Q     Ms. Fowler -- do you recall Ms. Fowler agreeing

3    to take her out of the -- I'm sorry -- to take    Jane

4    out of the classroom?

5       A     She told me that she wasn't going to agree to

6    doing anything, that I need to take my child to the

7    hospital.  That's when I asked again can    Jane    be

8    taken out of the classroom, and she wouldn't agree to do

9    that.  It was basically like we're not even talking to

10   you right now, period.  So I was just there by myself

11   with people that are telling me just mind your business

12   and take your child to the hospital.

13                   MS. BROYLES:  I'm plugging in my laptop

14              because it's getting low.  Give me just a

15              second.

16   BY MS. WARE:

17      Q     Do you recall anyone else saying anything in

18   that meeting other than Ms. Jefferson or Ms. Fowler?

19      A     No, ma'am, I can't remember.

20      Q     Were you told a DFCS report had been made?

21      A     No, ma'am.

22      Q     When was the first time you found out that a

23   DFCS report had been made?

24      A     When the DFCS worker knocked on my door around

25   Christmastime.

```
 1        Q     So you were not aware the school had made a

 2   DFCS report until around Christmastime of 2017?

 3        A     Yes, ma'am.

 4        Q     You don't recall anyone in the meeting

 5   explaining to you that a DFCS report had already been

 6   made?

 7        A     No, ma'am, that wasn't told to me till the

 8   second time, I believe, when I met with Ms. Fowler and

 9   the assistant principal.

10        Q     All right.  So during that meeting, do you

11   recall --

12                    MS. WARE:  Ms. Broyles, are you writing --

13                    MS. BROYLES:  No.  No.  No, not at all.

14             I'm writing notes to myself, so that's --

15                    MS. WARE:  Okay.  Well, I'm going to ask

16             if Ms. Thomas could just not look over there at

17             what you're writing because it looks as if

18             she's being cued.  And I'm not accusing you of

19             that, but --

20                    THE WITNESS:  No, ma'am, I'm just trying

21             to remember.

22                    MS. BROYLES:  Hold on.  One at a time.

23             She's looking to me for reassurance.

24             I'm -- I am not giving her anything, but she's

25             looking to me for reassurance because she's
```

1      nervous.  So, no, I am not writing anything.

2      But I'm actually thinking about taking --

3      asking for a very brief break to discuss -- to

4      talk with my client.  So if we could take a

5      two-minute break.

6           MS. WARE:  All right.  Is there a question

7      that is on the table that is unanswered?  What

8      was the last thing I asked, Ms. Fuller.

9           (The following partial question was

10     read:

11          Q    All right.  So during that meeting,

12     do you recall --)

13          MS. WARE:  That's fine.

14     (Recess from 11:40 a.m. through 11:42 a.m.)

15          MS. BROYLES:  Ms. Ware, we're ready when

16     you are.  And I also made clear to Ms. Thomas

17     these notes are for myself, they're not for

18     her.

19          MS. WARE:  Okay.  Thank you.

20   BY MS. WARE:

21     Q    Okay.  So we were talking about the meeting

22   when you returned to the school on the 17th.

23     A    I think you were asking me about the meeting

24   with the DFCS, and I said that the lady came to the

25   door.  But I forgot, that was -- that was a lady came

1    there.  But when   Jane      -- see, we haven't even gotten

2    to that part yet where we went to the hospital, yes,

3    ma'am, and a DFCS man came there and interviewed

4    everybody.  So I guess I was going to tell you about

5    that once we got to the hospital part.  So I'm kind of

6    jumping all around here.  I'm sorry.

7         Q     That's okay.  So let's try to focus on the

8    meeting, though.  At that meeting you do not recall

9    being made aware that a DFCS report was going to be

10   made?

11        A     No, ma'am.

12        Q     And do you recall Ms. Fowler or anyone else in

13   that meeting explaining that the school does not

14   interview children of such young age in sexual assault

15   cases because they allow people who are trained in that

16   to interview the children?

17        A     No, ma'am.

18        Q     And do you recall them telling you a DFCS

19   report had been filed and that you would be contacted by

20   DFCS?

21        A     No, ma'am.  The only time I knew, I was

22   surprised when the DFCS worker came to the hospital, the

23   man came there.  That's when I found out.

24        Q     Okay.  What time did you get to the school that

25   morning originally to drop the kids off?

1      A    I guess it was around 8:00 something.  I just

2  know I -- it was regular time that you bring them

3  because the crossing guard lady was out there, and

4  traffic, it was a lot of traffic, you know, like pulling

5  in and out.  So I'll say like 8:45 probably.

6      Q    Okay.  And when you came back for this second

7  meeting, how long did that meeting last?

8      A    Not long at all.  I'll say about 15, 20

9  minutes.

10      Q    How did the meeting end?

11      A    With me telling them that I'm going to take my

12  child to the hospital and me letting -- expressing the

13  disgust that I have for the way that I've been treated

14  and my child has been treated.  And I told them that I

15  felt like this -- this isn't fair, that no one is giving

16  me any answers about anything, and I feel like they're

17  just brushing me off.  And I left.

18      Q    During that meeting, did anyone tell you that

19  they could not discuss the boy with you because of

20  certain legal protections or limitations they have

21  because they can't discuss other students?

22      A    No, ma'am, they didn't even give me the

23  courtesy of that.  Nothing.  Just only what I told you.

24      Q    So where did you go after you left -- and about

25  what time was it that you left Oakhurst?

**Confidential**                                          66

```
 1        A     I can't be for sure.

 2        Q     The second meeting?

 3        A     I can't be for sure.  That's when I was going

 4   to -- when you say "the second meeting," that was

 5   actually the first meeting with Ms. Fowler.  Because,

 6   remember, I never got a chance to see her in the

 7   beginning.

 8        Q     Well, I understand, but it was the second

 9   meeting that you had been in that day about this

10   incident; correct?

11        A     Oh, yes, ma'am.  Yes, ma'am.  I can't remember

12   exactly what time -- about what time it was.  But I just

13   know I went to -- it was daytime when I took   Jane    --

14   I left from that meeting, and we went to the hospital.

15   Me and   Jane   and   older sister   went to the hospital, and I

16   went and got   older brother   and went to the hospital.

17        Q     Straight from Oakhurst?

18        A     Yes, ma'am, I went and picked up my son from

19   ████████ , and then we went to I think it's Egleston or

20   something like that to the hospital.

21        Q     Did you have to check him out, your son out of

22   school early?

23        A     I think so.

24        Q     So it was before dismissal time at his school?

25        A     Yes, ma'am.
```

**Confidential**                                                    67

1      Q    And what time was dismissal at his school?

2      A    His school is different.  The girls got out at

3  2:45.  I think -- I think he got out at 3:15 because

4  he's in junior high school.

5      Q    Is he in junior high now, or was he in junior

6  high then?

7      A    He was in junior high then.

8      Q    Okay.  So you think you picked him up before

9  dismissal and checked him out early?

10      A    Yes, ma'am.

11      Q    Did you have to check older sister out early?

12      A    Yes, ma'am.

13      Q    And you guys -- and what about  Jane     Did

14  you have to check her out early?

15      A    Yes, ma'am.

16      Q    And then you guys went to -- straight to the

17  hospital after you picked up your son?

18      A    Yes, ma'am.  And as a matter of fact, I didn't

19  have to check them out.  Because of what was going on,

20  there was no need for me to check out anyone because

21  they -- you know, they knew that I was going to the

22  hospital, so they just basically called -- went and got

23       and  Jane   and -- for me, the receptionist

24  person.

25      Q    But you had to check out older brother?

1      A     Yes.

2      Q     All right.  So you take them to the hospital,

3  and tell me what happened at the hospital.  Well, first

4  of all, about what time was it you got to the hospital?

5      A     I guess from the time it took from there -- I

6  guess like 3:00 or 4:00, maybe around that time.

7            And so I went in the hospital, and I signed her

8  in.  And she was triaged.  And so the nurse came in

9  there and spoke to   Jane   .  Another nurse came in

10  there as well and interviewed   Jane   about what

11  happened.  They checked between her legs.

12            So we were still waiting, and then a male

13  doctor came in to check -- with assistants to check.

14  And he just, you know, did a quick examination, as he

15  said he really didn't want to do too much because she --

16  he was -- he's a male, and he didn't want to make her

17  feel uncomfortable like that.

18            So we were still waiting.  Hours went by.  And

19  I was trying to understand why we were like still there

20  because now at this time, ma'am, it's nighttime.  And --

21  oh, ████████████████████████████████████████

22  ██████████████████████████████████████████████

23  ████████████████████████         ██████████████████

24  ████████████     ███████████     ████████████████████

25  ██████████████████████████████████████████████

1         So we were still waiting.  And I kept trying to

2    ask.  They were like, Well, just hold on a minute, hold

3    on a minute.  So it got to be nighttime, and that's when

4    the person came in from Department of Family and

5    Children Services.  It was a guy.  I don't know his

6    name.  I can't remember it.  But he said he needed to

7    talk with    Jane    .

8         So I was thinking that, you know, like

9    protocol, like the hospital had called DFCS or

10   something, like, you know.  So I -- he asked us to go in

11   a separate room, and he spoke with    Jane    by hisself.

12   Then he got with  older sister  and spoke with  older sister  by herself.

13   He got with  younger sister  and tried to ask her questions as best,

14   but  younger sister  is smaller.  And she's ███████████, so there

15   wasn't much she could really add to it or anything.  She

16   was small.  And he spoke with  older brother  separately.

17        And then he spoke with me separately.  And then

18   he told me that someone would be getting in contact with

19   me.  And that was it.  And from there we went back home.

20             MS. BROYLES:  Ms. Ware, may I ask a

21        clarifying question, or shall I wait?  Okay.

22             From my understanding did you go first to

23        Egleston, and then were you told to go to a

24        second location for the examination for

25             Jane    ?

```
 1              THE WITNESS:  Oh, yes, ma'am.  Yes, ma'am.
 2         They gave me some paperwork to go to CHOA,
 3         Children's Hospital of Atlanta, because they
 4         wanted to like -- they're the place that you go
 5         to when kids have like traumatic stuff --
 6         things happen to them.  And they have their way
 7         about going about finding out things, you know,
 8         and they're more experienced than they are.
 9              And that's where I ended up taking her, to
10         CHOA, but not just that day.  The nurse, I
11         think, made me an appointment or the
12         receptionist or whomever.  So I ended up -- I
13         can't remember how many days past that that I
14         went to what the appointment was set up for.
15              But, yes, ma'am, they did give me
16         paperwork to take her to CHOA.
17    BY MS. WARE:
18         Q    Okay.  So on the day of this -- that you
19    reported the incident to the school, November 17th, what
20    was the hospital that you took her to?
21         A    Egleston.
22         Q    Okay.  And Egleston is -- which location?
23         A    In -- I think in Decatur.
24         Q    Okay.  Like the Emory location?  In the Emory
25    area?
```

 1        A    I think so, ma'am.  I don't know.  I was using

 2   my GPS.  I don't know.

 3        Q    I rely on mine as well, so I understand.

 4             Was that the only facility you went to that

 5   day?

 6        A    Yes, ma'am.

 7                  MS. BROYLES:  So this is what I'm trying

 8             to clarify, because this confused me as well,

 9             Ms. Ware.  So I'll just ask it again.

10                  When you -- so you went to Egleston

11             initially?

12                  THE WITNESS:  Uh-huh.

13                  MS. BROYLES:  And maybe I'm confused, and

14             so you can straighten me out if I am.  Did they

15             send you to CHOA that day?

16                  THE WITNESS:  No.  It was nighttime by the

17             time I left there.  No, ma'am.

18                  MS. BROYLES:  Okay.

19   BY MS. WARE:

20        Q    Okay.  Okay.  So they were sending you to a

21   second facility that specializes in sexual assault?

22        A    With kids.  It's mainly with kids, anything

23   that -- not just sexual assault, but, you know, things

24   with kids mainly.  That's what they were saying, that

25   that's like their specialty with kids.

1      Q    Okay.  And was it a place they were going to do

2    like a physical exam, or was this second place somewhere

3    they were going to do an interview of    Jane    ?

4      A    No, they told me they wanted to do a -- for me

5    to go there and that they're going to do a physical

6    exam, but they also are going to like interview her as

7    well.

8      Q    So this is --

9      A    -- than they were at the emergency room

10   basically.

11     Q    I'm sorry.  Say that again.

12     A    They were going to go more in-depth in it than

13   they were able to do at the -- at the emergency room,

14   you know, at the hospital, yes, ma'am.

15     Q    Because Egleston wasn't -- where you were

16   initially was not somewhere that specializes in dealing

17   with childhood sexual assault; correct?

18     A    Yes, ma'am.

19     Q    So they were going to send you to a second

20   facility where they do specialize in that?

21     A    Yes, ma'am.

22          MS. BROYLES:  Okay.  So, Ms. Ware, if I

23          can ask this:  Was    Jane    examined that day

24          on the 17th?

25          THE WITNESS:  Yes, that's --

**Confidential**                                        73

1              MS. BROYLES:  Okay.

2              THE WITNESS:  Yes, ma'am, that's what I

3         just stated to her.  Yes, ma'am.

4              MS. BROYLES:  Okay.  And was she examined

5         at Egleston, or was she examined at CHOA?

6              THE WITNESS:  She was examined at Egleston

7         that day, and then she went to CHOA and was

8         examined and interviewed at CHOA.

9              MS. BROYLES:  And was that second

10        examination and interview at CHOA -- was that

11        on the 17th, or was that --

12             THE WITNESS:  It was a couple of days

13        after that, ma'am, because they had to make the

14        appointment for me, so it was a couple of days

15        later.

16             MS. BROYLES:  Okay.  Sorry.  I'm done.

17   BY MS. WARE:

18        Q    What did Benjamin -- you said the DFCS worker

19   came.  You couldn't remember his name?

20        A    Yes, ma'am.

21        Q    But it was a male?

22        A    Yes, ma'am.

23        Q    Do you recall, was it Benjamin Bell?

24        A    I can't remember.  It was a white male.  That's

25   the only thing I remember.

1        Q     Okay.  What did he discuss with you?

2        A     I asked him why was he -- first of all, I said,

3   Is it legal for you to talk to   Jane   without me being

4   in the room with him?  And he told me yes.  And he asked

5   me -- well, there really wasn't any discussion of too

6   much of anything.

7            He asked me what happened, and I told him just

8   what   Jane   had told me -- had told me -- had stated

9   to me.  And he just said that he was there because the

10  school -- no.  No.  No.  He didn't say because the

11  school.  He said that he was there because I brought

12  Jane   to the hospital, and it's basically -- the way

13  he was saying, it's protocol for DFCS to come and speak

14  with everyone that's, you know, in the family.  And he

15  basically said that someone will be getting back to me.

16  And that was it.

17       Q     Okay.  So he didn't specify that he was there

18  because the school had called DFCS?

19       A     No, ma'am.  He just stated that he was there --

20  it was protocol, that I brought   Jane   to the hospital

21  and that was protocol that . . .

22       Q     So do you know whose protocol he was referring

23  to?

24       A     I didn't know.  Like I said, I don't know was

25  he saying -- I don't know.  It was just protocol.  it

1    just seemed like it would make sense to me that -- I

2    thought the hospital had called because, you know,

3    they -- I guess I was assuming that's what they have to

4    do or something.  I don't know.

5        Q    What made you think the hospital had called

6    DFCS?

7        A    Because I'm there with a child that had been

8    sexually assaulted or something like.  I mean, it's kind

9    of like if a kid comes in with a broken arm or

10   something, you know, they have to make sure that the

11   parent is not doing something, that the parents didn't

12   cause the injury or something, you know.  That's the

13   only reason I could make sense of.

14       Q    Do you remember if anybody at the hospital

15   asked you has DFCS been contacted?

16       A    No, ma'am.

17       Q    Did anybody at the hospital ask you for any

18   contact information for anyone at the school?

19       A    No, ma'am.

20       Q    Did Mr. Bell -- or the gentleman that was there

21   from DFCS ask you for any contact information for anyone

22   at the school?

23       A    No.  No, ma'am.

24       Q    And you don't recall giving anyone contact

25   information for anyone at the school?

1        A     No, ma'am.

2        Q     So the doctor or the staff at the hospital

3    instructed you to take    Jane      to the second facility,

4    CHOA.  Did they give you any other instructions?

5        A     No, ma'am, just to take her to CHOA.

6        Q     Do you recall them referring you to a

7    counselor?

8        A     No, ma'am, I can't remember any of that.  I

9    just know that they was saying that CHOA is going to

10   take -- has a lot of people there that's experienced.

11   They have counselors there.  They have all kind of

12   doctors and everything.  That's what I remember.

13       Q     Was there anyone else with you at Egleston

14   other than you and  older    , younger  ,   Jane   , and  older   ?
                          brother    sister                    sister

15       A     No, ma'am.

16       Q     And you said a nurse spoke with    Jane     and

17   asked her what happened while you were at Egleston?

18       A     Yes.  One nurse came in and asked her what

19   happened.  Then they brought a second person, and I

20   guess she -- she said she was the hospital social

21   worker.  I don't remember her name.  But she, again,

22   asked    Jane    what happened.

23             So then the male doctor asked    Jane     -- so

24     Jane   was examined like -- the poor child was

25   examined -- the poor child was examined at least like

1   two or three times at Egleston and had to tell what

2   happened, you know, over and over again to the point

3   where    Jane     -- when the DFCS worker came, he was

4   frustrated because    Jane    told him that she was -- you

5   know, by that time she had -- during that day,    Jane

6   had told like between the school and the hospital at

7   least five people her story.  So she was upset, and she

8   just didn't want to talk about it no more.  You know,

9   she was just like crying.  Like it was just -- it was

10  overwhelming.

11       Q    So after you left Egleston that day or that

12  evening, about what time do you think it was?

13       A    It was nighttime.  It was, I would say -- we

14  were hungry, so I'd say about 10:00, 9:00 or 10:00.  We

15  had been there for hours, several hours.

16       Q    And where did you go after that?

17       A    I went back to my home.

18       Q    Did you ever report back to the school what the

19  doctor found at the hospital or said at the hospital?

20       A    I tried to reach out to Ms. Fowler, but she

21  wasn't taking my calls at all.

22       Q    How do you know she wasn't taking your calls?

23       A    Because I called several times and the

24  receptionist picked up saying that she was busy.

25       Q    Okay.  Did you get a name of the receptionist?

**Confidential**                                          78

```
 1      A      No, ma'am.  I used to know, but I can't

 2   remember it now, ma'am.  It's been years ago now.  I

 3   can't remember it.

 4      Q      Do you know how the school discovered which

 5   bathroom this occurred in?

 6      A      The bathroom, from my understanding, like where

 7   Jane's   classroom is at, the bathroom is near there.

 8   So wherever your classroom is at, you use the nearest --

 9   you know, the nearest ones closer to you.  Because --

10   which I'll get into that later on which I found out that

11   some of the classrooms, like the kindergartners, they

12   have a bathroom in between it, the classes, like right

13   there, so   Jane   wouldn't have to venture off and go

14   to the bathroom.  It's like right there within, you

15   know, the classroom.

16          So but those what   Jane   went to was like the

17   hallway kind of, sort of bathrooms.

18      Q      So but there are multiple bathrooms in the

19   school.  So how did the school know which bathroom this

20   occurred in?  Do you know?

21      A      I have no idea, ma'am.  I wasn't there.  I

22   don't know.

23              MS. BROYLES:  Let me ask you this,

24          Ms. Thomas:  Do you know which bathroom this

25          occurred in?
```

```
1              THE WITNESS:  Yes, I know which one, but I
2         can't describe it to you.  It's been some years
3         ago.
4              MS. BROYLES:  What is it near?
5              THE WITNESS:  I want to say it's the one
6         that's near the principal's office in the
7         hallway.
8    BY MS. WARE:
9         Q    How did you learn that was the one it occurred
10   in?
11        A    When I went back for the second meeting with
12   Ms. -- Principal Fowler because I wanted to see the
13   bathroom.
14        Q    Okay.  The day that you met with Ms. Durham and
15   the counselor, did either you or  Jane   tell them
16   which bathroom it occurred in?
17        A    No, ma'am, we didn't.  That didn't come up.  We
18   didn't get a chance to do all of that, no, ma'am.
19        Q    And they didn't ask you?
20        A    No, ma'am.
21        Q    All right.  And then in the second meeting when
22   you came back to the school where Principal Fowler was
23   there and the other people you've named, did anyone at
24   that point indicate which bathroom at Oakhurst it
25   occurred in?
```

**Confidential**                                                          80

1       A     No, ma'am.

2       Q     Do you recall telling them which bathroom it

3   occurred in?

4       A     No, ma'am, I don't think so.

5       Q     Okay.  So after you left Egleston, what was the

6   next communication or attempted communication that you

7   had with the school or anyone from the school?

8       A     I kept calling over and over again for days.

9   And then -- no, at this point in time, ma'am, I wouldn't

10  let -- I wouldn't allow   Jane   and them --   Jane

11  and   older sister   to come back to school because I wanted to

12  speak with the Principal Fowler to see, you know, what

13  type of protocol or what are you going to do about this

14  situation about her safety.  So I kept calling.  I kept

15  calling.

16          So by this time, if I'm not mistaken, it was

17  the holidays, Thanksgiving break or whatever, and --

18      Q     So this was the 17th.  What day of the week was

19  that?  Do you recall?

20      A     I can't recall.  Because I know it was coming

21  up on a break.

22      Q     Right, Thanksgiving.

23      A     Thanksgiving break, yes, ma'am.  Because I

24  remember telling them and saying that when I -- when we

25  come back from break, I expect to know what -- you know,

1    know something about this situation, but . . .

2        Q    So this was on the 17th, and I'll just tell you

3    it was a Friday according to a calendar.  The following

4    week was going to be Thanksgiving break?  Is that what

5    you recall?

6        A    No, I think it was going to be the week after

7    that.  I just know that it may have been that week -- I

8    know that it was coming up to it.  It was coming up to

9    it.  It was right there at it, so . . .

10              MS. BROYLES:  Excuse me, Ms. Thomas.  Just

11              looking at the calendar -- oh, excuse me.

12              Forgive me.  I was looking at the wrong

13              calendar.

14              Ms. Ware, I think we can look at the

15              calendar together.  You said that day was --

16              the 17th was a Friday, and Thanksgiving day

17              that week for the record was that following

18              week on November 23rd.

19              THE WITNESS:  Okay.  So, yes, ma'am.

20    BY MS. WARE:

21        Q    So do you recall that the school was closed for

22    Thanksgiving break from November 20th through the 24th

23    that week?

24        A    Yes, ma'am, I think so.  Because I didn't want

25    to say it, but, yes, I pretty much was very upset.  And

1  I remember -- the more I think about it, when you said

2  how did the meeting end, I said, All hell is going to

3  break loose when -- when -- after the break if you don't

4  do something about that boy and take him out of that

5  room.  And that's what happened.

6         So, yes, ma'am, all of that was right around

7  the same area of time.

8     Q    So when you were calling the school, when were

9  you calling the school?  Was it over Thanksgiving break

10  or after the break?

11     A    After the break.

12         During the break, the lady from the

13  McKinney-Vento that's over it, she called me during the

14  break to just check on   Jane   .  And then when school

15  came back in, I started calling back again.  I mean, I

16  started calling -- not calling back, but I started

17  calling when school came back in from the break.  And

18  every time I would call I would be told that Ms. Fowler

19  is busy or she's in a meeting or she's on the phone.

20     Q    Okay.  So school reopened on the 27th after

21  Thanksgiving break.  Do you think you called the school

22  that day on the 27th?

23     A    Yes, ma'am.  As soon as school came back in,

24  that first day, I started calling then.  Because I

25  wanted to let them know I wasn't going to bring the

1   girls back until, you know, they did something about

2   what happened to my baby.

3       Q    And about how many times do you think you

4   called the school before --

5               MS. BROYLES:  Ms. Ware, can you hear me?

6               I was just trying to ask a question.  Forgive

7               me for interrupting.

8               Do you recall telling me about someone

9               named Robin Dickerson?

10              THE WITNESS:  That's who I was telling her

11              had called, Robin Dickerson.

12              MS. BROYLES:  And who is Robin Dickerson?

13              THE WITNESS:  She's over the

14              McKinney-Vento.

15              MS. BROYLES:  Okay.  Because there's been

16              a little confusion about who that was.  Okay.

17              Go head.

18  BY MS. WARE:

19      Q    And you said she no longer works for the

20  school?

21      A    Yes, ma'am, she no longer works there.

22      Q    But she worked for the school at the time?

23      A    Yes, she worked right down there with

24  Superintendent Dude, like at the main place inside of

25  there, yes, ma'am.

1      Q     In the central office?

2      A     Yes, ma'am.

3      Q     And did you know her prior to this incident?

4      A     Yes, because she was the one that when you're

5   McKinney-Vento you go to her so that you can get your

6   kid into school, yes, ma'am.

7      Q     Okay.  So you think that you first started

8   reaching out to the school again on the -- about the

9   situation on the 27th of November.  And I was asking how

10  many times did you reach out to the school between the

11  27th and when your meeting occurred with Ms. Fowler.

12     A     I called every day for two -- I called every

13  day and left a message.  For the first three days, I did

14  that.  The next couple of days I just started calling

15  like three or four times a day because I just wanted to

16  make it clear and -- and the receptionist lady, I

17  remember telling her like, There's no way that she's

18  that busy, and I'm not going anywhere, I'm going to keep

19  calling until she gives me a call back.  And so I got

20  frustrated.

21     Q     Let me ask this real quick:  Were you leaving

22  messages with the receptionist, or did she put you in to

23  a voice mail?  Where did you leave your messages?

24     A     No, ma'am, with the receptionist.

25           So then I kept calling and kept calling, and no

1    one would respond or anything.  So by this point in

2    time, I contact -- I contact Ms. Dickerson, Ms. Robin

3    Dickerson, and I was telling her that the kids are --

4    the kids are not in school.  And she knew why, and --

5         Q    What do you mean by that, she knew why?

6         A    Because that's -- she was there at the meeting,

7    remember, about what happened, about   Jane   .

8         Q    Okay.

9         A    And I told her, I said that they're not

10   guaranteeing her safety, and they -- you know, the  lady

11   -- the principal won't even talk with me.  And so she

12   said that she was going to talk with her boss about it

13   to see what could be done about it, that the kids --

14   that to get Ms. Fowler to respond to me basically.

15        Q    Who was her boss?

16        A    My attorney has his name.  I can't remember his

17   name.  Her boss is -- Dr. Dude is her boss's boss if

18   that makes any sense.

19        Q    Okay.

20        A    So because her main position was that the kids

21   are not in school.  And so during this time, I still

22   can't get in contact with -- with her.  So one day --

23   I'm very frustrated -- someone knocked at the door, and

24   I didn't recognize who it was.  So I kept -- I couldn't

25   see anyone out the peephole, but when I opened up the

1    door, it was a letter left there.  And it was from

2    Ms. Nicole Jefferson and Dr. Ratcliff, and it stated to

3    me that if -- if I don't bring my kids to school they're

4    going to press charges against me with DFCS.

5              So now I'm angry because you mean to tell me

6    that you're going to leave me a letter at the door

7    saying that if I don't put my daughter in danger you're

8    threatening to call DFCS and press charges against me

9    because I just want my daughter to be safe.  So that's

10   when I thought about it, and I called up to the school

11   and I left -- I told the receptionist, I said, Let me

12   guess, Ms. Fowler is not available again.

13             No, she's not.

14             I said, Well, you tell her this, you tell her

15   unless she want to go on the record for preventing those

16   kids from getting their education, I advise her to give

17   me a call because I'm going to call the news and let

18   them know what happened to my child and that you guys

19   won't do anything to secure the fact of   Jane's

20   safety, that now you're depriving my children of their

21   safety and their education.

22             So when I said that, all of a sudden Ms. Fowler

23   called me back that same day when I said I was going to

24   the news.

25        Q    What date was that?  Do you recall?

1        A    No, ma'am, I can't remember.

2        Q    Was it the same day the letter was left at your

3    door?

4        A    No.  No.  Oh.  Wait a minute.  Wait a minute.

5    When they left there, yes, ma'am, I think it was the

6    same day.  Yes, ma'am.  Because I was very angry about

7    it, yes, ma'am.

8              MS. BROYLES:  All right.  So, Ms. Ware,

9              it's 12:16.  I brought a little bit of lunch

10             for Ms. Thomas to eat, so -- because I knew we

11             were going to have a long day.

12             THE WITNESS:  I don't want to stop it now.

13             MS. BROYLES:  No.  I'm just putting it out

14             there, Ms. Thomas.  So at what point would you

15             like to take a short break for lunch to eat the

16             sandwich that I got you?

17             THE WITNESS:  Ms. Ware, if you don't mind,

18             it's not that -- I have other kids as well, and

19    ███████████████████████████████████████████████.

20    █████████████████████████████████████.  So I'm

21             trying to get as much done as possible because

22             I know you said eight hours, and I was like, I

23             don't have eight hours.

24             MS. WARE:  Well, we don't have to go all

25             eight hours today -- or seven hours.  But I

1          know that Ms. Broyles had expressed a concern

2          about your needing to have to have childcare

3          and everything when you're away from the kids.

4          So, you know, my goal was to try and get

5          everything done as much as possible today if we

6          can.

7               THE WITNESS:  Yes, ma'am.

8               MS. WARE:  But so that was the reason.

9               MS. BROYLES:  You know, I'll suggest that,

10         Ms. Ware, if you're able to complete your

11         questions in the time -- in a time frame that

12         she has available, great.  If not, then we'll

13         have to, you know, make different arrangements

14         to allow you to complete your questions.

15              So I just wanted -- I just wanted to make

16         sure that you have a chance -- because I don't

17         think you've eaten much.  You were very nervous

18         this morning.  And I got you a sandwich to make

19         sure you have energy.

20              THE WITNESS:  But I just want to --

21              MS. BROYLES:  So when's a good time to

22         break to just give you maybe 15 minutes to eat

23         a sandwich?

24              THE WITNESS:  I mean, if I have a problem,

25         I'll just let you know.  I just want to keep --

1           it's hard already to remember a lot of this

2           stuff, and then it's like rehashing the pain

3           and everything, so I don't want to --

4                MS. BROYLES:  So this is what I'm going to

5           suggest we do, I'm going to suggest at 12:30 we

6           take a ten-minute break.  You just eat what I

7           have sitting here for you.

8                MS. WARE:  Can we go off the record?

9                MS. BROYLES:  Yes, can we, please?

10      (Off the record from 12:18 p.m. through 12:19 p.m.)

11   BY MS. WARE:

12      Q    Okay.  We were talking about Ms. Jefferson and

13   Mr. Ratcliff had left a letter at your door, and you

14   were angry.  And that same day you called the school

15   again and asked to meet with Ms. Fowler and then said if

16   she doesn't call me back I'm going to the news.  And

17   then I think you said she called you back that same day?

18      A    Yes, ma'am.

19      Q    Okay.  When she called you back, was it her on

20   the phone or somebody else on her behalf?

21      A    It was her.

22      Q    And what did she tell you?

23      A    She said that she was open to having a meeting

24   with me.  And her -- I think she said her and her

25   assistant principal.

1        Q     All right.  Did you all set a date to meet?

2        A     Yes, ma'am, and I can't remember that date.

3        Q     Okay.  Do you think it was soon after that

4    phone call, though?

5        A     Yes, I think a couple of days afterwards.

6        Q     Okay.  So did that meeting occur?

7        A     Yes, ma'am.

8        Q     Where did that meeting occur?

9        A     In her office.

10       Q     And did you -- do you have a copy of the letter

11   that was letter by Mr. Ratcliff and Ms. Jefferson?

12              MS. BROYLES:  Excuse me.  Hold on.

13              Ms. Ware, we had produced that to you in a

14              document production we sent to you two days

15              ago.  That was the December -- I'm sorry.  I'm

16              confusing these.  What was your last question,

17              Ms. Ware?  You said which letter?

18              MS. WARE:  I asked if she had a copy of

19              the left that Dr. Ratcliff and Ms. Jefferson

20              left at her door.

21              MS. BROYLES:  Okay.  Forgive me.  No, I'm

22              sorry.  We do not have a copy of that letter.

23              I'm thinking of the letter of the reentry

24              meeting notes from December 8th.  We did

25              produce that, but not the one you just

**Confidential**                                          91

```
 1              referenced.  We do not have that.
 2   BY MS. WARE:
 3       Q    Okay.  So did you not retain a copy of that
 4   letter?
 5       A    Yes, ma'am.  I used to have it, yes, ma'am, but
 6   I don't have it no more.  I used to have it.
 7              And, also, I'd like to state also going back to
 8   what you were saying, after -- after the letter was left
 9   there, before I called to the -- back to the school,
10   I -- because it was a phone number on there, and it was
11   Dr. Ratcliff.
12              And he was like, Well, it's going -- you're
13   looking like the bad person right now because your kids
14   are not in school, and it's only going to hurt you more
15   with DFCS.  And do you know that you can actually go to
16   jail for not, you know, having your kids in school?
17              And I said, What about  Jane  ?  This was on
18   the phone, our conversation.  He said, I understand what
19   you're saying, but you have to get them to school.  And
20   so then I got off the phone with him and I called
21   Ms. Robinson -- I mean Ms. Dickerson, and I explained to
22   her that they had just left the letter on the door, and
23   I told her what the conversation was with me and
24   Dr. Ratcliff.
25              And she was saying that, I know you don't want
```

1    to do it, but right now you need to let them go back to

2    school because what they're going to do is paint you out

3    to be a bad parent and press charges against you.  And

4    she said, I know it's not fair, but -- and I said, Well,

5    no, I'm not going to do that.

6            So that's when I called to the school and

7    threatened Ms. -- Dr. Fowler with going to the news.

8        Q    Okay.

9        A    If she didn't have a meeting with me.

10       Q    So this was the second call to Ms. Dickerson

11   then?

12       A    Yes, ma'am.

13       Q    All right.  And you told her you had gotten

14   this letter from Ratcliff and Jefferson and that you had

15   spoken with Mr. Ratcliff, and she said, you know, you

16   need to get them back in school?

17       A    Yes.  Yes.

18       Q    All right.  And then the next phone call you

19   made to the school was to speak with Ms. Fowler, and

20   then Ms. Fowler called you back the same day and agreed

21   to meet with you and the assistant principal?

22       A    That's after calling so many times.  That's --

23   that's when I had to keep -- when I threatened her about

24   her not returning my call for weeks.

25       Q    For weeks or just from the 27th?

1      A     It went on like a week or two with me calling.

2      Q     So when was the meeting that you ended up

3   having with Principal Fowler and the assistant

4   principal?

5      A     I think it was on the 8th or the 9th.  So it

6   may have been just a week.  I know some days had went

7   past, and I can't -- I don't -- I can't remember all of

8   that right now, but I know days had passed with them not

9   being able to go to school.

10                 MS. BROYLES:  All right.  So let me just

11             interject.  Just looking at the calendar,

12             Ms. Ware, for the record December 8th is a

13             Friday.  December 9th is a Saturday.

14                 So would it have been on that Friday,

15             December 8th?

16                 THE WITNESS:  Probably -- probably so.

17                 MS. BROYLES:  Okay.

18   BY MS. WARE:

19      Q     Okay.  So you think you had a meeting on the

20   8th -- or you had a meeting on the 8th with Ms. Fowler

21   and Mr. Credi.  Was there anyone else at that meeting?

22      A     No.  No, ma'am.  Wait a minute.  Wait a minute.

23   Who was there?  Let me think.  Let me think at that

24   meeting.  Yes.  Yes, there was.

25                 As a matter of fact, I have a friend of mine.

1  Her name is Ms. Christa, and Ms. Christa had been, you

2  know, like a support for me and my kids.  So Ms.

3  Christa -- I forgot her last name.  I can't think of it

4  right now -- she came there with me so that she can

5  basically take notes of what's going on and as a witness

6  as well for me and as a support person.  And

7  Dr. Ratcliff was there as well.

8      Q    Was Nicole Jefferson there?

9      A    I can't remember.

10         I know Dr. Ratcliff was there because

11 Ms. Christa said that she wanted to make sure that we

12 get a summary of everything that was said basically in

13 that meeting, and Dr. Ratcliff was the one that he just

14 went and typed up something real quick and gave it to

15 us.  I can't remember what the summary said on it.

16         MS. BROYLES:  And that's what we provided

17         to you in discovery, Ms. Ware, a couple of days

18         ago.

19 BY MS. WARE:

20      Q    Okay.  So tell me who started the meeting.  Who

21 was the first one to speak?

22      A    Principal Fowler.

23      Q    All right.  And what did Ms. Fowler say?

24      A    She introduced her -- the vice principal -- I

25 mean assistant principal, and I -- and I think I started

1   off.  She was basically -- I can't remember who started

2   it, but I know that I was starting to let her know my

3   concerns as to what happened to my daughter and the fact

4   that I feel like you guys are not caring about her

5   safety.

6           And I asked her, I said, It's been days now

7   I've been trying to contact you.  I said, So what have

8   you achieved as far as in having some new information as

9   far as into how you're going to make sure that my child

10  is going to be safe here?  I said, Are you going to take

11  him out of the -- remove him out of the classroom?

12          She said, I'm not removing anyone.  I said,

13  What do you mean you're not removing anyone?  She said,

14  I'm not going to remove him.  I said, Well, why you

15  won't remove Jane    then?

16          Well, I'm not going to do anything.

17          I said, Ma'am, why can't you -- I said, Also,

18  why was he in the bathroom?  I said, Well, let me ask

19  you some questions.  I said, As far as the little boy

20  goes, I said, have you even had a chance to speak with

21  his parents or talk with them?  She said that she --

22  she's not going to discuss that with me.

23          I said, So is he still in the classroom?  And

24  she said, Yes.  I said, So you're going to tell me

25  you're not going to do anything about this?  And I asked

**Confidential**                                                96

1   her to remove him.  She said, I can't remove him.  No.

2   She said, I'm not going to remove anyone, I can't remove

3   him.  I said, what do you mean you can't remove him?

4            I said, And, also, why was he allowed to use

5   the bathroom?  Why was he in the bathroom?

6            And she was -- she told me that that was his

7   right to go in there.  I said, What do you mean that's

8   his right to go in the bathroom, in the girls' bathroom?

9   She said -- how did she put it?  Per Obama rules

10  basically, that whatever a person identifies themself as

11  that they have the right to use that facility, you know,

12  like the bathrooms or whatever.  So like if I identify

13  myself as a male, I have the right to go in there and

14  that there's nothing no one can do about that and

15  that -- which I don't understand this.  She said that

16  there's -- because the government funding -- she kept --

17       Q    Did she tell you that the little boy identified

18  as a girl?

19       A    Her exact words were, Per Obama -- well, the

20  laws or whatever he put into place, whatever a person

21  identify themself as that's what they -- they have the

22  right to, you know, those accommodations and that they

23  have to do what the laws are.  So I said, So -- and we

24  are -- she said, So we are -- she said something about

25  the funding, that they are funded through the

1    government, through the federal something, and they have

2    to go by those rules because they're funded.

3          And I'm like, So we have to -- we have to go by

4    the rules set forth by President Obama?  So I said, So

5    what does President Obama have to do with this?  We're

6    talking about a boy in the bathroom.

7          Well, and she went back into whatever person

8    identifies themself as.  I said, So, okay, whatever a

9    person identifies themself as.  I said, So if that's the

10   case, if   Jane   identifies herself as a frog, can she

11   go leaping through here?  And so she just bust out

12   laughing.

13         I said, I don't think it's funny.  You said

14   whatever a person identifies themself as.  So what if

15         identifies herself as a frog?  Can she just

16   leap around through here?  I said, Because it's not

17   making sense what you're saying and all this Obama

18   stuff.  I want to know what you're going to do about

19   that situation.

20         And I said, I want my child out of that room

21   then because my child is not coming back until you put

22   her in another classroom.

23         And I think she was saying that -- I think she

24   said that she would -- I can't remember it's been so

25   long ago.  But I know at some point I asked -- I asked

1    for -- let me go back.  I think I'm messing up

2    something.

3                    MS. BROYLES:  This is probably --

4                    THE WITNESS:  Hold on.  My head right now.

5            Hold on.  Hold on.

6                    MS. BROYLES:  Let me pause you.

7                    THE WITNESS:  I'm messing it up.

8                    MS. BROYLES:  Let me pause you because

9            I -- again, I really feel like your sugar's

10           getting low.  We've been going about another

11           hour and 15 minutes, so I'm going to ask that

12           we take that brief break.  I went ahead and

13           brought a sandwich so we wouldn't be taking up

14           that much time.  If we can take a 15-minute

15           break, I would like my client to eat a little

16           bit.

17                   MS. WARE:  Okay.  I just want to make sure

18           you don't have any further answer to the last

19           question that was asked before we --

20                   MS. BROYLES:  She probably does.

21                   MS. WARE:  -- go on break.

22                   MS. BROYLES:  Part of the issue is that

23           this area, I kind of know it's going to

24           probably go for a while.  You're going to

25           probably have a number of questions, Ms. Ware,

```
 1              on this area that we're talking about.  I'm not
 2              in any way trying to cut short your questions
 3              or interrupt.  She will continue answering as
 4              you desire because there's more, I'm sure.
 5                   MS. WARE:  All right.  Let's take a
 6              15-minutes break.
 7                   MS. BROYLES:  So we'll come back on at
 8              12:40 -- 50.  I guess that's 12:50 at this
 9              point.  No, 48.  Okay.
10         (Recess from 12:33 p.m. through 12:50 p.m.)
11  BY MS. WARE:
12     Q    So we were talking about your meeting with
13  Ms. Fowler and the assistant principal on or about
14  December 8th, and you were saying that you were letting
15  the principal know your concern.  You asked if the boy
16  would be removed, and you asked, Well, why don't you
17  move    Jane   ?  And you said Ms. Fowler's response was
18  she's not going to remove anyone.
19     A    Okay.  Yes, ma'am.  But the reason -- I need to
20  backtrack here some, if you don't mind.
21              Prior to that I went -- I don't know the exact
22  date, but during that week -- I'm not good with dates.
23  But it would have been that Monday.  If you can look on
24  your calendar, ma'am, that Monday of the 8th, that
25  Monday is when I went down to the -- what you just
```

**Confidential**                                    100

1    called it down there where Dr. Dude works at?

2        Q    Central office?

3        A    Yes, ma'am, the central office place.

4             So I went down there that Monday because I was

5    trying to speak with Superintendent Dude and -- and I

6    forgot the other person's name that would be

7    Ms. Dickerson's boss.  And I sat there waiting on

8    Dr. Dude all day long, and I mean literally for hours.

9    I waited.  I waited.  I waited.  And I kept being told

10   he was busy.  He can't talk with -- he can't speak with

11   me.  That went on that Monday.

12            I came back that Tuesday, and I said -- because

13   they -- well, on that Monday they were asking me what do

14   I need -- what do I need to speak with him about.  I was

15   trying to get a transfer for the girls because they, you

16   know, couldn't go back to school because of the incident

17   and they weren't guaranteeing the safety or anything.

18            So that Monday I went there about it.  I was

19   told that he can't speak with me.  All day, I was

20   sitting there all day.  So then I come back -- I came

21   back on that Tuesday and did the same thing.

22            On that Tuesday I waited for hours, and his

23   assistant came down.  Instead of letting me speak with

24   Superintendent Dude, she said, He told me to give you

25   this piece of paper -- a regular sheet of notebook

1  paper and write down what it is I want to talk to him

2  about.

3        And I said, So you mean to tell me I can't make

4  an appointment with him?  This is my second day here,

5  and you're going to give me a piece of paper?

6        And she was like, Well, I'm just telling you

7  what he told me to tell you.

8        So Ms. Dickerson was in there at the time when

9  I wrote it out about my concerns about I want  Jane

10  and  older sister  moved because I fear for their safety because

11  they are not doing anything about what happened in the

12  bathroom and they're going to continue to let him go in

13  the bathroom.

14     Q    So Ms. Dickerson was there when you were

15  talking to Dr. Dude's assistant?

16     A    Yes.  And she saw her give me the piece of

17  paper and -- well, she heard everything that I just

18  stated to you.  So --

19     Q    Was she aware that you had been sitting there

20  for two days?

21     A    Yes, she had been aware of it, that the girls

22  had been out of school as well, and she had been trying

23  to get with her boss that was telling her that Dr. Dude

24  said that he too -- he was too busy for that, to do

25  that.

1              MS. BROYLES:  So excuse me, Ms. Thomas.

2              Ms. Ware, we disclosed to you the note

3       that Ms. Thomas wrote to Mr. -- to

4       Superintendent Dude.

5              Ms. Thomas, may I ask you, did you take --

6       did you snap a copy of that note and you gave

7       it to me?

8              THE WITNESS:  I snapped a copy of it, and

9       I dated it as well.

10              MS. BROYLES:  So --

11              THE WITNESS:  Did you give her the note?

12              MS. BROYLES:  I disclosed it, yes.  We

13       sent it out to her on Tuesday.

14              Now, Ms. Thomas, let me ask you:  I'm

15       showing you a calendar.  December the 6th, that

16       note was dated December 6th.  Is it possible

17       that the day that you sat and waited for

18       Dr. Dude to meet with you that it was December

19       the 6th rather than the 5th?

20              THE WITNESS:  I just know I went two days

21       in a row.  It's possible.  I know I was there

22       two days in a row, and on that second day is

23       when I got the -- when he sent his assistant

24       down with the paper, with that piece of paper

25       and a pencil for me to write whatever I wanted

1            to talk to him about.

2                  And Ms. Dickerson was there.

3    BY MS. WARE:

4        Q    I'm sorry.  Ms. Dickerson was there?

5        A    Yes, ma'am.  And I wrote it -- wrote it.

6    Ms. Dickerson -- because the assistant went back

7    upstairs.

8        Q    What was the assistant's name?  Do you

9    remember?

10       A    I only know it was a black lady that came down

11   and said she was his assistance -- his assistant.

12       Q    Okay.

13       A    So I gave the letter to Ms. Dickerson because

14   she -- the assistant went upstairs.

15            Ms. Dickerson said, Hold on a minute.  Let me

16   go ahead, and I'm going to take this up there to the

17   assistant.

18            So she walked it up there to the assistant.  In

19   the meantime Dr. Ratcliff comes inside of there, and he

20   starts up again about what am I -- what am I going to be

21   looking like, like, as a parent, it's going to be harder

22   on me because I'm the one that's keeping their kids out

23   of school, what do I think, you know, is going to

24   basically happen to me.

25            And I'm like, This is crazy.  I'm not going to

1    let my kids go back there until, you know, they're able

2    to tell me something.  So that -- I want to say that day

3    or the next day on the 7th -- let me see.  5th, 6th,

4    7th.  The 7th is when I contacted -- the 7th is when I

5    called, and like I told you before, and threatened to go

6    to the news about their education and about what

7    happened to   Jane   if they don't -- you know, if she

8    won't have a meeting with me about the matter.  So

9    that's when she called me back that same day.

10            Then on the 8th is when --

11       Q    All right.  Hold on.  Slow down a minute.

12            So I need to get something straight here.  So

13   you think you were at the central office on the 5th and

14   the 6th because the letter you left you dated for the

15   second day you were there and it's dated the 6th.  And

16   you said that on the 6th Dr. Ratcliff came by and again

17   told you to get your children back in school?

18       A    Yes.

19       Q    Was this conversation before or after

20   Dr. Ratcliff had left the letter at your house?

21       A    This was after.  This conversation happened

22   with -- after that.  That's when it happened, after

23   that.  Because this -- the conversation that me and him

24   had was after that.  Yes, I'm pretty sure of that, after

25   he had left the letter there.

1      Q    So when you saw him at the central office that

2   day and he came by, you believe it was -- that was after

3   he had left the letter on your door?

4      A    Yes, ma'am, because the girls was still not

5   going to school.

6      Q    Okay.  So it's logical then that he would have

7   left that letter on your door before December the 6th?

8      A    Yes, ma'am.

9      Q    Okay.  Between November 27th and the day that

10  Mr. Ratcliff and Ms. Jefferson left the letter, had you

11  been contacted by anyone in the school system?

12     A    No, ma'am.  The only person that ever contacted

13  me was Ms. Dickerson, and she had been contacting me a

14  couple of times out of concern for   Jane  .  And she

15  was saying that she felt angry that -- that the girls

16  are out of school and that what happened.  You know, she

17  was -- you know, that her -- her main thing is that her

18  job is about education and that no child -- whether you

19  were homeless or whatever, you should be able to get

20  your education.  And she said her hands were crossed

21  because she went to her boss and she was like this

22  parent's -- the kids are not in school because the

23  parent is afraid for their safety and what can we do

24  about it.  And he's saying that Superintendent Dude told

25  him he's too busy for that, he don't have time to deal

1   with things of that nature.

2          So over that time nobody has ever contacted me

3   during that time but Ms. Dickerson.

4      Q    Okay.  So Ms. Dickerson called you over the

5   Thanksgiving break to check on   Jane  , and then

6   between November 27th and the day that Ms. Jefferson and

7   Mr. Ratcliff left the note, you don't -- she contacted

8   you at some point during that time, Ms. Dickerson did;

9   correct?

10     A    Yes, ma'am.  And I --

11     Q    No one else from the school system contacted

12  you or tried to reach out to you during that time?

13     A    No, nobody at all.

14          So, ma'am, I just can't remember his name.

15              THE WITNESS:  Attorney Vernadette, do you

16          remember the guy's name?  Oh, I can't say.

17              MS. BROYLES:  I can't testify for you.

18              THE WITNESS:  I'm trying to -- it's

19          Ms. Dickerson's boss.

20  BY MS. WARE:

21     Q    Bruce Roaden?

22     A    That's him.  They put me through to his voice

23  mail.  I had blew his voice mail up several times as

24  well.

25     Q    During the same time frame between --

1        A     Yes, ma'am.

2        Q     Okay.  From November the 27th through December

3   the 6th when you went -- or 5th when you first went to

4   the school; correct?

5        A     Yes, ma'am.

6        Q     And then you said you wrote out the letter and

7   dated it, and you took a photo of it on your phone?

8        A     Yes, ma'am.

9        Q     Do you still have the same phone?

10       A     No, ma'am.

11       Q     Do you still have the same phone number that

12   you had back at that time?

13       A     No, ma'am.

14       Q     What was your phone number back at the time?

15       A     I have no clue, ma'am.  I have had several

16   different numbers.  I have no clue.

17            MS. BROYLES:  Ms. Ware, like I said, we

18            did produce that in your discovery.  You have a

19            copy of what -- that picture.

20            MS. WARE:  Right.  I understand that.  I'm

21            asking about her cell phone number back at the

22            time of this incident and when you were making

23            the calls to the school.

24   BY MS. WARE:

25       Q     Were all of these calls made on your cell

1    phone, or were they made from a landline?

2         A    From a cell phone.

3         Q    Who was your provider back at that time?

4         A    It may have been Metro PCS.  I'm not for sure.

5    Or T-Mobile.  There's no telling back then.  I don't

6    know.

7         Q    When you spoke to Mr. Ratcliff after he and

8    Ms. Jefferson left the note -- you said that you

9    contacted him.  He had left his phone number, and you

10   called him -- did he tell you why he had left that note

11   on your door --

12        A    He told me that --

13        Q    -- just calling you on the phone?

14        A    He said that -- the note said to give him a

15   call if I don't give the kids whatever, like I explained

16   to you.  So I knew what it was about.  So when I called

17   him, I called him back about it, and he said if I don't

18   bring -- put the kids in there they're going to press

19   charges against me for not having my kids in school and

20   they're going -- like DFCS press charges.  And he said I

21   can go to jail if you don't have your kids in school.

22        Q    So I need to be clear.  Was that written on the

23   note, or did he just leave you a phone number and you

24   called him and he told you that over the phone?

25        A    No, ma'am.  The note said that you need to --

1   you need to have your kids in school.  I'm paraphrasing

2   it.  But it was saying that I needed to have the kids in

3   school and that if I don't that they're going to contact

4   DFCS and they will be pursuing -- pressing charges for

5   me not having my kids in school.  So when I spoke with

6   him, that's when he -- I'm sorry.  Go ahead.

7               MS. BROYLES:  Maybe I can ask a question

8          that helps.  When you spoke with him, did he

9          reiterate what was on the note?

10              THE WITNESS:  Yes.

11              MS. BROYLES:  Okay.

12  BY MS. WARE:

13      Q    But did he tell you when you spoke with him on

14  the phone why they came to your house as opposed to just

15  calling you on your cell phone?

16      A    No.  I don't know.  He didn't never say nothing

17  like that.  He just said that he came to -- what he was

18  there for was about the kids going to school, and he was

19  basically saying make it easier on myself.

20      Q    All right.  So let's go back to Mr. -- you said

21  Mr. Ratcliff came -- the day you were at the central

22  office Mr. Ratcliff comes by, again tells you you really

23  need to get your kids back in school.  And you gave the

24  letter to Ms. Dickerson who took it upstairs, and you

25  believe that she gave it to either Dr. Dude or his

1   assistant?

2       A     Yes.  She gave it -- she told me she gave it to

3   his assistant, the same person that brought me the

4   paper.

5       Q     So did she come back downstairs and tell you,

6   Okay, I've given it to Dr. Dude's assistant?

7       A     Yes.  She said, I gave it to -- to him.

8       Q     When was the last time that you spoke with

9   Ms. Dickerson?

10      A     It's been some years ago.  It was during the

11  time when all of that was going on.

12      Q     Okay.  All right.  Now, we had kind of diverged

13  because you wanted to tell me about going to see

14  Dr. Dude, and that was on the 5th and the 6th.  And you

15  think the first day you sat there all day long; right?

16      A     Two days.

17      Q     What time did you get there on that first

18  morning?

19      A     I'll say like 9:00.  9:00.

20      Q     And what time do you think you left that day?

21      A     Around maybe 2:00.  Because what it was is

22  that, ma'am, I was trying to -- I figured he had to come

23  out at some point in time and eat lunch.  So I figured

24  he's going to get hungry eventually and come downstairs,

25  but he never did.  So instead I got hungry.  So I was

1    there for like two days.

2        Q    Okay.  So the first day on the 5th you think

3    you sat down there from about 9:00 to 2:00.  And then on

4    the second day, what time did you arrive?

5        A    That day I probably came around like 10:00,

6    something like that in the morning, and I stayed only --

7    I stayed up until like 3:00.  I think it was 3:00

8    something.

9        Q    Okay.  And after you had Ms. Dickerson take the

10   note upstairs, did you continue to wait after that, or

11   did you leave?

12       A    No, I spoke with Ms. Dickerson for a few

13   minutes, and then I left.  I just was, you know, vexting

14   to her about what -- what -- you know, about my

15   frustration.  And I told her that I'm -- I was trying to

16   get a -- the reason for me coming was to get the kids to

17   go to -- what is it called?  Transferred.  I was trying

18   to get them transferred.

19       Q    Okay.

20       A    And then because the school -- when I called

21   down to the central office, I was told that -- I was

22   told that -- no, when I called to central office, I

23   asked for a transfer.  I was told that the only person

24   that can do a transfer is Superintendent Dude.  And I

25   said, Well, that doesn't make any sense.

1       Q     When did you call central office?

2       A     During -- during the time when I had been

3    calling already Ms. Fowler for those days.  I had also

4    called and asked -- one day and asked the lady, I said,

5    Can I get -- what do I need to do to get a transfer?

6    And she told me that Dr. Dude had to approve transfers.

7    And I said, That don't make a bit of sense because I've

8    never heard of a superintendent doing -- you know,

9    approving transfers.  Like, that's -- I didn't know that

10   was in the job title.

11      Q     Who did you speak with at the central office?

12      A     Whoever it was over the phone.  I don't -- I

13   don't know.

14      Q     Okay.  The days that you sat there and waited

15   on Dr. Dude, was there a receptionist sitting out at the

16   desk there?

17      A     Yes, ma'am.  And I don't remember her name, but

18   she's kind of like Hispanic or something, I think.  But

19   either way it goes, I was there so much that -- so long

20   that, you know, she started talking to me.  So we were

21   having a small chat.

22              MS. BROYLES:  And, again, don't guess.  If

23         you know it, say it.  If you don't, don't.

24              THE WITNESS:  Okay.  It was a lady.

25              MS. BROYLES:  And if I could ask you a

1          question, did you ask to speak with Bruce

2          Roaden when you went to the central office at

3          that time?

4                    THE WITNESS:  Yes.

5                    MS. BROYLES:  And what was your

6          understanding of what Bruce Roaden did?

7                    THE WITNESS:  Ms. Dickerson said that she

8          went to Mr. Roaden again, and she said she

9          expressed her concern.  Mr. Roaden said that he

10         tried to speak to Superintendent Dude, but

11         Superintendent Dude told him that he was too

12         busy.

13                    MS. BROYLES:  No.  What was his role?

14         What was your understanding of his role?  Did

15         he have anything to do with student services?

16                    THE WITNESS:  I don't -- I don't know.

17         Ms. Dickerson told me that that was her boss

18         and that he's like Superintendent Dude's

19         right-hand man basically.  Like he could speak

20         with him about it or -- or, you know, stress my

21         concerns basically.

22                    Because what Ms. Dickerson was saying is

23         it's looking like she's not doing her job

24         because, you know, the girls are out of school.

25         So she's telling her boss, Hey, I need your

1              help because now my job is on the line because

2              I have people under me that if it -- you know,

3              if something happens, they're going to be like,

4              Well, what were you doing while the girls was

5              out of school?  And she's like, Well, my hands

6              are tied.  I can't -- you know, I need you to

7              help me.

8    BY MS. WARE:

9        Q    Okay.  All right.  So you left the school on

10   the 6th, and then you -- did you already have -- and

11   then at some point Ms. Fowler called you.  Was that

12   after the meeting?  I mean, after you were at central

13   office that Ms. Fowler called you?

14       A    No, after the two days of me going down there,

15   that next day I called Ms. Fowler and left a message

16   with the secretary and said that I was going to the

17   news, and that's when Ms. Fowler called me back.

18       Q    Okay.  So that would have been on the 7th you

19   called the school again, and Ms. Fowler called you back

20   that same day?

21       A    Yes, ma'am.

22       Q    Okay.  And set up the meeting.  And then we

23   were talking about the meeting, and I want to go back to

24   that.  And you said Ms. Fowler had said she wasn't going

25   to move anyone.  But    Jane    ultimately was moved,

1    correct, to another class?

2        A    Yes, ma'am, because she said that she -- first

3    of all, I asked them about the little boy, about the

4    discipline.

5            I said, Well, what are you going to do as far

6    as in disciplining him?  What is the policy?  What do

7    you do?

8            She said that she wasn't going to discuss that

9    with me.  Then I said, Well, so you mean to tell me that

10   he can just go and do what he wants to do?  I said,

11   Well, where is it at in the handbook?  I said, Show me

12   that in the handbook.  You know, I was upset.  I was

13   demanding to see the handbook.  She said, It's not in

14   the handbook.  She said, It was on the news.  I said,

15   The news?

16           I said, I never -- I don't remember seeing

17   that.  I ain't never.  This the first time I ever heard

18   of the policy that you're talking about.  I said --

19               MS. BROYLES:  Can I just interrupt you

20           because I think it's gotten a little confused?

21           What were you asking that was in the -- was in

22           this school manual?  Were you referring to the

23           bathroom policy?

24               THE WITNESS:  No, the Obama mandate that

25           said that whatever someone identifies themself

**Confidential**                    116

```
 1              as that -- you know, that they can -- they can
 2              utilize.  So I asked her about that.
 3                    I said, Show it to me.  She said, It was
 4              on the news.  I said, On the news?  I said, Are
 5              you serious?  I said, Ma'am, I'm quite sure
 6              just like I didn't know anything about this,
 7              other parents don't know because I would not
 8              have my child here if I knew.  And so I -- so
 9              she said, It was on the news.
10   BY MS. WARE:
11       Q    Okay.  So but we were talking about you had
12   asked about discipline of the little boy, and she said I
13   can't -- I'm not going to discuss that with you.  And
14   then I said, Well, at some point  Jane   was
15   transferred to another classroom; right?
16       A    Yes, ma'am, because I told her, I said, Well, I
17   tell you what, since you say you're not going to do
18   anything, I said, are you willing to go on the record
19   for depriving my children of their education, depriving
20   my child -- I was talking about  Jane   then -- of her
21   education if you're not -- because I'm not going to
22   bring my child here?  So if you're willing to lose your
23   job and go on the record and you're not willing to move
24   my child, then that's you.  You're going to lose your
25   job.
```

**Confidential**                                    117

```
1              And that's when she agreed to move my baby.
2       Q     Okay.  So you don't recall her offering to move
3   Jane   to another class?
4       A     No, ma'am.
5       Q     Okay.  And then you don't recall her saying I
6   will move her to another class with a bathroom that is
7   inside the classroom?
8       A     Yes, she said that after all of that.  When she
9   agreed to move my baby once I said that about her losing
10  her job, that's when she did put them in there.  And we
11  went to check out the bathroom to make sure that there
12  was a bathroom inside of there.  And that's the only
13  reason why I allowed   Jane   to -- you know, to come
14  back to school.
15      Q     Well, didn't you -- she actually offered
16  Jane   to come back and you objected -- I mean -- I'm
17  sorry -- offered to move   Jane   to a different
18  classroom, and you actually objected to that because you
19  didn't want   Jane   to have to be moved out of her
20  class?
21      A     No.  And originally I asked -- the very first
22  meeting I asked for the boy to move.  That's what I
23  stated, asked for him to leave because   Jane's   the
24  victim.  Why would   Jane   have to leave?  She said
25  that she wasn't moving anybody.
```

1     Q    But she offered to move Jane , and you

2  objected and said, No, I don't think Jane should

3  have to leave; right?

4     A    No.  She said she's not moving anybody.  There

5  was never a offer.  There was -- none of that didn't

6  take place till that meeting with -- we were just

7  discussing.  Till that meeting with the vice principal

8  and me and Ms. Christa and us that we just -- that was

9  the only time.

10               MS. BROYLES:  Are you talking about the

11          meeting on December 8th?

12               THE WITNESS:  Yeah, December 8th meeting,

13          that was the only time.  And she didn't want to

14          do it then until, like I said, I threatened her

15          job.

16  BY MS. WARE:

17     Q    And so did anyone else in the meeting -- is

18  that everything Ms. Fowler said in the meeting?

19     A    Yes, ma'am.  Because the vice principal, he

20  didn't really talk about any -- he didn't say anything.

21  He was, I guess, just there just as a witness or

22  something, and that's why, I guess, they had

23  Mr. Ratcliff there as a witness as well, I guess.

24     Q    Mr. Ratcliff didn't talk either?

25     A    No.

1      Q    And Ms. Jefferson, you said you thought she

2  might have been there.  Do you remember her talking?

3      A    I don't remember her being there.

4      Q    And what about Ms. -- your friend Christa you

5  said?  Did she speak?

6      A    She just said, My name is Christa Smith, and

7  I'm just here as support for Ms. Thomas and to, you

8  know, make sure that I write down some important things

9  that -- you know, to keep a record for her.  And that

10 was it.

11     Q    Do you recall anything else being discussed in

12 that meeting that we haven't talked about today?

13     A    Let me think.

14          MS. BROYLES:  Let me just ask a clarifying

15          question because I feel like you may be a

16          little confused.  You're saying that you asked

17          the boy to be removed that first meeting on the

18          17th of November?

19          THE WITNESS:  Yes.

20          MS. BROYLES:  And then the December 8th

21          meeting, did you ask that the boy be moved

22          first?  In other words, were you asking that

23          Jane   be moved first or that the boy be

24          moved first?

25          THE WITNESS:  When I went back there to

**Confidential**                                   120

1          the December 8th meeting, I asked her had the

2          boy been removed, and she said no.  And so

3          that's what led me -- and she said she's not

4          going to remove anybody.  So that's what --

5          that's what I'm trying to say.  Like, it's not

6          that I was trying not to -- I wasn't like,

7          Okay, no, no, no, uh-uh, if you can't move

8                    whatever, no.  It didn't happen like

9          that, ma'am.

10              I wasn't like -- basically how can I put

11         this?  I didn't decline to like say, well --

12         she offered for -- to make things better for

13         Jane  , and I was like, No, no, no, why

14         should  Jane   have to leave.  No, that didn't

15         happen.  She wasn't going to even move  Jane

16         is what I'm trying to explain to you.  She said

17         she wasn't going to move anybody.

18                  MS. BROYLES:  Okay.

19                    (Simultaneous talk.)

20                  MS. BROYLES:  -- anything else that was

21         asked that day?

22                  THE WITNESS:  Let me see.  Let me think,

23         that day.

24                  MS. BROYLES:  Was there any discussion

25         about whether either child had been interviewed

```
 1              by anyone in the December 8th meeting?
 2                   THE WITNESS:  Yes.  I asked her had she
 3              interviewed the little boy.  She said no.  I
 4              asked her had   Jane   been interviewed.  She
 5              said, No, neither kids were interviewed.  But I
 6              told her, I said, No, that's not true because I
 7              know for a fact   Jane   was interviewed.
 8                   And she said, No, that -- she claimed that
 9              they weren't interviewed.  Neither kids were.
10              I wasn't there, so I -- I don't know.
11                   And like I said, ma'am, because I didn't
12              even know that while I was gone the police came
13              up there to the school.  And as a matter of
14              fact, when I asked him about it because I asked
15              him about the pressing charges, he said that,
16              Well, you know, we -- he's so little that we
17              can't press charges on a 5-year-old, you know,
18              he's too -- 5- or 6-year-old.
19    BY MS. WARE:
20         Q    When did this conversation occur?
21         A    Days after the kids -- after the incident when
22    the kids were out of school and I couldn't get
23    Ms. Fowler on the phone, so I got frustrated, and I
24    called to find out what policeman came up to the school
25    because I wasn't there.  And so I had to go through a
```

**Confidential**                                    122

 1    lot, but I found out which policeman.

 2            And he was like, Well, I thought that that

 3    situation was resolved.  They haven't contacted you back

 4    yet, the school, so your daughter's still in the

 5    classroom?

 6            I said, Yes.  I said, Well, she's not in there

 7    because she's at home with me.  And I asked him at that

 8    time did he interview the little boy.  He told me no, he

 9    didn't interview nobody but   Jane   .  So therefore I

10    knew Principal Fowler was telling a story then because

11    it came out of the policeman's mouth that he had

12    interviewed my daughter, but only my daughter.

13        Q    All right.  So who was this officer?  Do you

14    recall?

15        A    I think my attorney has his name.  I can't --

16    it's so much.  It's been years ago, but I think I

17    provided that information to my attorney.

18        Q    Was it the officer who was on the report,

19    that made the report?

20        A    Yes, ma'am, the school officer.  That's what

21    they called it.

22        Q    School resource officer?

23        A    Yes.

24        Q    Officer Damico?

25        A    Yes, that's him.

**Confidential**                                        123

1      Q    So you spoke with Officer Damico, and he said

2   he did not interview the boy but he said he did

3   interview   Jane   ?

4      A    Yes.

5      Q    Did he tell you what   Jane   told him, or did

6   you have any discussion with him about that?

7      A    He said that   Jane   told him what happened

8   and that he understood my frustration, but you have to

9   understand -- he said, But you have to understand, I

10   cannot arrest a 5-, 6-year-old.

11      Q    Did he tell you why he didn't interview the

12   boy?

13      A    I asked him that.  He said that he only

14   interviewed   Jane   .  And I said, Why didn't you

15   interview the boy?  And -- no, that's what he said.  He

16   said that he only interviewed   Jane   because he was

17   told that I had given permission for him to interview

18   Jane   , but he hadn't -- the little boy's family or

19   whatever, they didn't give permission.  Like, he would

20   have to have permission from the little boy's family.

21   But, again, I wasn't even there, and he interviewed my

22   baby.

23      Q    Didn't you ask in that meeting that morning

24   with Nurse Durham and the counselor whether   Jane   was

25   going to be interviewed?

1     A     No.  There was no need for me to ask if

2     Jane    was going to be interviewed because, like I

3     stated before to you, she had already told it already.

4     So, you know, it was already -- everybody knew.  So, I

5     mean, like I said, I was too busy trying to get   Jane

6     in there to speak with the person that she needed to

7     speak to, the principal, because these are like school

8     workers and all, but I needed her to speak with the

9     principal.

10     Q     Okay.  So this conversation you had with

11    Officer Damico, you said this was when?  Was it during

12    the Thanksgiving break?

13     A     It was days when they were out of school.  It

14    was -- I guess, so it had been some days.

15     Q     Well, I know they didn't go back to school

16    until the 8th.  But I'm trying to figure out, did you

17    speak with him over Thanksgiving break, or was it the

18    week of the 27th when you started trying to reach the

19    school system?

20     A     I think it was during the time when I called

21    down there about the transfer, when I had been calling

22    to speak to Mr. -- what his name?

23                  MS. BROYLES:  Roaden?  Bruce Roaden?

24                  THE WITNESS:  Roaden.  Around that time.

25                  And also, ma'am, I also -- Ms. Fowler

**Confidential**                                           125

```
 1              stated and said that none of them had been
 2              interviewed, but then she turned around and
 3              told me that  Jane   could not tell her -- she
 4              felt -- how did she put it?  She said that she
 5              basically felt that   Jane   was fibbing about
 6              it because in her mind that   Jane   -- because
 7              my baby couldn't tell time, ma'am, so to tell
 8              when the accident happened -- I mean not
 9              accident, but when the assault happened.
10                   You have to understand something.  My
11              daughter's in the -- was in the kindergarten.
12              For one thing she didn't have a watch on, but
13              she couldn't tell time.
14                   And that's -- and I was like, This is
15              foolishness, Principal Fowler.  You just said
16              you didn't interview her, but now you're
17              calling my child a liar because she can't tell
18              you what time it happened.  Well, she can't
19              tell time.  She's in the kindergarten.
20      BY MS. WARE:
21         Q    And you said "what time it happened."  Do you
22      mean the time of day or the time as in the date that it
23      happened?
24         A    No, the time within that day, like 1:00, 2:00,
25      3:00, like that.
```

Confidential                                    126

1      Q     Okay.  Do you recall Principal Fowler saying

2   anything else in that meeting?

3      A     Not that I can think of.

4              MS. BROYLES:  Let me ask you this, Pascha:

5              Was there any issue about the date that the

6              police officer wrote down about when he thought

7              the incident happened, what day it happened?

8              THE WITNESS:  He had the wrong date.  And

9              right now, ma'am, I can't tell you.  All these

10             dates are in my head, and I -- and I -- and I

11             did something about that, about the date.  I

12             mean, that date was not right.

13   BY MS. WARE:

14     Q     He had the wrong date on the report?

15     A     I think so.  It was something to that nature,

16   and I was trying to say like that was going to make a

17   big difference like when I, you know, called down there.

18   Like, you can't just put stuff on there, you know.

19     Q     What date did he have wrong, the date it

20   occurred or the date the report was made?

21     A     I think it was the date that it occurred.

22     Q     Did anybody know what date it occurred?

23     A     I did at the time.  Oh.  No.  No.  No, I

24   didn't -- no, I didn't know the date.  I just know when

25   she told me about it.  She said it had happened like a

**Confidential**                                    127

1    couple days ago.

2              MS. BROYLES:  This might be -- this might

3         be helpful:  The date that   Jane    disclosed

4         to you this happened, all right, I believe you

5         testified that that was November 16, the day

6         before you went to the school; is that right?

7              THE WITNESS:  Yes.

8              MS. BROYLES:  Okay.  And did   Jane   say

9         to you whether that the incident happened a day

10        or two days prior to that?  Or what did she

11        tell you about how long prior to November 16th

12        it happened?

13             THE WITNESS:  I want to say it was a day

14        or two.  It was like a day or two.  It wasn't

15        like, ma'am, like, oh, that happened a week or

16        two and she's just now, you know, telling me

17        this.  No, it was like a day or two.  Like, it

18        was fresh.

19   BY MS. WARE:

20        Q    Okay.  So when you say that Officer Damico got

21   the date wrong on the report, are you referring to

22   the -- I'm trying to figure out what date he had

23   incorrect.  Was it --

24        A    The date that he wrote the report out.

25             MS. BROYLES:  Again, I can help you here

**Confidential**                              128

1          because all this is on the record.  The date on

2          the report, Ms. Ware, it said it happened

3          November 11th as the date which the incident

4          supposedly happened.  November 11 is what's

5          listed on the police report.  Okay?

6                And your testimony just a minute ago is

7          that it would have happened according to

8          Jane    on either the 14th or the 15th.  So is

9          it the case that there appears to be a

10         several-day discrepancy between November 11 and

11         November 14 and 15 when   Jane    said it

12         happened and the police report says November

13         11?  Is that the discrepancy you're talking

14         about?

15               THE WITNESS:  I guess so.  I'm so confused

16         right now I don't know.

17  BY MS. WARE:

18     Q    Do you know where Officer Damico got the date

19  of the 11th, November the 11th?

20     A    I don't know, ma'am.  I don't know.

21     Q    All right.  After Ms. Fowler -- how did it come

22  about -- you said -- well, strike that.

23               You said you threatened Ms. Fowler's job and

24  she finally agreed to transfer   Jane    to a different

25  classroom.  Did anything else happen in that meeting?

1      A    Not that I recall, uh-uh.

2      Q    So do you recall whether or not she said I have

3  a classroom that has a bathroom inside of it?

4      A    Yes.

5      Q    And do you recall whether she took you to look

6  at that bathroom and classroom during that meeting?

7      A    Yes, ma'am, that's what I told you before.

8  Yes, ma'am.

9      Q    And that you agreed to   Jane   being

10 transferred to that classroom?

11     A    Yes, ma'am, until the -- until being withdrawn

12 because that already -- the letter, ma'am, that I wrote

13 out to Superintendent Dude it was asking for my kids to

14 be transferred.  So I was -- I agreed to do that

15 until --

16             MS. BROYLES:  Sorry.  It's unstable.  Let

17         me stabilize it.

18             THE WITNESS:  -- until the kids get -- are

19         able to get transferred, yes, ma'am.

20 BY MS. WARE:

21     Q    And during the meeting on the 8th, were you

22 asked about whether   Jane   was in counseling?

23     A    I don't recall that.  I don't know.

24     Q    Okay.  Were you asked whether you would like

25 for   Jane   to be provided with some counseling

1  sessions?

2      A    No, ma'am.

3      Q    Did   Jane   have a counselor at that time on

4  December the 8th?

5      A    No, ma'am.  I mean, all of this was fresh at

6  that time, ma'am.  Like, it had just really happened.  I

7  mean, I was back and forth trying to, you know, figure

8  this whole thing out.

9      Q    Does   Jane   have a counselor now that she's

10  been seeing?

11      A    No, ma'am, she had -- she went to two different

12  counselors, and then recently due to the COVID and other

13  things going on and some personal matters that I didn't

14  want to just put too much on her because it can be

15  over -- you know, overbearing.  So what I'm going to do

16  is begin back the beginning of the -- of the year

17  because I want her to, you know, get through the

18  holidays.  I don't want to start something up right

19  around now.  But the beginning of the year I'm going to

20  start her back up with the two counselors that she had

21  because they had a good rapport with each other.

22      Q    Who are the counselors?

23      A    Dr. Aldridge and -- oh, gosh, what's the other

24  one's name?  It starts with an M.  Do you have that in

25  your --

```
 1                    MS. WARE:  Have we been provided the
 2            records from those counselors?
 3                    MS. BROYLES:  You have been.  So do you
 4            recall a Dr. --
 5                    THE WITNESS:  Medlin.
 6                    MS. BROYLES:  -- Laura Medlin?
 7                    THE WITNESS:  Medlin.  Yes, Medlin.
 8   BY MS. WARE:
 9       Q    All right.  When was the last time that
10   Jane    saw these two counselors?
11       A    It was a couple months back.
12                    MS. BROYLES:  Okay.  So I -- again, we've
13            provided the records, so if I can just ask you
14            a question.  Do you recall -- do you recall the
15            last time   Jane   saw Dr. Aldridge being
16            either December or January, either December of
17            last year or January of the beginning -- it
18            might have been the beginning of the year,
19            January?
20                    THE WITNESS:  I think so.  I can't --
21                    MS. WARE:  And that's okay.  If you -- I
22            believe it's in the -- (audio distortion) --
23            that we provided you.  I'll go back and double
24            check.
25   BY MS. WARE:
```

1      Q     For Dr. Aldridge did   Jane    have ongoing

2    sessions with Dr. Aldridge, or did she just meet with

3    her one or two times?

4      A     Ongoing.

5      Q     Okay.  How long did she see Dr. Aldridge for?

6    What span of time?

7      A     Sometimes -- do you mean to like a hour or two

8    hours?  Do you mean like that?

9      Q     No.  Like what date did she first start seeing

10   Dr. Aldridge?

11     A     Okay.  I'm not good with dates, ma'am, and I

12   don't want to lie.  I guess it's in the record.  I

13   don't -- I don't know.

14            MS. WARE:  Well, I don't know that we've

15         been provided records for any extended period

16         of time.  I think all we have -- and you can

17         correct me if I'm wrong, Andy -- is the report

18         from Dr. Aldridge for an initial visit.

19            MS. BROYLES:  Keri, I will go back, and if

20         there's -- if there's something we didn't

21         produce, I'll make sure you have those dates

22         because I do think you're entitled to them.  So

23         I'm making a note to myself to supplement to

24         get you the dates of those visits.

25            MS. WARE:  And the same for Dr. Medlin if

**Confidential**                                    133

```
 1            there are --
 2                 MS. BROYLES:  If you look at -- you know
 3            what?  If you look at the invoice that we
 4            disclosed to you, it has all the dates listed
 5            on there.
 6                 MS. WARE:  And I'd want the records from
 7            all those visits.  I think we asked for all
 8            those records.
 9                 MS. BROYLES:  Well, that would be in her
10            possession, so I can't give -- I can't give
11            what doesn't belong to me.
12   BY MS. WARE:
13        Q    All right.  ████████   ████   █████████
14   ███████████████████████████████████████████████
15   ██████████?
16        A    ████████████
17        Q    All right.  Is there anything else that we need
18   to discuss about the December 8th meeting that you
19   recall occurring that we have not talked about?
20        A    No, ma'am.
21        Q    Your children returned to Oakhurst on December
22   8th; correct?
23        A    I think so, yes, ma'am.
24        Q    So that was --
25                 MS. BROYLES:  I'd like to ask a question,
```

Confidential                                      134

1              Ms. Ware, about the December 8th meeting.

2                   Ms. Thomas, did you ask the principal

3         about other parents being contacted about the

4         incident or if they were going to contact other

5         parents?

6                   THE WITNESS:  Yes, I asked them.  I said,

7         So -- my exact words were, Are you going to let

8         the other parents know?  Are you going to --

9         this is what I said, I said, the same way as if

10        a child brings a gun into the class -- into the

11        school, you'll get like this alert, ma'am, that

12        tells you like somebody did something or a

13        accident -- you know, a incident happened at

14        that school.

15                  So I said, Are you going to do that to let

16        the other parents know?  And they told me no.

17        And I said, Why not because they have a right

18        to know?  Because, I mean, when something

19        happens you're supposed to -- big like that,

20        you know, you're supposed to, I thought by law,

21        let the parents know.  But she said no.

22   BY MS. WARE:

23        Q    Is there anything else that I need to know

24   about that meeting?

25        A    No, ma'am.

1      Q      Jane      continued to attend Oakhurst from

2    December 8th until the end of that semester, correct,

3    just in a different classroom?

4      A      Yes.

5      Q      And who was the new teacher?

6      A      I can't remember, ma'am.  It's been years ago.

7    I can't remember.

8      Q      Did she have any problems or concerns in that

9    classroom?

10     A      No, ma'am.

11     Q      Did she seem to enjoy being in that classroom?

12     A      Yes, ma'am, she said she enjoyed it because she

13   can go to the bathroom, you know.  I guess the setup was

14   different because, you know, it's inside of there, and I

15   guess -- oh, I asked her.  I said, Have you seen any

16   boys going in the girls' bathroom or vice versa, you

17   know, girls going in the boys' bathroom?  And she was

18   like, No, ma'am, it's not like that in this room.  I

19   said, Okay.  And I just left it at that.

20     Q      Okay.  All right.  So you stated that you first

21   learned that DFCS had been contacted at the hospital on

22   the night of the 17th; correct?

23     A      Yes, ma'am.

24     Q      But you weren't sure who had called them?

25     A      No, I wasn't.  I just assumed the hospital.

**Confidential**                                    136

```
1        Q     When did you learn that the school had

2   contacted DFCS?

3        A      When the -- when another DFCS worker came to my

4   house around Christmastime.  A lady came to the door,

5   and she said that she was -- gosh, I forgot her name.

6   It's in the records.  Ms. -- but it was a DFCS lady, and

7   she told me she was there because the school had made a

8   report against -- a report ████████████████████████████,

9   ████████████████████████████████████████████████████████

10  ██████████

11       Q     And what did she say that the school reported?

12       A     That a child being sexually assaulted in a

13  bathroom.

14       Q     Okay.

15       A     In the bathroom.

16       Q     ██████████████████████████████████████████

17  ████████████████████████████████?

18       A     ████████████████████

19       Q     ████████████████████████████████████████████

20  ████████████?

21       A     ████████████████████████████████████████████████

22  ████████████  ████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████  ██████████████████████  ██████████████
```

1   ████████  ███████████████  ██████████████

2                ████████████████████████████  --

3   ████████████████████████████████

4        Q    Okay.  Did she tell you who at the school had

5   made the report?

6        A    She -- that's the thing about it, she just said

7   the school.  She never said who because DFCS has these

8   rules where they can't really, you know, like give you

9   the person's name or, you know.  But she know that it

10  was about the school incident.

11            So I asked her, I said, So you're here and you

12  mean to tell me that you're questioning me?  And I

13  explained to her everything that happened.

14            And she looked at me and said, Hold on a

15  minute.  Well, why is your name on here when you was at

16  home and you wasn't supervising your child?  That was

17  the school's responsibility.

18            I said, I don't know.  She said, So why am I

19  here?

20            I said, I don't know, ma'am.  I'm trying to

21  figure it out.  Why are you here?

22            I said, Well, when you leave here, are you

23  going to the little boy's -- you know, the boy who did

24  this home as well?  She said, what little boy?  She

25  said, The only person named on there is you and

1     Jane    .

2          Q     And so --

3                     MS. BROYLES:  Excuse me.  I'm sorry,

4             Ms. Ware.

5                     Would that have been ████████████?

6                     THE WITNESS:  ████████████.  And she said,

7             That's not -- she said, Wait a minute.  She

8             said, This is crazy.  And she said, If I were

9             you -- she said, I'm just going to go ahead and

10            get with my supervisor and tell her to close

11            this case out, and I advise you to go find you

12            a good attorney, ma'am.  She said, I'm sorry --

13            sorry for what happened to your baby.  And she

14            left.

15   BY MS. WARE:

16        Q     Was this the only visit that DFCS made to your

17   home?

18        A     Yes.

19        Q     So ██████████ was the only person from DFCS

20   who came to your home?

21        A     ██████████.  And then was it her supervisor, I

22   think, to close it out maybe?  Or it might have just

23   been -- I might have just spoke with her on the phone.

24   I know that she had to have permission to close it out,

25   so it may have been over the phone that I spoke to her

1  supervisor about it because I was stressing about -- you

2  know, because I was upset because it was embarrassing.

3      Q    So you spoke with ███████████ at your home;

4  right?  This was around Christmastime you said?

5      A    Yes, ma'am.  And then I spoke with her then,

6  and also I let her speak with my -- well, you know,

7  they're DFCS.  They're going to talk with your kids.

8  They came in there and spoke to the kids.  It was just

9  us there, so, yes, ma'am.

10      Q    So it was right around Christmastime.  Do you

11  know if it was before or after Christmas?

12      A    I want to say it was after Christmas because I

13  remember seeing a whole bunch of, you know, like the

14  wrappers, Christmas wrappers.

15      Q    Okay.  And so she did talk to your children

16  while she was there?

17      A    Yes, ma'am.  They did everything like they

18  normally do and, you know, check your fridge, look at

19  the kids.  You know, and I walked out of the room while

20  she spoke to them, you know, because I don't have

21  anything to hide.  So she spoke with them and  *Jane*  .

22      Q    So you fully cooperated with DFCS?

23      A    Yes, ma'am, because I had nothing to hide.

24      Q    Did you contact Ms. Broyles while the DFCS

25  worker was there?

1       A       Yes, ma'am.

2       Q       And did you refuse to speak with the DFCS

3   worker while they were there?

4       A       No, ma'am.  This is what happened:  I let the

5   lady in, in the house.  I said, Well, hold on a minute.

6   I said -- when she was starting to ask some questions, I

7   said, Let me just -- hold on a minute.  Let me see --

8   when she started telling what she was there for, I said,

9   Let me make one phone call before I say anything.  And

10  so I called Attorney Broyles, and Attorney Broyles

11  spoke --

12      Q       I don't want you to tell me what your attorney

13  told you.

14      A       No, I'm not going to get into that.  But she

15  told me -- she gave me back the phone and Attorney

16  Broyles said, Go ahead, it's okay, you can talk.  And

17  that was it.

18      Q       ████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ███████████████████████████████████████████ that

21  is not consistent with your recollection?

22      A       No, that's not consistent with it.

23              And the only reason I had called Attorney

24  Broyles is because after the -- you know what I told you

25  about Dr. Ratcliff and Ms. Jefferson, you know, their

1   threats and stuff about me going to jail for not having

2   the kids at school?  And now I got DFCS, you know.  I

3   didn't know what was about to happen.  So I just, you

4   know, wanted to let somebody know what was going on.  As

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████.  I don't

7   know.

8              MS. BROYLES:  So because this is involving

9         potentially attorney-client discretion, I would

10        like to take a minute off the record with my

11        client and just make sure we protect

12        appropriately our discussions.  So if I may

13        have a moment, please.

14             MS. WARE:  That's fine.

15   (Off the record from 1:45 p.m. through 1:47 p.m.)

16             MS. BROYLES:  Okay.  Ms. Ware, I didn't

17        lose you.

18             Okay.  So, Ms. Thomas, without discussing,

19        you know, our discussions between you and me,

20        which is obviously privileged, but certainly

21        you can testify as to what I said and you heard

22        me saying to ████████████ and also what she said

23        and did as a result.  So go ahead.

24             THE WITNESS:  Okay.  So Attorney

25        Vernadette was saying, like I said -- okay.

1    When she came in, I -- I cooperated.  I let her

2    ████████████████████████████████    ████████████

3    ████████████    ██████████████████████████████████

4    ████████████.

5          So Attorney Vernadette told her that once

6    I called her -- because she had already been in

7    the -- in the place already, and we had been

8    talking.  But I was like, Hold on a minute.  I

9    said -- I was worried.  I said, I don't know.

10   I said, I don't know where this is going to.

11   So I said -- that's when I called Attorney

12   Vernadette, Attorney Broyles, and Attorney

13   Broyles told her that, you know, due to

14   everything that's going on that she feels like

15   this is too much, that I'm being harassed and

16   that she needs to wrap it up and leave.

17         And then she said, No problem.  I

18   understand.

19         And she went ahead, and she talked to me

20   for a little while longer, and then she left.

21         But I was -- I cooperated a hundred percent.

22   BY MS. WARE:

23   Q    Okay.  And what was it that the DFCS worker

24   said to you that caused you concern that you needed to

25   contact Ms. Broyles?

```
 1        A     Because when she -- I was thinking she was

 2   there about    Jane  , you know, like worried about

 3     Jane   .  It was about    Jane   's safety.  ████████

 4   █████████████████████████████████████████████████.

 5   That's why I called Attorney Vernadette, Attorney

 6   Broyles.

 7        Q     ██████████████████████████████████████████

 8   █████████████████████████?

 9        A     ████████████████████    ████████████████████

10   ██████████    ████████████████████    ██████████████

11        Q     ██████████████████████████████    ██████████

12   ██████████████████████

13        A     ██████████████    ████████████    ██████████ --

14   █████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████

16   ██████████████████████.

17        Q     Okay.  And --

18              MS. BROYLES:  -- documents to you,

19         Ms. Ware.

20              MS. WARE:  I'm sorry?

21              MS. BROYLES:  We've disclosed the DFCS

22         documents to you two days ago.

23   BY MS. WARE:

24        Q     Was this a report that was separate -- if you

25   know, was this report separate from the report about the
```

```
1    sexual assault?
2        A    Can you make that clearer, ma'am?
3        Q    So there was a report made by the school about
4    the sexual assault; correct?
5        A    Yes, ma'am.
6        Q    Do you know if this was a separate report that
7    was made about something else?
8        A    No, this was -- this was the same report
9    that -- the school reported it to DFCS, and so she came
10   out about that.
11            MS. BROYLES:  I don't know if you've had
12        the chance to review those records, Ms. Ware,
13        but you'll see that it's all the same report.
14   BY MS. WARE:
15       Q    ███████████████████████████████████ you
16   did not want to answer questions that day, you dispute
17   that?
18       A    Yes, I dispute that because I answered
19   everything.
20       Q    Okay.  Are you aware of whether DFCS had been
21   trying to reach you between the date that you were at
22   the hospital and you met with the DFCS worker there and
23   the date they showed up at your house or home after
24   Christmas?
25       A    The only time I knew that DFCS was trying to
```

1   reach me -- I found out this later.  Do you remember the

2   guy you said, Mr. Bell, the guy that came to the

3   hospital?  He had already come to my home while we was

4   in the hospital.  That's what was taking so long.  He

5   was at my home waiting on me, but I was at the hospital.

6   So he had left a notice in there.  He said -- you know,

7   when I got there, I seen the little sticker thing from

8   DFCS.

9           So other than that, no, ma'am, until, like I

10  said, around Christmastime when the lady was ==

11  ████████████     came.

12      Q    So after you spoke with Mr. Bell at the

13  hospital, did you have any missed calls from DFCS or

14  voice mails from DFCS?

15      A    No, ma'am.

16      Q    You didn't get any correspondence from DFCS

17  until they showed up at your house after Christmas?

18      A    Yes, ma'am.  So I assume -- remember when I

19  said Mr. Bell said someone would be getting in contact

20  with you?  So I guess I just assumed that's who he was

21  talking about, her, ████████████ .

22      Q    In January    Jane    was transferred to Winnona

23  Park; correct?

24      A    Yes.

25      Q    So your transfer request was granted; correct?

1       A    Yes.

2       Q    And she -- did she have any problems or issues

3   in her new classroom at Winnona Park?

4       A    Not per se her with any kids or anything.  It

5   was just that the harassment from kids and adults

6   towards our family, period, about the -- because, ma'am,

7   the schools are close-knit areas, so basically when this

8   took place, it became like big, like with social media

9   and everything.  And so, you know, we were -- she was

10  getting harassed up there.  When I go to pick her up, I

11  was getting harassed or, you know, a lot of lies being

12  told.

13          But other than classmates or anything like

14  that, no.  Like I said,   Jane   is a good girl.

15      Q    So who was harassing her at -- this was at

16  school she was being harassed?

17      A    Yes, teachers and everyone's up there.  Like I

18  said, they were doing it to me as well because when I

19  would, you know, like walk her towards the whatever, you

20  would hear them say, That's the one right there, that's

21  the one that -- that lied and said that stuff about the

22  sexual assault in the bathroom because Superintendent

23  Dude said that it never happened.  So now we're just

24  lying, and people are mad at us.

25      Q    All right.  So this is the first time you've

1    ever made this allegation, so I'm going to need you to

2    be specific about who was harassing you and who was

3    harassing   Jane   at Winnona Park.

4         A    It was -- it was kids.  I don't know their

5    names.  I'm just walking when you go to the school, and

6    I can hear it.  And I heard the teachers saying things

7    and whatever.

8                        was telling me about one of the

9    teachers asked her about it, you know, like -- because

10   they really -- they didn't know who   Jane   was until

11   they saw my face.  So they put two and two together,

12   ma'am.  You get what I'm trying to say, like?  So that's

13   when -- that's when all the harassment came to be.  It

14   was just like a lot.

15            But the principal had come to me and told me

16   that -- that he knew about -- I guess that -- because we

17   got transferred, he knew about the case over there at

18   the --

19                 MS. BROYLES:  Oakhurst.

20                 THE WITNESS:  At the school, yes.

21   BY MS. WARE:

22        Q    So the principal came to you and said he's

23   aware of the case at Oakhurst?

24        A    Yes.

25        Q    And did the principal harass you?

```
 1        A     Yes.  He told me that -- he asked me why did

 2     Jane     lie.  I said, My baby ain't lie.

 3        Q     Who was the principal?

 4        A     It was a man, a white man.  I can't remember.

 5   He's the principal at Renfroe now from the last time I

 6   checked.

 7        Q     All right.  So how soon after the transfer did

 8   the principal come to you and say he knows about the

 9   incident at Oakhurst and why did     Jane     lie?

10        A     I'll say about two -- two or three weeks, give

11   or take.  Like, two or three weeks.

12        Q     Okay.  And where did this conversation with the

13   principal take place?

14        A     In the hallway.

15        Q     Which one?

16        A     By the -- by his office.  Because I had gotten

17   a call, and it was like I was getting calls about crazy

18   things.  Like they were saying that     Jane     was

19   scooting around on the rug on her butt or whatever.

20   And, you know, but when I get there, it's not     Jane

21   at all.  It's my daughter that's ██████████.  You

22   know, it was just like they were just trying to figure

23   out anything to just -- it was just harassment.

24        Q     Okay.  So which one of your daughters is ████

25   ██████████
```

**Confidential**                                    **149**

```
 1                    MS. BROYLES:  Go ahead.  Go ahead.
                                      Younger
 2                    THE WITNESS:  sister .

 3   BY MS. WARE:
              Younger
 4        Q   sister   .  So they were confusing   Jane    and
     younger
 5   sister  ?

 6        A    Yes.

 7                    MS. BROYLES:  Can I -- can I --

 8   BY MS. WARE:

 9        Q    And so when Principal Wiseman --

10                    MS. WARE:  I want to finish my line of

11             questioning, please, Vernadette.

12   BY MS. WARE:

13        Q    When the principal asked you why did   Jane
                                           younger
14   lie, was he confusing          with  sister ?

15        A    No.

16        Q    How do you know that?

17        A    Because he said, I know about the incident that

18   happened at the school.  Why did your daughter lie?

19        Q    He said your daughter?

20        A    Yes.

21        Q    Well, hadn't one of your other daughters told a

22   lie at Winnona Park?

23        A    No, that never even happened.  And that's what

24   I said.  That was some mess that I -- that was set up.

25   That never even happened.  Like I told the principal, I
```

1   said, You got my baby here in tears, and he's telling --

2   she's telling you that that never happened.

3           I said, So why would you say -- number one, why

4   are you interrogating my child without me being here and

5   she's telling you that that didn't happen?  And she told

6   you that the little girl was scared -- told her, said

7   something had happened or whatever and said will you

8   tell the teacher for me, I'm afraid to tell it.  And so

9   she told the principal that.

10          She said, I never said that he did this or

11  whatever, and she was fool crying saying like why are

12  you -- and I was like, Why are they interrogating her?

13  She was just repeating what she -- somebody else was

14  talking about, but now you're --

15          I mean, he was like, Because what we're not

16  going to do is have -- basically I destroyed his

17  school's reputation.  It was just ridiculous.

18          And I said, Sir, what you're going to need to

19  do is when my children come here, whatever happened over

20  there at Oakhurst, that's for me to deal with Oakhurst

21  about, but I want my kids to be treated fairly as if

22  that incident never happened.  I don't want to bring it

23  up, and I don't think it's fair that you're in here

24  bringing up things and just trying to just make me --

25  make us look like either we're crazy or we're just big

**Confidential**                                    151

1    liars or whatever the case may be.  It still doesn't

2    change the fact that that happened at that school.

3        Q    So you had this conversation with the principal

4    in the hallway at Winnona Park; correct?

5        A    Yes, in the hallway.  Then it went towards his

6    office part too.  We went into the office part too.  It

7    went from there to there.

8        Q    All right.  And you said this was a couple of

9    weeks after your girls started at Winnona Park; correct?

10       A    I think so.  I can't be for sure.  I can't be

11   for sure.

12       Q    And you -- what was the reason that you were in

13   the hallway at that time having the conversation with

14   the principal?

15       A    Because he had called me about my daughter

16   older sister , and when I got --

17       Q    Older sister or younger sister?  Earlier you said younger sister

18       A    No, that was -- that was the first time was

19   younger sister , like, or whatever.  This particular conversation

20   with the principal was about older sister and her --

21       Q    Okay.

22       A    -- what the girl had said.  So that's what he

23   called me up there about.  And I was --

24       Q    So hang on.  Hang on.  Hang on.  Let's go slow

25   because I want to make sure I'm getting all the details

**Confidential**                                   152

1    correct.

2            So the principal called you about older sister ,

3    something that had happened with older sister ?

4        A    Yes.

5        Q    And when you came up to the school to meet with

6    him, that was the purpose of the meeting?

7        A    Yes.

8        Q    So tell me what happened with older sister that he

9    called you up there about.

10       A  Older sister said that a little girl who was sitting

11   over there -- and they was standing there talking, and

12   the little girl said, You see whoever the little boy's

13   name was, he pulled his pants down.  And she said, I'm

14   afraid to tell the teacher.  She said, Will you tell her

15   for me?  And older sister was like, I don't want to tell her,

16   tell the teacher.  And the little girl was like, Will

17   you tell because I'm afraid to tell her?

18           So older sister just went up to the teacher and said,

19   Such and such, whatever the little girl's name is, said

20   that such and such did this.  She never said I seen this

21   or whatever else.  She said, Such and such just told me

22   to tell you that whoever did that.  And that was it.

23           Now, all of a sudden, my daughter done told a

24   lie, and, you know, just it blowed all the way up.  And

25   then we got it established and straightened out.  The

```
 1   principal felt like a idiot, and he apologized for it.

 2   I said -- because like I told him, Whatever went on at

 3   Oakhurst I don't -- this is a new chapter in their life

 4   over here.

 5        Q    Okay.  I'm going to stop you again because I'm

 6   trying to make sure I understand all the details of this

 7   conversation.

 8             So  older    made this report to her teacher?
                    sister

 9        A    Yes.

10        Q    And you said it was another student had said to

11   older sister go tell the teacher this, and  older  did.  And then
                                                 sister

12   the school misunderstood that  older   -- they thought
                                    sister

13   older sister saw the boy pull --

14        A    Yes.

15        Q    -- his pants down --

16        A    Yes.

17        Q    -- not the other little girl?

18        A    Yes,  older  .  So  older  by the time she stopped
                     sister         sister

19   crying enough to explain it to him -- because like I

20   said, he was interrogating my baby bad when I came in

21   there.  By the time  older   -- I wiped her face off.
                          sister

22   And she explained it to him that I never said I seen

23   nothing, whoever the little girl's name is asked me to

24   tell the teacher that the little boy had did that.  She

25   said, And I told him that such and such, whatever the
```

1   little girl name is, told me to tell you -- that's the

2   teacher -- that whatever the little boy did or whatever.

3          So that's why the principal sound like a idiot.

4   But like I said, you're bringing that stuff from over

5   there at Oakhurst over into here.

6      Q    Hold on.  When he said to you why did your

7   daughter lie, was he talking about older sister because he

8   thought older sister had lied about that situation?

9      A    No.  He was saying -- this is what he said --

10  he said, I already know about the situation at Oakhurst.

11  And why did your daughter lie?

12          I don't know if that was intertwined.  We

13  wasn't talking about --

14     Q    He didn't say anything -- he didn't say, Why

15  did Jane lie?  He said, Why did your daughter lie?

16     A    Yes, that's what he said.

17     Q    Do you know whether he believed that older sister had

18  lied to him in this situation that you're telling me

19  about?

20     A    At first he thought that.  So he was rambling

21  on and mad because he was thinking, okay, I got one

22  daughter that's lying over here, now I got another --

23  the other -- the other sister lying over here in this

24  school.  So he was saying, I already know your daughter

25  lied over there.  You know what I mean?  Like he was

1    putting it all together.

2              And that's when I had to straighten him out

3    about the situation.  And we got all that situated.

4        Q    Did another one of -- did one of your daughters

5    make a report about someone assaulting her or touching

6    her in the bathroom at Winnona Park?

7        A    No, not that I was aware of.

8        Q    Did you ultimately send a text message to

9    someone at the school system saying that your

10   daughter -- what your daughter reported was not true and

11   that you were sorry she lied?

12       A    No.  No, ma'am.  Wait a minute.  Hold on a

13   minute.  In which case?  I mean, I never did it either

14   way it goes.  But what was it supposed to been about,

15             or the -- or Winnona Park?

16       Q    It was not   Jane      It was one of your other

17   daughters.

18       A    I don't know anything about it.  Either way I

19   never left a text that said I'm sorry or -- I don't know

20   nothing about any of that.

21       Q    You don't recall sending a text saying, you

22   know, what my daughter said wasn't true and it was wrong

23   that she lied?

24       A    No, ma'am, that never happened.

25             MS. BROYLES:  Do you have such a text,

1          Ms. Ware?

2                    MS. WARE:  I think it's been produced,

3          hasn't it?

4                    MS. BROYLES:  I don't recall seeing such a

5          text, but I'll have to go back and look through

6          your -- the documents you produced.

7    BY MS. WARE:

8      Q    Other than this conversation with the principal

9    and some students that you said you heard outside but

10   you don't know their names, was there anyone else that

11   you believe harassed you or your children at Winnona

12   Park?

13     A    Like I said, I mean, you know, it's harassment

14   to me when I pull up to get my kids and teachers are

15   pointing and saying that's the one from -- that told the

16   lie.

17     Q    Do you know which teachers that was?

18     A    No, ma'am.  I'm just telling you what I -- I

19   know that they're teachers, and I know what I went

20   through daily.

21     Q    And did you ever report this to anyone at the

22   school system that you were being harassed?

23     A    No, ma'am.  I mean, why would I do that?  It

24   took me forever for someone to listen to me about what

25   happened to my daughter and to get her transferred.

1        Q    Had you ever reported it to anybody before
2    today?
3                    MS. BROYLES:  Hold on just a second.
4               Ms. Ware, I just would point out the
5               retaliation claim has been dismissed, so we're
6               not pursuing that.  Just --
7                    MS. WARE:  That's what I'm trying to get
8               at.  Is that --
9                    MS. BROYLES:  We're not pursuing that, so
10              I'm not sure -- your line of questioning is
11              going on.  But, again, that claim is gone.
12                   MS. WARE:  Okay.  So I'm just making sure
13              there's nothing -- there's been no new
14              allegations that she's trying to raise here.
15              So to be clear you will not be pursuing a
16              retaliation claim based upon her testimony that
17              she was harassed at Winnona Park?
18                   MS. BROYLES:  At this point we couldn't.
19              It was dismissed.  That's been foreclosed.
20                   MS. WARE:  Okay.
21                   MS. BROYLES:  I mean, if there's anything
22              else you want to, that's fine.  But I'm just
23              looking at the time.
24                   MS. WARE:  No, I mean, if you're telling
25              me on the record you're not pursuing that and

1                  this is not going to be part of your claims,
2                  then that's fine.  There's no need for me to go
3                  into it.  But I don't want to be surprised is
4                  all I'm saying.
5                       MS. BROYLES:  Well, candidly, it hasn't --
6                  it stopped being the focus once the claim was
7                  dismissed.  If you have -- I mean, I can't at
8                  this moment tell you if we try this case that
9                  it will be not -- it's impossible that we may
10                 bring it in to go to -- it may be tangentially
11                 relevant to any of the claims.  I can't on the
12                 record be certain that, you know, there's no
13                 circumstances that it might not be relevant.
14                      So, I mean, if there's -- so if there's
15                 anything further about that, that's fine.  It's
16                 just not a focus at this moment.
17   BY MS. WARE:
18       Q    Well, let me just be clear that I understand.
19   You don't recall any names of teachers that allegedly
20   harassed you or your children; correct?
21       A    Correct.
22       Q    You don't know any names of the children who
23   you believe harassed you?
24       A    One second.
25                      THE WITNESS:  We should talk about this.

**Confidential**                                          159

1              I thought you said you're not going to do --

2                   MS. BROYLES:  She would like to talk to me

3              off the record briefly, if I may take a moment.

4                   MS. WARE:  I'm going to go off the record

5              as well.

6         (Recess from 2:09 p.m. through 2:19 p.m.)

7                   MS. BROYLES:  All right, Ms. Ware.  So I

8              just called my co-counsel.  We don't have any

9              texts like that.  You haven't produced any

10             texts like that.

11                  MS. WARE:  Okay.  Because I don't think

12             they would have been responsive because they

13             don't have to do with          or this

14             incident.

15                  MS. BROYLES:  Okay.  And so -- right.  And

16             so Ms. Thomas just testified and clarified the

17             incident involved  older sister  where they thought she

18             had lied.  Turns out that was not the case.

19             She was reporting what the other little girl

20             had said.  And as far as we're concerned,

21             that's it as far as Winnona Park is concerned.

22             There's nothing further, and there's certainly

23             nothing further that we intend to bring as a

24             claim.  So I think that we probably have

25             exhausted this area.

1          MS. WARE:  Well, I'm not going to concede

2     that I've exhausted the area because you won't

3     confirm you're not going to later bring up

4     claims of, you know, harassment or that it

5     might somehow tangentially be relevant at

6     Winnona Park.

7          MS. BROYLES:  So I can -- and that's

8     another thing I talked with my co-counsels.  As

9     of this time, we have not brought a claim for

10     that or the claim we did has been dismissed.

11     We do not foresee the -- you know, the need

12     to try to reassert that claim.  Obviously if

13     for some reason we do, it's going to entitle

14     you to do discovery on that, but at the moment

15     I can make the good faith representation that

16     we're not -- we're not seeing that at this

17     time.  So if we -- if that changes, you're

18     obviously entitled to follow up and do whatever

19     discovery you feel needed.

20          MS. WARE:  Okay.  I just wanted to make

21     sure we're clear on that.  I can move on.

22     BY MS. WARE:

23     Q    So, Ms. Thomas, the hospital at Egleston, ████

24     ████████████      █████    ███████████████████

25     A    █████████████████████████████,



1
2
3
4
5
6
7  Q
8  ?
9  A
10 Q
11
12 A
13 .

14          MS. BROYLES:  Well, actually, asked and
15  answered.  You went through that whole litany a
16  couple hours ago.
17          MS. WARE:  Was that the Dr. Aldridge and
18  Dr. Medlin you referred to?
19          MS. BROYLES:  Dr. Medlin, which was first,
20  and then Dr. Aldridge.  That is correct.
21          MS. WARE:  Okay.  And you were going to
22  verify whether there had been records produced
23  for any ongoing treatment.
24          MS. BROYLES:  Yes, I will go back and see
25  if there's anything further we can.  I believe

1              that the invoice we produced to you documents

2              the different dates ████████████████████

3              visits, so I believe that's what we had -- what

4              we have that would show the documentation of

5              the various visits.

6                   If there's something further, I will

7              produce that, but I believe that's what we

8              have.

9    BY MS. WARE:

10        Q    Okay.  Ms. Thomas, after the 17th when you

11   reported it to the school, this incident to the school,

12   from then until you withdrew your children from Oakhurst

13   and transferred them to Winnona Park, who did you talk

14   to about the incident other than people from the school?

15   ████████████████████?

16        A    What do you mean?  Like my family?  No, of

17   course.

18        Q    Yes, family or community members, friends,

19   neighbors.

20        A    One moment.

21             MS. BROYLES:  Okay.

22        (Discussion between the witness and her attorney.)

23             MS. BROYLES:  All right.  She's asking me

24        about whether the other attorney -- she had

25        spoken to some attorneys, and I would assert

```
 1               attorney-client privilege with regards to that.
 2               But obviously the witnesses that have been
 3               disclosed already, Ms. Christa Smith, her
 4               family.  You can talk about those people
 5               because that's not privileged.
 6    BY MS. WARE:
 7        Q    Okay.  So you had previously identified
 8    Ms. Christa Smith.  You said she was a friend.  You
 9    talked to her about it.
10        A    Yes.
11        Q    And then who else?  You said family members?
12    You spoke with them?
13        A    Yes, a couple of my family members.
14        Q    Who?  What family members did you talk about it
15    with?
16        A    My cousin Monica Patterson.
17        Q    And where does Monica Patterson live?
18        A    She lives in Atlanta, Georgia.
19        Q    And any other family members?
20        A    No, not really.
21        Q    Not really?
22        A    No.
23        Q    So no or --
24        A    I mean, not that I can recall.  Kenyata Marsh,
25    my best friend, she lives in Columbus, Georgia.
```

1       Q     Kenyata Marsh?

2       A     Yeah, she lives in Columbus, Georgia.

3       Q     What about any other parents at the school

4    system?

5       A     No, ma'am, I don't know any other parents at

6    the school system.

7             MS. BROYLES:  Let me ask about:  Did you

8             talk to any of the parents who had been -- any

9             of the African American parents who had been

10            concerned about this policy, a Ms. Major?

11            THE WITNESS:  Oh, yes, Ms. Gena Majors.

12            She had been concerned about the policy because

13            at the time she had a child that went to school

14            downtown there in Decatur.

15   BY MS. WARE:

16      Q     Okay.  And what did you tell Ms. Major about

17   the incident?

18      A     I asked her if she knew about the policy.

19   Well, I basically told her that I didn't know anything

20   about the policy.  It was just a small conversation that

21   I didn't know.

22      Q     How did this conversation come about?

23      A     We were just talking about it.  Like,

24   someone -- I think she had put on social media her --

25   had put on there about the policy or something maybe,

1    and it just -- I just happened to see it, you know.  I

2    was -- actually, Ms. Keri, I was looking up the policy

3    and seeing, you know, like was it really a policy.

4            And I think her little blog popped up.  And I

5    was like, oh, okay, so it really is a policy.  I just

6    was basically trying to do some research to see, you

7    know, was it a policy for real.

8        Q    All right.  And had you ever met Ms. Major

9    before or known of her before this popped up?

10       A    No, ma'am.

11       Q    So how did you end up communicating with her?

12       A    When the blog -- when it popped up, I just was

13   like, Hey, I didn't know anything about this policy.

14   And it just started from there.  I was saying that I was

15   researching it to see if the policy was really a policy

16   that was put into place, and we just started talking

17   from there.  And I just -- you know, it wasn't no big

18   thing.  I was just saying that I don't agree with the

19   policy, and I just told her that, Hey, this policy put

20   my child in jeopardy.  And she was like, I agree with

21   the same thing.  It wasn't like a long drawn-out

22   conversation, ma'am.

23       Q    So what did you tell Ms. Major specifically

24   about what happened that put your child in jeopardy?

25       A    That the little boy was able to come -- because

1    the policy says whatever you identify yourself as you

2    can use whatever type of restroom or whatever.  And I

3    said, If that policy wasn't in place, he would be --

4    would have been forced to have to use the -- you know,

5    the boy's bathroom.  He would have never been allowed

6    to, you know, go in the girls' bathroom.  And that was

7    just my opinion.

8        Q     So you relayed to her that   Jane   had been

9    assaulted in the girls' bathroom by a little boy?

10       A     Yes, based off of -- yes, because of that

11   policy was put into place.

12       Q     And was this on social media that you guys were

13   having this discussion or telephone or in --

14       A     No, it was like blogging, but -- it was like

15   blogging, but it was like none of this was said where

16   nobody could really hear our conversation.  It was like

17   private blogging type of thing, but it wasn't where

18   nobody else can chime in or nothing.  I don't know what

19   the appropriate term is.

20       Q     Okay.  Was it like in the -- via e-mail or a

21   private chat through the blog?

22       A     Yes, just a private chat.

23       Q     Okay.  And when do you -- do you recall when

24   you had this conversation with Ms. Major?

25       A     It was years ago, and it was during the time

1    when all of this was, you know, fresh and everything

2    that happened with, you know -- with my daughter.

3         Q    Was it before          was transferred to

4    Winnona Park?

5         A    Yes, ma'am.  Yes, ma'am.

6         Q    And do you think it was before she was

7    transferred to a new classroom that you were looking

8    this policy up and came across Ms. Major?

9         A    Yes, ma'am.

10        Q    Was it on Facebook that you saw this?

11        A    I can't remember.  It was just a -- just

12   some -- just a blog, like when you look up something and

13   it just popped up, you know.  I can't remember.

14        Q    Did you and Ms. Major discuss anything else?

15        A    No, that's the only thing that we have in

16   common to talk about was -- you know, we was just

17   talking about the policy.

18        Q    Did she suggest that you get an attorney or

19   anything like that?

20        A    No, she just discussed -- we just discussed the

21   policy as in how to get that policy out of place before

22   anyone else gets, you know, hurt.  That was the main

23   thing, just to get it out of place before someone

24   gets -- another child gets hurt by it.

25        Q    Did she disclose to you that Ms. Broyles had

**Confidential**                                        168

```
 1   actually represented her and her husband in some

 2   discussions about this policy in a public forum?

 3                   THE WITNESS:  I can tell?

 4                   Okay.  Yes.

 5   BY MS. WARE:

 6        Q    She did?

 7        A    Yes.

 8        Q    And did she provide you with contact

 9   information for Ms. Broyles?

10        A    Yes, ma'am.

11        Q    And when was the first time that you reached

12   out to Ms. Broyles?

13                   MS. BROYLES:  I'm going to ask -- I think

14            that's beginning to get into attorney-client.

15                   MS. WARE:  When she reached out to you is

16            not a communication.  It's just a date.

17                   MS. BROYLES:  That's fine.  You're right.

18            That's correct.  All right.  That's fine.  As

19            far as date.

20                   THE WITNESS:  I don't know, ma'am.  It's

21            been years.  I don't know.

22   BY MS. WARE:

23        Q    Well, did you contact Ms. Broyles shortly after

24   you spoke with Ms. Major?

25        A    Yes, I contacted her.  And I contacted her,
```

1    yes, shortly after that to try to get the girls back

2    into school, you know, do something with that policy so

3    my babies can get back in school.

4        Q    And had you contacted other attorneys prior to

5    speaking with Ms. Broyles?  And I don't want to know

6    what you discussed with them.  But had you attempted to

7    contact other attorneys?

8        A    Yes.

9        Q    About how many other attorneys do you think you

10   contacted?

11       A    I mean, like -- I think I just asked a question

12   to one attorney.  I was trying to see how to get my kids

13   back in school, and I was trying to find out can I just

14   go to jail for, you know, keeping my kids out of school.

15   That was it.

16       Q    Anybody else that you spoke with other than

17   Ms. Major in the community, family members, neighbors,

18   anything like that?

19                MS. BROYLES:  Or Ms. Smith, Christa Smith

20          was the other one.

21                MS. WARE:  Right.  I have her.

22   BY MS. WARE:

23       Q    And Ms. Smith.

24       A    Not that I know of.  I was trying to keep it

25   kind of private because that's something you just don't

1   sit around and discuss.

2       Q    Do you know who disclosed it to the media?  Was

3   it Ms. Major?

4       A    I don't know.  The only thing I found out about

5   it was I think Mr. Dude himself did it because he

6   disclosed and said that it didn't happen.  That's how I

7   found out about it because it was a big write-up that he

8   said it never happened and that, you know, it was a lie

9   and that DFCS had found -- had investigated it and all

10  of that.  So I think Superintendent Dude did it.

11      Q    So you're not aware of any members of the

12  community that were raising concern -- or were making

13  comments publicly or in the community that an assault

14  had happened at Oakhurst?

15      A    Yes, when I -- once I seen that on the -- it

16  popped up on there about the -- someone had -- like I

17  said, about -- the comments came up under Mr. Dude, what

18  he had, you know, said.  That's the only comments I seen

19  when there were -- the headline was like superintendent

20  says that it was a lie or whatever, and all the comments

21  came under what he -- that's what I'm trying to get you

22  to understand that he put out there.

23      Q    But I'm saying:  Prior to that when he posted

24  or issued a statement, were you aware of parents or

25  community members discussing the assault on your

1    daughter in the community?

2         A    No, ma'am.

3         Q    Were you contacted by anyone about it?

4         A    No, ma'am.

5         Q    In the community?

6         A    No, ma'am.  No one reached out to me.

7         Q    So you said the -- and when did you see

8    Dr. Dude's statement?

9         A    I can't remember exactly when it was, but I

10   know that his statement was like shortly after that

11   incident or something.  Like it may have been a couple

12   of weeks or whatever.  I can't remember.  But I just

13   know that I saw his, you know -- about it.

14        Q    How did you see that statement?  Where was it

15   that you saw it?

16        A    It was online.  It was online.

17             MS. BROYLES:  Was it in the newspaper, the

18             Decaturish?

19             THE WITNESS:  Yes, that's it.  That

20             Decaturish thing or whatever.  It was inside of

21             there.  And then they have like a website, and

22             it was up under there and then with the

23             comments and everything.

24   BY MS. WARE:

25        Q    Okay.  And what was it from that statement

1    that -- or did you learn anything new from that

2    statement that you didn't know before?

3        A    That he's a liar and trying to cover up the

4    fact that it happened.  That's the only thing I found

5    out from it.

6        Q    Okay.  Factually what was in that statement, if

7    anything, that was -- that you were not aware of before?

8    In other words, I understand you think he's a liar, but

9    that's an opinion.  I'm saying what in the article, that

10   was stated in the article?

11       A    Because he -- okay.  In the article he said

12   that it never happened, that DFCS investigated --

13   investigated it.  DFCS didn't investigate anything,

14   period, about that case.  Said that the police did a

15   full -- I mean, and the DFCS found -- found it to be

16   untrue and that the police investigated it and found it

17   to be untrue.  None of that happened.  The police never

18   found anything to be untrue.  DFCS never found anything

19   to be untrue.

20       Q    At the time of -- that you read Dr. Dude's

21   statement, had you had your meeting with Ms. Fowler

22   where she agreed to transfer   Jane   to a different

23   classroom?

24       A    I think that statement maybe came before that.

25   I'm not sure.

1      Q     Anything else in the article that you learned
2  that you didn't know about before reading it?
3      A     No, ma'am.
4      Q     So you said he said in the article it never
5  happened, that DFCS investigated, that DFCS found it to
6  be untrue, and that the police found it to be untrue?
7  Those are the things that you took away from the article
8  that you didn't know before?
9      A     Yes, because I wasn't aware of that because
10 when did DFCS -- I mean, it was just total lies.  I
11 didn't know anything about any of that.
12     Q     Did the school system at any time tell you they
13 were investigating the matter?
14     A     No, ma'am.
15     Q     Did anyone at the school tell you or in the
16 school system tell you that they were interviewing
17 witnesses?
18     A     No, ma'am.
19     Q     So at neither of your meetings with Ms. Fowler
20 no one told you they are still investigating?
21     A     No, ma'am.  Oh, I'm sorry.  Let me go back to
22 that.  At that last meeting on the 8th, she tried to say
23 that they were still waiting on DFCS to get back with
24 them.
25            And I was like, What does that have to do with

**Confidential**                               174

```
 1   anything?  I'm talking about right now.
 2            But that was her answer, We're still waiting on
 3   DFCS to get back with us.
 4       Q    All right.  Do you still have a cutoff time of
 5   3:00, Ms. Thomas?
 6       A    Yes, ma'am.  But how long do you think we need
 7   to go?
 8       Q    I mean, I've probably got another couple of
 9   hours of questioning at least.
10       A    Yes, ma'am.
11       Q    So we would need to continue this to another
12   day if --
13            MS. BROYLES:  Why don't we just go until
14            3:00, and then we'll -- if we need to continue
15            it, we'll continue it.  I'm actually curious as
16            to how much more you have left in all candor
17            because you've covered -- you've covered the
18            incident.  So anything other -- anything else
19            related to -- to the incident or the immediate
20            aftermath that you want to ask about?
21            MS. WARE:  Well, I'm going to go through
22            my questions, and, you know, we'll get there if
23            we get there.
24   BY MS. WARE:
25       Q    Has   Jane   ever made any allegations prior to
```

**Confidential**                    175

```
 1    this incident that she was improperly touched by anyone?

 2        A    No, ma'am.

 3        Q    Have you ever made any allegations that anyone

 4    improperly touched her?

 5        A    No, ma'am.

 6        Q    What about your other children?  Have you made

 7    allegations that your other children have been

 8    improperly touched?

 9        A    No, ma'am.

10        Q    Have any of your other children made

11    allegations or accusations that they've been improperly

12    touched?

13             MS. BROYLES:  I'm going to -- I'm going to

14             just make an objection for the record.  I

15             believe this is well beyond the scope of

16             discovery and invasion of privacy, but I will

17             allow my client to answer.

18             THE WITNESS:  No, ma'am.

19    BY MS. WARE:

20        Q    What about allegations of rape either by

21    Jane    or the other children?

22        A    No, ma'am.

23        Q    Have you ever made allegations that any of the

24    other children were raped?

25        A    No, ma'am.
```

```
1        Q    Or that  Jane   was raped?

2        A    No, ma'am.

3        Q    Did   Jane    ever report to you that the little

4   boy that touched her in the bathroom -- did she ever

5   report prior to him touching her that he was mean to

6   her?

7        A    No, ma'am.

8        Q    Did she ever indicate she didn't like him

9   because he wouldn't play with her?

10       A    No, ma'am.

11            MS. BROYLES:  I believe that was in

12       ██████████████████.  That was a statement made

13       ████████████.

14            MS. WARE:  Yeah, I understand.  I'm asking

15            if she ever made that statement to Ms. Thomas.

16  BY MS. WARE:

17       Q    How did you learn of Dr. Medlin?

18       A    Attorney Broyles.  Attorney Broyles,

19  Vernadette.

20       Q    Okay.  So your attorney recommended Dr. Medlin

21  to you?

22       A    Yes, ma'am.

23       Q    All right.  And when you went to meet with

24  Dr. Medlin -- and I'll just tell you the records

25  indicate it was in January of 2018 -- who went to meet
```

```
 1   with Dr. Medlin at that first meeting?

 2       A     The same people, myself and the kids.

 3       Q     I'm sorry.  Say that again.

 4       A     Myself and the kids.

 5       Q     Okay.  Your attorneys, neither Mr. Trakas nor

 6   Ms. Broyles went to --

 7       A     Attorney Broyles was there.

 8       Q     Okay.  And what was the reason that you went to

 9   see Dr. Medlin?

10       A     So that   Jane   can speak with the

11   psychiatrist, psychologist, whatever needed to be to

12   assess her, see, you know, what's going on with her

13   basically after the assault.

14       Q     Okay.  And did you -- when you met with

15   Dr. Medlin -- it's a female; correct?

16       A     Yes, ma'am.

17       Q     █████████████████████████████████████

18   █████████████████████████████████████████████████████

19   ███████████

20       A     ██████████████████

21       Q     ████████████████████████████████████████████

22   ██████████████████

23       A     █████████████.

24       Q     ████████████████████████████████████

25   ████████████████████
```

1    A    ████████████████████████████████████

2    ███████████

3    Q    ██████

4    A    --  ██████    ████████    .

5    Q    ████████

6    A    ████████████████  ██████  ,  ██████████  ██████████

7    ██████████

8    Q    ███████████████████████████

9    ██████████████████████████████████████

10   ██████████████████████████

11   A    ███████████████████████████████████

12   ████████

13       Q    Okay.  Was Attorney Broyles present during the

14   entirety of the meeting?

15              MS. BROYLES:  Somebody just walked in.

16         Let me just let them know they shouldn't be

17         here.  Hold on.

18              Okay.  They've left.

19              MS. WARE:  I'm sorry.  Ms. Fuller, can you

20         repeat my last question?

21              (The following question was read:

22              Q    Okay.  Was Attorney Broyles present

23         during the entirety of the meeting?)

24              THE WITNESS:  I'm sorry.  Was she present

25         for the meeting?

**Confidential**                                                179

```
 1  BY MS. WARE:

 2      Q    With Dr. Medlin?

 3      A    No, nobody was in there, but Jane      was in

 4  there.  We was outside.  Nobody was allowed to be in

 5  there with her.

 6      Q    ████████████████████████████████████████████

 7  ██████████████████████

 8      A    █████    ██████████████████████████████

 9  ██████████  ██████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ██████████████

12      Q    ████████  ████████  ████████████████████████

13  ██████████████████████████████████

14      A    No.

15              MS. BROYLES:  Let me pause.  Let me pause.

16      (Discussion between the witness and her attorney.)

17              THE WITNESS:  █████████████████████████████

18      ████████████.

19              MS. BROYLES:  Whatever you remember,

20      that's fine.

21              THE WITNESS:  █████████████████████████████

22      ████████████████████████████████████████████████

23      ██████████████████████

24  BY MS. WARE:

25      Q    ████████████████████████████████████████████
```

**Thompson Reporting Services, Inc.**
**(678) 483-0600**

1    ████████████████████████

2        A    ██████████████████████████████████

3    ████████    ████████████████    ████████████████████

4    ███████████████████.

5        Q    Okay.  And Dr. Medlin interviewed  Jane  ?

6        A    Yes.

7        Q    █████████████████████    ███████████████

8    ████████████████

9        A    ██████████████████.

10       Q    Okay.  And Ms. Broyles was there.  Did she

11   speak with Dr. Medlin?

12       A    Not that I remember other than speaking.

13            MS. BROYLES:  I spoke with her briefly.

14            MS. WARE:  Okay.

15   BY MS. WARE:

16       Q    Tell me what, if anything, has changed for

17   Jane    from before the incident -- well, actually, you

18   know what, let me back up.

19            Dr. Aldridge, according to the records, you saw

20   her for the first time -- or   Jane   saw her for the

21   first time in December of '20 or January of '21?

22       A    I'm not sure.

23       Q    Am I getting that time right?

24       A    I'm not sure.

25       Q    How did you find out about Dr. Aldridge?

**Confidential**                                    181



1   A   ████████████████████████████

2   ████   ██████████████████████████████████

3   ██████

4   Q   ████████████   ██████████████████████

5   ████████████?

6   A   ████████   ██████   ████████████████

7   ████████████████,████████████████████████

8   ████████████████████████   ██████████████

9   ██████

10      Q   And did you go and meet with Dr. Aldridge?

11      A   Yes.

12      Q   Did Attorney Broyles or Mr. Trakas attend that

13  meeting with you?

14      A   No.

15      Q   Who was there?

16      A   Myself and my kids.

17      Q   Okay.   ████████████████████████████

18  ██████████████

19      A   ████████████████████████████████

20  ██████████

21      Q   ██████████████████████?

22      A   ██████████   ██████   ██████   ████████████

23  ██████████████████   ██████   ,   ████████

24  ████████████████████████████

25      ██████   ,   ██████████████████████

1  ████████████████████████████████████████████

2      Q     What did you tell Dr. Aldridge was the reason

3  for being there?

4      A     That she was sexually assaulted in the

5  bathroom.

6      Q     And what did you tell Dr. Aldridge, if

7  anything, that you felt like needed --   Jane     needed

8  help with?

9      A     I mean, just day-to-day things, like getting

10 over it.  Because for a while she was crying at

11 nighttime.  She started eating more, just eating

12 excessively; just sadness, real clingy towards me.

13 There was just things that I wanted her to just discuss

14 with her, things that   Jane    maybe won't open up to me

15 about, like she would have expertise in knowing how to,

16 you know, get the child to open up.

17     Q  ████████████████████████████████

18 ████████████████████████?

19     A  ███.

20     Q  █████████████████████████████████

21 █████████████████████████████████████.

22 ████████?

23     A  ██████████████████████████████████████.

24     Q  █████████  █████████████████████████████

25 ██████

```
 1     A     ████████████████   ██████████

 2     Q     ██████████

 3     A     ███████████████████

 4     Q     ████████████████████████████████████

 5     ██████████████████████?

 6     A     ███████████████████████████████████

 7     ███████   █████████████████████████████████

 8     ██████████████   ████████████████████████████████████

 9     ████████████████████   ████████████████████

10     Q     ████████████████████████████████

11     ███████████████████████

12     A     ████████████████████████████████████████.

13     Q     ███████████████████████████████████████

14     ██████████████████████████████████████

15     A     █████

16     Q     Okay.  How many occasions did that occur where

17     the kids were in a shelter?

18     A     Once.

19     Q     And how long were you there?

20     A     Less than 30 days.

21     Q     And where was that?  You don't have to disclose

22     the address, but was it locally here in Atlanta?

23     A     Yes.

24     Q     Were you ever in a -- a shelter in ████████ or

25     Tennessee?
```

**Confidential**                                            184

```
 1      A      Before I went to Tennessee, I was in one.  Like
 2   I said, I left because of the verbal domestic.  So I
 3   went to one, and then I left from there and went to
 4   Tennessee.
 5      Q      Okay.  And in Tennessee were you in a shelter
 6   there at any point?
 7      A      No.
 8      Q      Prior to -- did she -- well, strike that.
 9             Did Dr. Medlin diagnose  Jane   with anything
10   that you are aware of?
11      A      I saw some paperwork, but I really don't know
12   what it means, to be honest.  So it was a lot.  I don't
13   know.
14      Q      ███████████████████████████████████████
15   █████████████████████████████      ██████  ?
16      A      Yes, she said she definitely needs counseling.
17      Q      All right.  And was that in January of 2018?
18      A      I have no -- I'm not good with dates, ma'am.  I
19   don't know.
20             MS. BROYLES:  Ms. Ware, it occurs to me
21             that we probably need to get to you -- I don't
22             know that there's any documentation, but I know
23             that █████████████████████████████████████████
24             ████████████   So if there's any documents that we
25             have on that, I'm going to go back and research
```

**Thompson Reporting Services, Inc.**
**(678) 483-0600**

1    that.  We will supplement quickly with those.

2         MS. WARE:  Dr. Aldridge, she's been

3    identified as an expert who you anticipate

4    calling at trial; correct?

5         MS. BROYLES:  That is correct.

6         MS. WARE:  Then I think that her -- any

7    visits that she had -- because earlier I think

8    you said you don't have those records or you

9    don't think you have those visits.

10        MS. BROYLES:  Yeah, I mean, we don't have

11   obviously any of her notes or anything like

12   those.  And, you know, typically when you go,

13   you don't -- you don't get documents.  But I'm

14   trying to -- we have looked through everything,

15   and I don't -- we didn't come across anything

16   for the -- there were a couple -- there were

17   ███████████████████ but I will double-check.

18   Because if there are, obviously you're entitled

19   to those documents.

20        MS. WARE:  Okay.

21        MS. BROYLES:  So -- (audio distortion) --

22   and then later on, I guess, 2020 and '21.

23        MS. WARE:  ████████████████████████

24   ████████████████████████████████████████

25   ████████████████████████████████?



1          MS. BROYLES: ███████████████████

2    ████████████████████████████████████████

3    ████████████

4          THE WITNESS:  I don't recall.

5          MS. BROYLES:  Okay.  Yeah, so we'll have

6    to research that and get back -- get that to

7    you.

8          MS. WARE: █████████████████████

9    ████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████████████████████

12         MS. BROYLES: ███████████████

13   BY MS. WARE:

14       Q   ████  █████████████████████████████

15   ██████  ███████████████████████████████

16       A   ████  █████████████████████████████

17   █████████████████████████  ████████████████

18   █████████████████████████████████

19   █████████████████████████████████████████████

20   ████████████████

21       Q   ███████████████████████████████

22   ████████████████████████  █████████████████████,

23   ████████████████████████████████

24   ██████  █████████████████████

25       A   ████████████████████████████████████

**Confidential**                                    187

1   ▮▮▮▮▮

2          MS. BROYLES:  ▮▮▮▮▮▮▮▮▮▮▮

3          THE WITNESS:  ▮▮▮▮  ▮▮▮▮

4      ▮▮▮▮▮▮▮  ▮▮▮▮▮▮

5      ▮▮▮▮▮▮▮▮▮▮

6      ▮▮▮▮▮▮▮▮▮▮▮

7      ▮▮▮▮▮▮▮▮▮▮▮

8      ▮▮.

9   BY MS. WARE:

10      Q     And then in March of 2021 when you returned to

11  Dr. Aldridge, what was the reason you returned to see

12  her -- or that   Jane   returned --   Jane   returned to

13  see her?

14      A    I think   Jane   -- I think that's when she had

15  started back crying at nighttime, having bad dreams

16  about what happened, started eating more, just, you

17  know, like from being stressed, stressed or something.

18  So I took her to see Dr. Aldridge.

19      Q    ▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮?

23      A    ▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮



1  ████████████████  █████████████████████████████

2  ██████████████████████████████████  ████████████

3  ███████████████████████████████████████████████████

4  ██████████████████████████████████████████████

5  ████████████.

6  Q   ████████████████████████  ██████████████████

7  █████?

8  A   ███████████████████  ███████████████████  --

9  █████████████████████████████████████████████████████

10 █████████████  ████████████████████████████████████

11 █████████████████████████████████████████████████

12 ████████████████████████████████████

13 Q   █████████████████████████████████████████████████

14 ██████████████████████████████████████████████

15 █████?

16 A   ████████████████████████████████████████.

17 ██████████████████████████████████████████████████████

18 ████████████████████████████  ███████████████████████

19 █████████████████.

20         MS. BROYLES:  All right.  Let me interrupt

21     because the March 2020, I think you mentioned

22     that, Keri, with respect to when COVID came.

23     Okay.  ████████████████████████████████████

24     ████████████████████████████████████████████████

25     ██████████████████  ████████████████████████████

**Confidential**                                                       189



```
 1
 2
 3                                          --
 4              MS. WARE:                   .
 5
 6
 7              MS. BROYLES:
 8
 9
10
11
12
13                        .
14                              .
15              MS. WARE:  Okay.
16   BY MS. WARE:
17        Q    Okay.  So prior to this incident, did  Jane
18   ever experience crying at night?
19        A    No.
20        Q    Prior to the incident, did she ever experience,
21   you know, eating more or increased appetite?
22        A    No.
23        Q    And prior to this incident, did she exhibit
24   sadness?
25        A    No.
```

1          Q    Or clinginess?

2          A    No, ma'am.

3          Q    What about any type of anxiety and depression?

4     Did she have any of that prior to this incident?

5          A    No.

6          Q    And is that something that -- in your

7     experience as her mother, is she experiencing that after

8     the incident?

9          A    Yes, the sadness.

10         Q    What about anxiety?  Did you see any indication

11    of anxiety after the incident?

12         A    Sometimes, like I said, when she's crying, she

13    thinks something is going to happen to her from time to

14    time, but I just assure her it's not going to happen.

15    So, yes.

16         Q    The symptoms, is she having any symptoms now,

17    currently?

18         A    Not really.  Just the -- every now and then

19    she's -- at this point right now, she's having the --

20    the nightmares and the -- she'll have good days and bad

21    days when she's sad, and then some days she's back

22    happy.

23              MS. BROYLES:  Ms. Ware, if you want to

24         finish this line of questioning and the topic

25         that you're on, it's 3:02.  I think we have

1              just a little bit of flexibility, but if you

2              want to finish that area, I had a few

3              clarification questions.  But I don't want to

4              interrupt you.

5                   MS. WARE:  Okay.

6    BY MS. WARE:

7        Q    You said she has some sad days.  When she has

8    those days, does she ever express to you why she's sad?

9        A    No, because she's already done it before so I

10   know why she's sad.  And I don't want to just keep

11   rehashing that.

12       Q    Has   Jane   been diagnosed or ever treated for

13   any anxiety prior to this incident?

14       A    No.

15                   MS. WARE:  I think that's all I have for

16              this line of questioning, so we'll have to --

17              and, Ms. Broyles, you can ask your

18              clarification questions, and then I guess we

19              can discuss off the record how and when to

20              continue this deposition.

21                        EXAMINATION

22   BY MS. BROYLES:

23       Q    Ms. Thomas, I'm going to try to march through

24   these pretty quickly.  Do you recall   Jane   ever

25   telling you that the name was   John Doe   ?

1      A      Yes.

2      Q      Does that sound familiar to you?

3             Okay.  Did anyone from the school ever discuss

4      with you, talk with you at all about a Title IX

5      coordinator?

6      A      I think that was -- yes, I think Ms. Fowler --

7      Principal Fowler did.

8      Q      Did a Title IX coordinator ever contact you?

9      A      Oh, nobody didn't.

10     Q      Okay.

11     A      No.  No.

12     Q      Were you aware of whether the district sent out

13     a statement to parents saying that there had been a

14     rumor about the assault, that the school had

15     investigated it and found it to be untrue?

16     A      What I saw, yes, on the TV.  I mean, not the

17     TV, the letter that was sent out by Superintendent Dude.

18     Q      Okay.  Do you happen to recall roughly when

19     that was?  Was that in January or December?  Or roughly

20     when that was?

21     A      I would say probably in December.  I'm not

22     sure.

23     Q      Of 2000 -- right after the incident?

24     A      Yes, after the incident.  Yes.

25     Q      Could that have been in January of 2018?

1       A     Could have.  I can't remember the date.

2       Q     Okay.  If you're not sure, you're not sure.

3             All right.  Were you a part of any controversy

4    in school board meetings or anything like that

5    concerning the policy?

6       A     No, ma'am.

7       Q     Were you part of any parent group that was

8    protesting the policy or anything like that?

9       A     No, ma'am.

10      Q     Okay.  Did DFCS close your case as

11   unsubstantiated?

12      A     Yes, ma'am.

13      Q     Ms. Dickerson, is she white or black?

14      A     Black.

15      Q     The bathroom which this incident -- your

16   daughter said occurred, was that near the principal's

17   office?

18      A     Yes.

19      Q     Okay.  And did your daughter ask to go to the

20   bathroom and the little boy ask to go to the bathroom

21   after, right after her?

22      A     She said she asked to go to the bathroom.  The

23   little boy was still in the classroom.  She went first.

24      Q     Okay.

25             MS. BROYLES:  All right.  Those are the

1          clarifications I wanted to ask, Ms. Ware.

2              MS. WARE:  I have a couple of follow-ups

3          based on that.  But you know what, I think we

4          can just wait until we reconvene.

5              MS. BROYLES:  Okay.  How much more time do

6          you think that you'll need, Ms. Ware.  Perhaps

7          we can figure out a date.

8              MS. WARE:  A couple of hours.

9              MS. BROYLES:  A couple of hours.  Okay.

10             (Pursuant to Rule 30(e) of the Federal

11         Rules of Civil Procedure and/or O.C.G.A.

12         9-11-30(e), neither a party nor the deponent

13         having requested right of review of the

14         deposition, the reading and signing of the

15         deposition is waived.)

16

17             (Deposition adjourned at 3:07 p.m.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

G E O R G I A

CARROLL COUNTY:


         I hereby certify that the foregoing
    Zoom Video Conference Deposition was taken down, as
    stated in the caption, and the questions and the
    answers thereto were reduced to typewriting under my
    direction to the best of my ability; that the
    foregoing pages 1 through 194 represent a true and
    correct transcript of the evidence given upon said
    hearing, and I further certify that I am not of kin
    or counsel to the parties in the case; am not in the
    regular employ of counsel for any of said parties;
    nor am I in any way interested in the result of said
    case.
         This, the 15th day of December 2021.




    _____
    MICHELLE FULLER, CCR-B-1991
    My License Expires: April 1, 2022

1                              DISCLOSURE

2

3    STATE OF GEORGIA
     COUNTY OF CARROLL
4
     DEPONENT: PASCHA THOMAS
5
     Date of Deposition: December 2, 2021
6

7         Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
8    Judicial Council of Georgia, I make the following
     disclosure:
9
          I am a Georgia Certified Court Reporter.
10
          I am not disqualified for a relationship of interest
11   under the provisions of O.C.G.A. Section 9-11-28(c).

12        I am a representative of THOMPSON REPORTING
     SERVICES, INC.
13
          THOMPSON REPORTING SERVICES, INC., was contacted by
14   Wilson, Morton & Downs, LLC, to provide court reporting
     services for this proceeding.
15
          THOMPSON REPORTING SERVICES, INC., will not be
16   taking this proceeding under any contract that is
     prohibited by Georgia law.
17

18
                              _____
19                            Michelle Fuller, B-1991
                              Certified Court Reporter
20                            Date: December 15, 2021

21

22

23

24

25

Case 1:20-cv-02317-MHC   Document 166   Filed 05/11/23   Page 197 of 215
Pascha Thomas, et al. v.
City Schools of Decatur, et al.
Confidential
Pascha Thomas -  Vol. 1
December 2, 2021

Case 1:20-cv-02317-MHC   Document 166   Filed 05/11/23   Page 212 of 215

Pascha Thomas, et al. v.
City Schools of Decatur, et al.

Confidential

Pascha Thomas -  Vol. 1
December 2, 2021

Confidential