## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| PASCHA THOMAS, as Guardian and next friend of JANE DOE, a minor,<br><br>    Plaintiff,<br><br>v.<br><br>CITY SCHOOLS OF DECATUR, DR. DAVID DUDE, and MARCIA FOWLER,<br><br>    Defendants. | CIVIL ACTION FILE<br><br>NO. 1:20-CV-2317-MHC |

## **ORDER**

This case comes before the Court on Defendants City Schools of Decatur

("CSD"), CSD Superintendent Dr. David Dude ("Dude"), and Oakhurst

Elementary School Principal Marcia Fowler ("Fowler")'s Motion for Summary

Judgment [Doc. 105] and Motion to Exclude Expert Testimony of Tom Rawlings

[Doc. 136].

I.      **BACKGROUND**[1]

A.      **The Incident and Thomas's Initial Report to Oakhurst**

Plaintiff Pascha Thomas ("Thomas")'s five-year-old daughter Jane Doe was

a student enrolled in Oakhurst Elementary School ("Oakhurst"), a school operated

by the CSD school system, from September 12, 2017, through December 21, 2018.

Pl.'s Resp. to Defs.' SUMF ¶¶ 1, 16.  Jane Doe was enrolled in Kindergarten with

teacher Susan Albright ("Albright") and paraprofessional Xavier Tilman

("Tilman").  Id. ¶ 16.

While at home on the evening of November 16, 2017, Thomas observed

Jane Doe touching herself in her genital area and asked her what was wrong.  Dep.

Tr. of Pascha Thomas (Dec. 2, 2021) ("Thomas Dep. I") [Doc. 108] at 29-30.  Jane

---

[1] At the outset, the Court notes that as this case is before it on Defendants' Motion
for Summary Judgment, the Court views the evidence presented by the parties in
the light most favorable to Plaintiff, and has drawn all justifiable inferences in her
favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986); Sunbeam TV Corp. v. Nielsen Media Rsch., Inc., 711 F.3d 1264, 1270
(11th Cir. 2013).  In addition, the Court has excluded assertions of facts that are
immaterial or presented as arguments or legal conclusions or any fact not
supported by citation to evidence (including page or paragraph number).  LR
56.1B(1), NDGa.  Further, the Court accepts as admitted those facts in Defendants'
Statement of Undisputed Material Facts ("Defs.' SUMF") [Doc. 106-1] and
Plaintiff's Statement of Additional Material facts ("Pl.'s SAMF") [Doc. 133] that
have not been specifically controverted with citation to the relevant portions of the
record.  See LR 56.1B(2), NDGa; Pl.'s Resp. to Defs.' SUMF ("Pl.'s Resp. to
Defs.' SUMF") [Doc. 132]; Defs.' Resp. to Pl.'s SAMF [Doc. 140].

Doe told Thomas that a boy ("John Doe") was in the girl's bathroom at Oakhurst and, as Jane Doe was in the process of pulling up her pants, John Doe pushed her up against the wall and stuck his fingers through her leggings between her vagina causing her pain (hereafter referred to as the "Incident"). Id. at 29-30.[2]

On the morning of November 17, 2017, Thomas drove with Jane Doe and Jane Doe's older sister to Oakhurst. Id. at 34-36; Defs.' Resp. to Pl.'s SAMF ¶ 1. After arriving at the school, Thomas told school nurse Dawn Durham ("Durham"), with counselor Laura Deming ("Deming") present, what Jane Doe told her occurred the previous evening. Thomas Dep. I at 36-37, 65; Dep. Tr. of Dawn Durham (Feb. 10, 2022) ("Durham Dep.") [Doc. 112] at 10-11; Defs.' Resp. to Pl.'s SAMF ¶ 2. Thomas testified that Durham questioned Jane Doe about the Incident during this interaction, but Durham testified that she did not question Jane Doe about the Incident until after the police arrived. Thomas Dep. I at 37 ("The nurse asked [Jane Doe] like more specific questions, asking who did this and what happened."); 49-50 ("Nurse Durham asked [Jane Doe] questions about it[.]"); Durham Dep. at 13 (stating that she first talked with Jane Doe "after the police officer, Officer D'Amico, came in."). Durham testified that she "had an idea" that

---

[2] Thomas and Jane Doe are Black females, and John Doe is a Black male. Pl.'s Resp. to Defs.' SUMF ¶¶ 17, 19.

the alleged perpetrator of the Incident was John Doe, based on Thomas's report, although Thomas testified that Jane Doe told Durham the boy's identity.  Durham Dep. at 16; Thomas Dep. I at 37.

After Thomas described the Incident to Durham and Deming, Thomas asserts that she asked to speak with Principal Fowler, but was told that Fowler was "on a phone call" and, despite waiting for thirty minutes and making multiple requests to see the principal,[3] Thomas had to leave to go to an appointment. Thomas Dep. I at 38-44, 53; Pl.'s Resp. to Defs.' SUMF ¶ 3.

### B.    The School's Initial Response to Thomas's Report

Within fifteen minutes after receiving the report of the Incident, Fowler contacted Bruce Roaden ("Roaden"), the Executive Director of Student Support[4] and whose responsibilities included supervising CSD's Title IX Coordinator, to inform him of an allegation that a student was inappropriately touched in the

---

[3] Fowler testified that she was in a closed-door meeting with another parent at this time and learned of Thomas's report after the meeting ended.  Dep. Tr. of Marcia Fowler (Mar. 17, 2022) ("Fowler Dep.") [Doc. 111] at 14, 41.  Thomas contends that Durham and Deming went into Fowler's office while Thomas was waiting and, after the two women were in Fowler's office for 10-15 minutes, they came out and Thomas saw that Fowler was not on the phone.  Thomas Dep. I at 40-41.

[4] The Department of Student Support was responsible for "communicating, monitoring, and enforcing" the procedures that prohibit discrimination regarding students, including those arising under Title IX.  Pl.'s Resp. to Defs.' SUMF ¶ 8.

4

bathroom.[5]  Pl.'s Resp. to Defs.' SUMF ¶ 9; Fowler Dep. at 67-69.[6]  School

Resource Officer Matthew Damico ("Officer Damico") of the City of Decatur

Police Department and Dr. Melvin Ratcliff ("Ratcliff"), the CSD social worker

assigned to Oakhurst, also were contacted by either Fowler or Roaden.  Pl.'s Resp.

to Defs.' SUMF ¶ 27.  Because Ratcliff was not initially available, CSD social

worker Nicole Jefferson ("Jefferson") was contacted to respond to the Incident,

although both arrived that morning.  Id. ¶¶ 28, 32.

Jefferson arrived at Oakhurst around 9:00 a.m. and received the substance of

Thomas's report of the Incident from Fowler and Durham.  Id. ¶ 29.  Fowler called

Roaden again to discuss the situation, and Roaden indicated he would come to

Oakhurst later that day.  Id. ¶ 30.  Officer Damico arrived at Oakhurst at

approximately 9:15 a.m. and discussed details of the Incident with Fowler,

Jefferson, and Ratcliff.  Id. ¶ 34.  So that Officer Damico would know the specific

restroom where the Incident occurred, Durham asked Jane Doe to identify the

---

[5] Roaden advised Dude, the CSD Superintendent, either on the day Roaden learned of the Incident or the day after, and Dude directed Roaden to oversee the investigation and response to Thomas.  Pl.'s Resp. to Defs.' SUMF ¶ 67; Dep. Tr. of David Dude (Feb. 14, 2022) ("Dude Dep.") [Doc. 110] at 11, 22.

[6] Roaden passed away in 2018, so there is no direct testimony from him as to his actions during the relevant time period.  Pl.'s Resp. to Defs.' SUMF ¶ 68.

restroom, which she did.[7]  Id. ¶¶ 36-38; Durham Dep. at 15.  Officer Damico

collected statements from Durham, Deming, and Aldridge and later informed

school officials that, due to John Doe's age, there would be no criminal

prosecution regarding the Incident.  Decatur Police Dept. Offense Incident Report

(Nov. 17, 2017) [Doc. 106-22] at 1-2; Pl.'s Resp. to Defs.' SUMF ¶ 35.

---

[7] Defendants contend that no other school official spoke with Jane Doe about the Incident.  See, e.g., Decl. of Marcia Fowler ("Fowler Decl.") (Dec. 8, 2022) [Doc. 106-18] ¶¶ 12-13; Fowler Dep. at 136-37; Dep. Tr. of Nicole Jefferson ("Jefferson Dep. I") [Doc. 113] (Feb. 11, 2022) at 30.  Thomas disputes that contention because "[t]here is no evidence that every employee at CSD at the time of the incident was queried about whether they spoke to Jane Doe about the incident."  Pl.'s Resp. to Defs.' SUMF ¶ 39.  However, Thomas presents no evidence (other than her own testimony that Durham asked Jane Doe questions during their morning meeting) to contradict the testimony offered by Defendants that, aside from Durham's inquiry about the location of the restroom, there were no other inquiries made of Jane Doe on November 17 regarding the Incident by school officials.  Thomas further objects to the consideration of any "post-hoc observations and subjective characterizations based on self-serving declarations prepared specifically for this Motion instead of deposition testimony" by Defendants.  See, e.g., Pl.'s Resp. to Defs.' SUMF ¶ 26.  But the Court is permitted to consider such declarations.  Under Rule 56(c), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  District courts may disregard statements that are not based on personal knowledge or are inadequately supported.  Pace v. Capobianco, 283 F.3d 1275, 1278-80 (11th Cir. 2002).  But the Court is within its discretion to consider declarations, especially if the statements are unopposed by any other portion of the record.  Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc., 793 F. App'x 896, 902 (11th Cir. 2019).

Fowler met with Albright and Tilman separately in her office, informed each of them of the allegations regarding the Incident, asked questions in order to determine if and when the Incident could have occurred, and inquired about any unusual behavior from Jane or John Doe. Pl.'s Resp. to Defs.' SUMF ¶ 43. Both Albright and Tilman reported that they did not allow John Doe to go to the bathroom by himself and that they did not notice any unusual behavior from either Jane or John Doe.[8] Id. ¶ 44. Fowler instructed Albright and Tilman to ensure that Jane Doe and John Doe were supervised if they had to go to the bathroom moving forward. Albright Dep. at 25-26; Tilman Dep. at 17-18 (noting that a new "bathroom operation" applying to Jane Doe and John Doe was instituted following that morning meeting).

Fowler also met with Jefferson and Durham to discuss the Incident, and then with Jefferson and Ratcliff to discuss what further steps to take with respect to John Doe. Jefferson Dep. at 24-25, 28. Fowler called John Doe's father to inform

---

[8] While John Doe displayed no prior behavior similar to the alleged sexual assault, he had displayed behavioral issues relating to anger control and destruction of school property. Dep. Tr. of Xavier Tilman (Apr. 29, 2022) ("Tilman Dep.") [Doc. 117] at 26-27 (discussing that John Doe would occasionally be defiant and get agitated to the point where he would damage school property by throwing things); Dep. Tr. of Susan Albright (Apr. 29, 2022) ("Albright Dep.") [Doc. 116] at 56-57 (noting that she did not trust John Doe to go to the bathroom alone because of his tendency for being "loud" and "a wanderer").

him of the allegations made by Jane Doe against his son.  Pl.'s Resp. to Defs.'
SUMF ¶ 47; Fowler Dep. at 246.  John Doe's father then came to Oakhurst and
spoke with Fowler, Ratcliff, and Jefferson, telling them that John Doe was
adopted, and that he and his wife had a home where John Doe was allowed to be
gender-fluid and wear girl's clothing if he wished.  Jefferson Dep. at 35.
Additionally, John Doe's father stated that John Doe had been seeing a therapist
"as a result of just the natural process of him being adopted."  Id.

Following their meeting with Fowler, Jefferson and Ratcliff decided to make
separate reports on Jane and John Doe, respectively, with the Department of
Family and Children Services ("DFCS") regarding the Incident.  Jefferson Dep. at
38-39, 81; Ratcliff Dep. at 50, 53-55.  This was based on their understanding that
incidents of suspected abuse to a child were required to be reported to DFCS.
Jefferson Dep. at 17-18; Ratcliff Dep. at 41-43.  See also O.C.G.A. § 19-7-5(c).
Dude testified that he "thought it was appropriate that there was a DFCS referral"
to "follow up on what might be happening in the households that could lead to
such behavior"—if the incident had occurred, he was concerned about Jane Doe
receiving adequate support and, if the incident did not occur, he was concerned as
to "why [she] would [] have said that it did."  Dude Dep. at 21, 84-85, 87.

### C.    Thomas's Return to Oakhurst

Thomas returned to Oakhurst following her appointment,[9] and met with Fowler, Ratcliff, Jefferson, Durham, and Robbin Dickerson ("Dickerson"), who served as CSD's Homelessness and McKinney-Vento Liaison[10] and had a prior relationship with Thomas.[11]  Pl.'s Resp. to Defs.' SUMF ¶ 55; Defs.' Resp. to Pl.'s SAMF ¶ 14.  The parties dispute about some of what was said during this meeting. According to Fowler, Thomas asked about what discipline would be given to John Doe and whether John Doe would be removed from Jane Doe's classroom, to which Fowler replied that she would not discuss what action might be taken against the alleged perpetrator during the course of the investigation but offered to

---

[9] There is a dispute of fact as to the efforts made by Oakhurst officials to contact Thomas prior to her return to Oakhurst in order to ensure that Jane Doe was taken for a medical evaluation, but the Court does not find this to be a dispute of any material fact.

[10] Eligible students who qualify as homeless as defined by McKinney-Vento may enroll in CSD and receive certain McKinney-Vento services.  Pl.'s Resp. to Defs.' SUMF ¶ 12.  Prior to and after the incident, Dickerson testified that the Thomas family had been receiving assistance through McKinney-Vento funds and had some attendance issues due to their homelessness, which was known to Roaden, Jefferson, and Ratcliff.  Dep. Tr. of Robbin Dickerson (May 16, 2022) ("Dickerson Dep.") [Doc. 118] at Dickerson Dep. at 33-42.

[11] Dickerson first learned of the incident through Thomas, who called her on the morning of November 17 to inform her of the report she made at Oakhurst and to ask Dickerson to come to the school.  Dickerson Dep. at 43.

change Jane Doe's classroom, the latter of which upset Thomas who rejected the offer.  Fowler Dep. at 110-111, 113, 115, 118; Fowler Decl. ¶¶ 16-17; Durham Dep. at 86.  Thomas agrees that she asked whether John Doe would be disciplined and requested that he be moved from Jane Doe's classroom, but denies that Fowler offered to remove Jane Doe from the classroom at this meeting.  Pl.'s Resp. to Defs.' SUMF ¶ 58; Thomas Dep. I at 60-61.

The parties also dispute whether Thomas was informed about the DFCS referral at the meeting; Jefferson testified that Thomas was told and was upset about the referral, Jefferson Dep. I at 42, 65, but Thomas testified that she did not learn of DFCS's involvement until later that evening and was not aware that it was the school had made the referral to DFCS until weeks later, Thomas Dep. I at 135-36.  The parties agree that the school officials expressed concern that Jane Doe needed medical attention, and Thomas indicated that she would take Jane to the hospital.  Pl.'s Resp. to Defs.' SUMF ¶ 56.  Thomas was unsatisfied with the school's response, and vowed at the end of the meeting that, "All hell is going to break loose when [] after the [Thanksgiving] break if you don't do something about that boy and take him out of that room."  Thomas Dep I. at 82; see also Fowler Dep. at 113 ("She was upset . . . [b]ecause she wanted him removed from

the classroom right away.").

Fowler testified that she would have abided with whatever instructions Roaden and the social workers gave her, but that she received no instructions or recommendations on removing either student. Fowler Dep. at 121. Roaden's recommendation on that first day was to "investigate what happened," and "provide support to both families." Id. at 121-22.

After students left for the day, Roaden arrived at Oakhurst and interviewed Fowler, Durham, Albright, and Tilman. Pl.'s Resp. to Defs.' SUMF ¶ 64. With respect to having Jane Doe obtain medical care, Roaden instructed Dickerson to ensure that Thomas took Jane Doe to the hospital, which Dickerson confirmed did occur. Id. ¶¶ 12, 64; Dickerson Dep. at 15-17.

### D. Initial DFCS Contact with Thomas

After leaving Oakhurst on the afternoon of November 17, Thomas took Jane Doe to Egleston Hospital[12] for a medical examination. Pl.'s Resp. to Defs.' SUMF ¶ 62. Thomas testified that a male DFCS worker, later identified as Ben Bell

---

[12] After receiving an initial medical exam at Egleston on November 17, 2017, the staff at Egleston referred Jane Doe to Children's Healthcare of Atlanta's Stephanie V. Blank Center, which specializes in child sexual abuse services. Pl.'s Resp. to Defs.' SUMF ¶ 65.

("Bell") came to the hospital after first trying to meet at her home and spoke with Jane Doe, her siblings, and Thomas separately.  Thomas Dep. I at 69.

### E.   Discussions Over the Thanksgiving Break[13]

On Sunday, November 19, 2017, Jefferson received text messages from Bell which informed Jefferson that he opened an investigation regarding the incident; he wrote specifically that Thomas had "a lot" of prior history with DFCS, that he did not believe that the alleged incident had occurred, and that he found Thomas "suspicious."  Pl.'s Resp. to Defs.' SUMF ¶ 69; Text Messages Between Ben Bell and Nicole Jefferson [Doc. 113 at 230-233].  Jefferson shared Bell's sentiment that Jane Doe was "coached" and added that schools should be careful about "believing some of these homeless families.  They are not all really homeless just looking for a quick come up to sue and get [some money.]"  Text Messages Between Ben Bell and Nicole Jefferson [Doc. 113 at 230-232]; Jefferson Dep. I at 140.[14]  Jefferson

---

[13] Oakhurst was closed Monday, November 20, through Friday, November 24, 2017, for Thanksgiving break.  Pl.'s Resp. to Defs.' SUMF ¶ 76.

[14] Jefferson testified that, although the majority of the homeless families in CSD at the time of the text messages were Black, she had worked with White homeless families and experienced similar behavior among them.  Dep. Tr. of Nicole Jefferson Vol. II (Feb. 24, 2022) ("Jefferson Dep. II") [Doc. 114] at 57-58.

also testified that, at the time of her communications with Bell, she did not believe that the Incident occurred.  Jefferson Dep. I at 129-30.

Later in the evening of November 19, 2019, Jefferson wrote an email to Fowler, copying Durham, Roaden, and Ratcliff, which indicated that she had spoken to Bell, who had concerns about what was reported, and that she wished to debrief with them on Monday, November 27, at Oakhurst.  Pl.'s Resp. to Defs.' SUMF ¶ 72; Email from Nicole Jefferson to Marcia Fowler (Nov. 19, 2017) ("Jefferson Email") [Doc. 113 at 220].  Specifically, Jefferson wrote, "At this point, the case has been accepted for investigation however DFCS has some alarming concerns about what was reported and how we need to take precaution as a school team with our interactions and conversations with the family if they continue to claim MK status and attend City Schools of Decatur."  Jefferson Email.

Additionally, over the Thanksgiving break, Dickerson reached out to Thomas about Jane Doe to offer support and services during the week that the children were out of school.  Dickerson Dep. at 52, 57-58.

**F.     Discussions Following the Thanksgiving Break**

Thomas did not return Jane Doe or her sister to Oakhurst following the Thanksgiving break on Monday, November 27, 2017.  Pl.'s Resp. to Defs.' SUMF ¶ 79.  That same day, Vice Principal Jean-Jacques Credi ("Credi") instructed

Albright that if John Doe "asked to go to the bathroom, to make sure that somebody's going with him, not just in the hallway, but, like, actually at the bathroom door and that, if she needed somebody to do that, to call." Dep. Tr. of Jean-Jacques Credi (Feb. 10, 2022) ("Credi Dep.") at 24. Meanwhile, in a meeting that same day, Jefferson informed Fowler and others that the Thomas family had a "history of making accusations to school districts about sexual assault." Fowler Dep. at 187-188; Jefferson Dep. I at 150. Ratcliff testified that, as a result of the meeting, he had an understanding that both he and Jefferson were tasked with following up with DFCS and John and Jane Doe, respectively. Ratcliff Dep. at 119.

That week, Jefferson followed up with the DFCS case worker assigned to her report on Jane Doe, Chandranique Bronson ("Bronson"), but Bronson reported that she did not have any updates regarding the investigation because she had yet to successfully contact Thomas. Pl.'s Resp. to Defs.' SUMF ¶¶ 82-85. Ratcliff also contacted DFCS regarding the report made for John Doe and learned that the report was "screened out" (i.e., "not taken on as a case"). Id. ¶ 90; Ratcliff Dep. at 96.

For the first three days after the Thanksgiving break, Thomas called Oakhurst once a day leaving messages with the school receptionist. Defs.' Resp.

to Pl.'s SAMF ¶¶ 19-20.  Thomas testified that after the first three days following the break, she called the school multiple times per day leaving messages with the receptionist but did not hear back from Fowler.  Thomas Dep. I at 84-85.  On November 28, 2017, Fowler either returned or received a call from John Doe's father, who was also concerned about not hearing anything from Oakhurst or DFCS, and Fowler informed him that DFCS would follow up with him and that she had no additional information to report, but would inform Roaden that he had not heard from DFCS.  Fowler Dep. at 247, 249.

Thomas reported to Dickerson that she was unwilling to bring her children back to Oakhurst because of the environment and insisted that they be transferred to another school.  Thomas Dep. I at 84-85; Dickerson Dep. at 64-67.  This generated conversations within CSD about potentially withdrawing the children due to lack of attendance, and Jefferson and Ratcliff were instructed to meet with Thomas at her residence.[15]  Dickerson Dep. at 66-68.  Jefferson and Ratcliff went to Thomas's home on or around December 7, 2017, but she did not answer the door; Thomas testified that she "couldn't see anyone out of the peephole" but when

---

[15] Fowler averred that it was a "standard practice" for CSD to contact parents when a student had multiple days of unexcused absences, and that attempts were made to reach Thomas by phone prior to the visit by Ratcliff and Jefferson.  Fowler Decl. ¶¶ 22-23.

she opened the door, she saw a letter was left stating that she would have charges filed against her with DFCS if she did not bring her kids to school, although Ratcliff could not remember whether such a letter was left. Pl.'s Resp. to Defs.' SUMF ¶ 94; Thomas Dep. I at 85-86; Ratcliff Dep. at 123-24.

### G.    The Report of John Doe's Father

On December 5, 2017, John Doe's father reported to Credi that John Doe was afraid to use the boys' restroom because two older boys pulled down his pants and told him he had a vagina. Pl.'s Resp. to Defs.' SUMF ¶ 87. John Doe reported he had then begun using the girls' restroom, where a girl grabbed the crotch of his pants. Id. John Doe's father asked Credi to increase efforts to chaperone John Doe to the restroom and again stated that he had heard nothing from DFCS. Id. In response to John Doe's father's report, Fowler and Credi reiterated that an adult must always accompany John Doe from his classroom to the restroom. Id. ¶ 88. No additional report was made to DFCS regarding John Doe's father's report. Id. ¶ 89.

## H.     Thomas's Meeting in Fowler's Office on December 8, 2017

On December 8, 2017, Thomas and Christa Smith, a community advocate brought by Thomas, met with Fowler, Credi, and Ratcliff in Fowler's office.[16] Pl.'s Resp. to Defs.' SUMF ¶ 97. During this meeting, Thomas again asked whether the school would discipline John Doe because of the allegation or remove him from Jane Doe's classroom. Id. ¶ 98. Thomas also requested to transfer Jane Doe and her sister to another elementary school. Id. ¶ 101. It was then agreed that Jane Doe would be moved to another classroom.[17] Id. ¶ 100. This classroom contained a private bathroom where only one person could use it at a time. Id.; Fowler Decl. ¶ 26; Credi Dep. at 68; Thomas Dep. I at 117. After the December 8 meeting, Thomas returned Jane Doe and Jane Doe's older sister to Oakhurst

---

[16] The parties dispute who took the lead in having the meeting scheduled. Thomas asserts that she called Fowler the same day Ratcliff left the notice on her door, asked to speak to Fowler, and told the receptionist she would "call the news" if Fowler did not return her call, and that Fowler then called back to say she was open to having a meeting. Thomas Dep. I at 86, 89. Fowler denied receiving any messages that Thomas was attempting to call her and would have followed up if Thomas had done so. Fowler Dep. at 205-06, 210. Given that all parties agree that the meeting was scheduled, the Court does not find that this to be a dispute of any material fact.

[17] Fowler avers that she explained to Thomas that she could not discuss John Doe's disciplinary status but offered to move Jane Doe to a different classroom. Fowler Decl. ¶¶ 25-26. Thomas testified that she was the one who advocated for the move of Jane Doe to another classroom. Thomas Dep. I at 116.

pending a potential school transfer.  Pl.'s Resp. to Defs.' SUMF ¶ 103.  There was

no reported contact between Jane Doe and John Doe after Jane Doe's return to

Oakhurst on December 8, 2017.[18]  Id. ¶ 104.  Thomas testified that Jane Doe

enjoyed being in the new classroom, and that Jane Doe experienced no additional

issues with the bathrooms or anyone entering while she was inside.  Thomas Dep. I

at 135.

I.      **The Closure of the DFCS Investigation**

Sometime in December, Jefferson spoke with Bronson about the status of

the DFCS investigation and was informed that a forensic interview was going to be

scheduled and that Bronson would be meeting with Thomas.  Pl.'s Resp. to Defs.'

SUMF ¶ 105.  Jefferson attempted to follow-up with Bronson again but received

no response.  Id. ¶ 106.  Thomas testified that a female DFCS worker (later

determined to be Bronson) came to her home after Christmas in December 2017,

and told her that the school had named Thomas as the person responsible for the

Incident.  Thomas Dep. I at 136.  Additionally, Thomas testified that the DFCS

_____

[18] Thomas argues that it cannot be contended that Jane Doe had no further contact
with John Doe because there was no way to know "absent monitoring Jane Doe's
movement every minute during the school day[.]"  Pl.'s Resp. to Defs.' SUMF
¶ 104.  However, there is no evidence offered by Thomas that Jane Doe told her of
any contact she had with John Doe after the Incident or that anyone else observed
such contact.

worker had no knowledge of John Doe's involvement and stated that she would be

closing the case against Thomas.  Id. at 137-138.  In January of 2018, Thomas

received notification that Jane Doe's DFCS case was closed as unsubstantiated, but

Jefferson did not receive any such notice and there is no indication in the record

that anyone at CSD received notice of the closure of the DFCS investigation.  Pl.'s

Resp. to Defs.' SUMF ¶¶ 110-11.

### J.   Transfer to Winona Park, Forensic Interview, and Conclusion of School Investigation

Roaden approved Thomas's request to move Jane Doe and her older sister to

Winnona Park Elementary School ("Winnona Park"), and Jane Doe began

attending Winnona Park on January 4, 2018.  Pl.'s Resp. to Defs.' SUMF ¶ 107;

Thomas Dep. I at 145-46 (confirming that her transfer request for her children was

granted).

On January 23, 2018, Dr. Julie Medlin ("Medlin") conducted a forensic

interview and evaluation of Jane Doe.  Id. ¶ 112.  The resulting report was

provided to Thomas, but CSD did not receive a copy of this report until Thomas

initiated this litigation.  Id. ¶ 113; Dep. Tr. of Julie Medlin (Mar. 31, 2022)

("Medlin Dep.") [Doc. 120] at 52-53, 97 (noting that she was not asked to release

the evaluation to the school).  Medlin's report concluded that Jane Doe's

"statements and nonverbal behavior in the current interview are consistent with

sexual abuse, as are her test results suggesting heightened sexual concerns." Forensic Sexual Trauma Eval. [Doc. 120 at 221-230] at 230.

A "Safety Update" signed by Fowler was released on February 2, 2018, stating "[a]lthough an incident was alleged, a thorough investigation involving Oakhurst administrators, central office staff, law enforcement, and social services agencies led us to confidently determine that the allegation was unfounded." Feb. 2, 2018, Safety Update [Doc. 110 at 294]. Prior to the release of the Safety Update, Dude was informed by Roaden that the investigation of the Incident was completed with the conclusion that the Incident did not occur. Dude Dep. at 88, 147-149.[19] Dude was not aware of any corrective action taken. Id. at 89.

Jane Doe's grades at Winnona Park were generally higher than those at Oakhurst, and her last day enrolled at Winnona Park and in CSD was December 21, 2018. Pl.'s Resp. to Defs.' SUMF ¶¶ 114-115.

### K.   OCR Findings

On May 23, 2018, Thomas filed a complaint on behalf of Jane Doe with the Department of Education's Office of Civil Rights ("OCR") alleging violations of

---

[19] There is no written report of the investigation provided by either party, and Dude testified that he did not expect a written report by Roaden regarding the investigation. Dude Dep. at 34-35.

Title IX.  Second Am. Compl. [Doc. 53] ¶ 123.  According to the OCR Report

issued on June 19, 2020, OCR investigators were tasked with determining whether

CSD "failed to provide a prompt and equitable response to a report" of sexual

assault.  OCR Report [Doc. 110 at 436-449] at 2.  OCR concluded that CSD

violated Title IX because, even though it "immediately started to respond to

[Thomas's] Report," it "took no further steps to determine what occurred" and

"never communicated to the parties the outcome of any investigation" into

Thomas's Report.  Id. at 12.  OCR determined that CSD "failed to complete an

investigation" concerning Thomas's Report and never took steps to investigate the

existence of harassment involving John Doe.  Id.  According to OCR, "[CSD]

reassigned [Jane Doe] to a different kindergarten classroom and ultimately granted

[Thomas's] request to transfer [Jane Doe] to another school."  Id.  However, even

though CSD "provide[d] some interim measures to [Jane Doe], with equitable

consideration for [John Doe]," it did not "assess whether there was any need for

interim measures beyond those [Thomas] requested."  Id.  The OCR Report noted

that CSD signed an agreement to resolve their noncompliance with Title IX, and

create a process to respond to complaints that are referred to outside entities like

DFCS or the police.  Id. at 13.  Additionally, CSD agreed to recordkeeping

requirements, as well as directing CSD to refer all sex discrimination complaints to the Title IX Coordinator who then will coordinate the compliance efforts.  Id.

## II.     PROCEDURAL BACKGROUND

On May 29, 2020, Thomas filed her initial Complaint [Doc. 1] that was thereafter amended on August 14, 2020, asserting the following three causes of action: deliberate indifference under Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681-1688 (Count I), a retaliation claim under Title IX (Count II), and a claim under 42 U.S.C. § 1983 for violation of Jane Doe's rights under the Equal Protection Clause (Count III).  First Am. Compl. ¶¶ 148-186.  On March 18, 2021, this Court entered an Order partially granting Defendants' Motion to Dismiss as to Count II and as to Count III against CSD and Dude and Fowler in their official capacities.  Mar. 18, 2023, Order [Doc. 36].

On October 7, 2021, the Court granted Thomas' Motion to Amend to add a cause of action against CSD for race discrimination in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq. (revised Count II), and a cause of action against Dude and Fowler for a violation of a right to be free from race discrimination under 42 U.S.C. § 1983 (Count IV).  Oct. 7. 2021, Order [Doc. 52]; Second Am. Compl.

## III.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence demonstrating a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.  Celotex, 477 U.S. at 324.  In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party.  Anderson, 477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th

Cir. 1999).  A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles.  Anderson, 477 U.S. at 248.  A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  Id.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita, 475 475 U.S. at 587.

## IV.   DISCUSSION

Defendants move for summary judgment on all claims brought against them. Specifically, CSD moves for summary judgment on Counts I and II, and Dude and Fowler move for summary judgment on Counts III and IV.  Defs.' Br. in Supp. of Mot. to Dismiss ("Defs.' Br.") [Doc. 106-29] at 8-39.

### A.   The Title IX Claim (Count I) Against CSD Fails Because Thomas Cannot Establish Deliberate Indifference.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20

U.S.C. § 1681(a).[20]  The Supreme Court has found an implied private right of action for individuals to enforce the mandates of Title IX through money damages actions.  Franklin v. Gwinnett Cnty. Pub. Sch., 503 U.S. 60, 76 (1992); Cannon v. Univ. of Chi., 441 U.S. 677, 717 (1979).

In Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 633 (1999), the Supreme Court considered "whether a private damages action may lie against the school board in cases of student-on-student harassment," and concluded that "it may, but only where the [Title IX] funding recipient acts with deliberate indifference to known acts of harassment in its programs and activities."  The Supreme Court further concluded "that such an action will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."  Id.

In Hill v. Cundiff, 797 F.3d 948 (11th Cir. 2015), the Eleventh Circuit clarified "the correct legal standard for student-on-student sexual harassment claims under Title IX," which is that "a Title IX plaintiff must prove the funding recipient had actual knowledge [as opposed to 'substantial knowledge'] that the

---

[20] There is no dispute that CSD receives Federal financial assistance and is subject to Title IX.  Second Am. Compl. ¶¶ 133; Answer to Second Am. Compl. [Doc. 54] ¶ 133.

25

student-on-student sexual harassment was severe, pervasive, and objectively offensive." Id. at 969.  The Eleventh Circuit then held that five separate elements must be proven in order to obtain a recovery: (1) the defendant must be a Title IX funding recipient; (2) an appropriate person must have actual knowledge of the alleged discrimination or harassment; (3) the discrimination or harassment must be severe, pervasive, and objectively offensive; (4) the defendant acted with deliberate indifference to known acts of discrimination or harassment in its programs or activities; and (5) the discrimination or harassment effectively bars the victim's access to an educational opportunity or benefit.  Id. at 970.

Defendants contend that Thomas's Title IX claim fails as a matter of law for the failure to establish elements (3), (4), and (5).  Defs.' Br. at 10.  But if no reasonable jury could find that the defendants acted with deliberate indifference in response to acts of discrimination or harassment against the plaintiff, the Court can resolve the Title IX claim "based solely on the failure to show deliberate indifference, without reaching the claim's other elements."  Adams v. Demopolis City Sch., No. 22-11317, 2023 WL 5659895, at *6 (11th Cir. Sept. 1, 2023).

Defendants contend that Thomas cannot establish that CSD's actions (or inactions) rose to the level of deliberate indifference based upon CSD's activity in response to Thomas's report of the Incident.  Defs.' Br. at 10-19.  Thomas asserts

that a jury could reasonably conclude that CSD was deliberately indifferent because there are genuine issues of material fact regarding CSD's failure to conduct a documented investigation, CSD's failure to respond to her numerous inquiries as to the status of the investigation and remedial actions, CSD employees' actions prior to the completion of any investigation, and the findings of the OCR report that CSD failed to comply with its Title IX requirements. Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Resp.") [Doc. 127] at 20-31.

Deliberate indifference is an exacting standard, and "[a] Title IX funding recipient is deliberately indifferent 'only where the recipient's response is clearly unreasonable in light of the known circumstances.'" Garrett v. Univ. of S. Fla. Bd. of Trs., 824 F. App'x 959, 964 (11th Cir. 2020) (quoting Davis v. Carter, 555 F.3d 979, 983 (11th Cir. 2009)). "To act with deliberate indifference, a state actor must know of and disregard an excessive—that is, an extremely great—risk to the victim's health or safety." L.S. ex rel. Hernandez v. Peterson, 982 F.3d 1323, 1330 (11th Cir. 2020). Courts can "identify a response as not 'clearly unreasonable' as a matter of law." Davis, 526 U.S. at 649.

> A school district is not deliberately indifferent simply because the measures it takes to stop the harassment or discrimination ultimately are ineffective. See Sauls v. Pierce Cnty. Sch. Dist., 399 F.3d 1279, 1285 (11th Cir. 2005); see also Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 456 n.12 (5th Cir. 1994) (en banc) (explaining that a school official may not be deliberately indifferent where it "warn[s] the state actor,

27

> notif[ies] the student's parents, or remov[es] the student from the
> teacher's class" even if those responses are ineffective).  Rather, to rise
> to the level of deliberate indifference, the response to the harassment or
> discrimination must amount to "an official decision . . . not to remedy
> the violation."  Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274,
> 290, 118 S. Ct. 1989, 141 L.Ed.2d 277 (1998); accord Doe v. Sch. Bd.
> of Broward Cnty., 604 F.3d 1248, 1259 (11th Cir. 2010).

Adams, 2023 WL 5659895 at *7.

The Eleventh Circuit also has stated that "[t]he standard for student-on-student sexual harassment claims is far more rigorous than a claim for teacher-on-student harassment."  Id. at 968 (citing Davis, 526 U.S. at 650-53).

> The [Supreme] Court imposed this high standard to guard against the
> imposition of "sweeping liability."  Davis, 526 U.S. at 652.  Unlike an
> adult workplace, children "may regularly interact in a manner that
> would be unacceptable among adults."  Id. at 651.  Due to their
> immaturity, children at various ages will invariably engage in some
> forms of teasing, shoving, and name-calling that "target differences in
> gender."  Id. at 651-52.  Some risk of sexual harassment is inherent to
> the enterprise of public education, in particular, because public schools
> must educate even the most troublesome and defiant students.

Hill, 797 F.3d at 969.

Thomas contends that there is a genuine issue of material fact as to whether there was an actual investigation of the Incident.  Pl.'s Resp. at 24-26.  But the undisputed evidence, with all reasonable inferences drawn in Thomas's favor, belie her argument.  The undisputed evidence shows that, on the same day that Thomas reported the Incident to Durham and Deming: (1) Durham and Deming notified

Fowler about the report of the Incident; (2) Fowler informed Roaden of the allegations; (3) Officer Damico and the CSD social workers were contacted to report the Incident; (4) Damico collected statements from Oakhurst personnel; (5) Fowler interviewed Jane Doe's teacher and paraprofessional to determine when the assault could have occurred and if they noticed any unusual behavior from either Jane or John Doe; (6) Fowler instructed them to ensure that both Jane Doe and John Doe were supervised when going to the bathroom; (7) Fowler discussed with the CSD social workers what steps should be taken with respect to John Doe; (8) the CSD school social workers filed reports to refer the matter, which involved an allegation of sexual abuse, to DFCS to secure support and services for both students; (9) CSD staff encouraged Thomas to take Jane Doe to the hospital for an evaluation; and (10) Roaden conducted interviews of CSD staff after students left for the day. CSD was informed thereafter that DFCS had opened an investigation into the Incident, and Dickerson reached out to Thomas over the Thanksgiving break to offer support and services for her children.

There is no evidence of further contact between Jane and John Doe following Thomas's report of the Incident. In fact, after the report of the Incident, Thomas kept Jane Doe out of school until after the meeting with Fowler on December 8, 2017, in which it was agreed that Jane Doe would be moved to

29

another classroom with a private bathroom accessible only by the students in that classroom. Thomas's request to move Jane Doe and her sister to Winnona Park was approved by Roaden, and Jane Doe began attended Winnona Park on January 4, 2018.

Thus, the undisputed evidence shows that CSD conducted an immediate investigation into Thomas's allegations and affirmatively took steps to ensure that Jane Doe would be protected from any contact by John Doe. In Davis v. DeKalb Sch. Dist., 233 F.3d 1367 (11th Cir. 2000), the Eleventh Circuit held that there was no deliberate indifference when, after learning of allegations of improper touching against a teacher, the principal directed a counselor and social worker to investigate, the interviews of alleged witnesses did not substantiate the allegations, the principal met with the teacher and student's guardian to discuss the allegations, and the principal offered the student the option to transfer to a different school, which the guardian rejected. 233 F.3d at 1373-74. The plaintiffs in Davis argued that the principal's failure to take written statements or record meetings as required by district policy amounted to deliberate indifference. Id. at 1374-75. But the Eleventh Circuit disagreed because the principal commissioned an investigation, instituted corrective measures despite concluding that nothing improper or sexual happened, and followed up afterward with the student throughout the year. Id. at

30

1374 ("There is simply no reasonable basis to believe that the failure to obtain

written statements or to record the meetings led to a failure to uncover relevant

evidence or caused the investigation to be any less thorough."). Although these

measures were ultimately unsuccessful in preventing future discrimination by the

teacher against different students, the Eleventh Circuit still ruled that the district

court properly granted summary judgment on the issue of deliberate indifference.

Id. at 1375; see also Garrett, 824 F. App'x at 965 ("In cases where this Court has

found potential Title IX liability for student on student harassment, the school

responded to a report of sexual assault by effectively doing nothing."). In this

case, no reasonable jury could conclude that CSD effectively "did nothing."

While Thomas may take issue with the thoroughness of the investigation

based on who was (or was not) interviewed, whether (in her view) she was

adequately informed of the investigation, and whether any written records were

kept, CSD's chosen investigative measures do not rise to the level of deliberate

indifference to Thomas's report of the sexual harassment. See Garrett, 824 F.

App'x at 964-65 (citation omitted) ("Title IX does not grant a victim of student-on-

student harassment the right to choose a school's remedial measures."). In Garrett,

a university was not deliberately indifferent when it began an investigation within

a day, had additional meetings with both the victim and complainant, and

conducted a two-month investigation prior to discussing sanctions. Here, within a day, multiple CSD staff were assembled and interviewed to establish a potential timeline of events, determine next steps, and to institute measures to protect Jane Doe from further contact with John Doe. The police and DFCS were notified, and a change in classroom was provided before Jane Doe returned to school following Thanksgiving break.[21]

Thomas argues that she raises factual disputes of whether Defendants responded appropriately to the allegation of sexual harassment. Pl.'s Resp. at 25-27. However, none of these factual disputes are material to whether there was deliberate indifference. Much of Thomas's dissatisfaction stems from her contention that her phone calls to Fowler were not returned and she was not kept apprised of actions taken by CSD. Even if CSD personnel were negligent in not

---

[21] Though CSD chose not to interview either student involved in the allegations, the "perfect investigation" is not what is required under the deliberate indifference inquiry. See Doe, 604 F.3d at 1259 (noting that, "[e]ven though the investigator arguably should have interviewed other witnesses, . . . this omission cannot be said to represent a decision by the School Board effectively not to remedy the violation.") (internal quotations omitted). Moreover, given the allegation of sexual assault involving two five-year-olds, the referral by CSD to DFCS for further investigation to include interviews with the children does not constitute deliberate indifference.

responding to phone messages left by Thomas after the Incident was reported, any such negligence would not approach the standard of deliberate indifference.

The failure of Thomas to offer sufficient evidence for which a reasonable jury could find that CSD was deliberately indifferent to the alleged harassment suffered by Jane Doe is evident from a consideration of the Eleventh Circuit's decision in Hill, which involved the rape of a 14-year-old girl by a 15-year-old boy when both were in the eighth grade. Prior to the rape, the boy "had accumulated a history of violence and sexual misconduct" and "propositioned female students to have sex with him in the school bathrooms." Id. at 959-60. The school then used the plaintiff as "bait" in a "sting operation" against the perpetrator. Id. at 961-62. The Hill Court indicated that a single-incident of harassment unlikely would be classified as sufficiently severe to deny access to education, but that Hill was "a unique case because the administrators effectively participated in [the plaintiff's] sexual harassment by setting [the perpetrator] up in a rape-bait scheme involving [the plaintiff] in order to 'catch him in the act,'" and that such facts "differ[ed] markedly from the 'rarely actionable, theoretical single incident mentioned in Davis.'" Id. at 972-73 (quoting Williams v. Bd. of Regents of the Univ. Sys. of Ga., 477 F.3d 1282, 1298 (11th Cir. 2007)). The Hill Court ruled that a Title IX plaintiff must present evidence from which a reasonable jury could conclude "the

33

Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination." Hill, 797 F.3d at 973. The Eleventh Circuit then found that there was a genuine dispute of material fact as to whether the school's deliberate indifference subjected the plaintiff to further discrimination, which precluded summary judgment. Id. at 973-76.

Unlike in Hill, there is no evidence offered by Thomas that CSD was previously aware of any history of inappropriate sexual behavior with respect to John Doe or that CSD had actual knowledge of or participated in the alleged Incident. The day of Thomas's complaint to the school, Fowler instructed Jane Doe's teachers to implement a restroom policy preventing John Doe from going to the bathroom unsupervised. Upon her return to school, Jane Doe was moved into a different classroom, with its own accessible bathroom, and then transferred to a different school in January. There were no reported additional interactions with John Doe after the Incident, nor any issues with Jane Doe having any other student go into the bathroom when she was using it. From the moment that the Incident was related by Thomas to CSD, until Jane Doe left CSD, there were no reported instances of additional sexual harassment involving Jane Doe. Thus, there is no evidence of further discrimination as required for a finding of deliberate indifference.

34

Thomas also argues that the finding in the OCR Report that CSD did not comply with its Title IX requirements creates a genuine issue of material fact with respect to whether CSD was deliberately indifferent. However, the mere "failure to comply with the [Title IX] regulations," does not alone "establish the requisite actual notice and deliberate indifference[]" needed for Thomas to prevail. Gebser, 524 U.S. at 291-92. Thomas has not cited any case in which a finding of deliberate indifference was made based on the findings contained in an OCR Report. Instead, Thomas contends that the OCR Report is further evidence of a "failure to respond reasonably to an allegation of sexual harassment." Pl.'s Resp. at 29-30. But there is undisputed evidence in the record that CSD staff were interviewed about the Incident, an investigation was conducted, and a determination was made that the sexual assault did not occur. Additionally, CSD staff reported the Incident to DFCS, which conducted and subsequently closed its own investigation. "[E]ven if in hindsight something more effective could have been done," an ineffective attempt to curb the behavior does not amount to deliberate indifference. Adams, 2023 WL 5659895, at *7. And unlike Adams, the behavior in this case did not persist after CSD was notified about the Incident.

Consequently, because Thomas has failed cite to evidence by which a reasonable jury could find that CSD acted with deliberate indifference in response

to any known acts of discrimination or harassment with respect to Jane Doe,

Defendants are entitled to summary judgment as to Thomas's Title IX claim in

Count I of the Second Amended Complaint.  Because of the failure of Thomas to

establish deliberate indifference as a matter of law, the Court need not discuss

whether Thomas satisfies the other elements necessary to establish a claim under

Title IX.  See Adams, 2023 WL 5659895, at *8 ("Because we resolve the

Adamses' Title IX claim on the deliberate indifference element, we do not reach

the other elements.").

**B.     Thomas Fails to Establish a Claim Under Title VI (Count II).**

In Count II of the Second Amended Complaint, Thomas seeks relief for

race-based discrimination under Title VI based on her allegation that "Jane Doe,

the daughter of a low-income African-American single mother, was treated less

favorably than was her male classmate, John Doe, the son of middle-class

Caucasian parents[.]"  Second Am. Compl. ¶ 151.  Thomas contends that the

disparate treatment of Jane Doe resulted in the same actions taken by CSD that

supported her alleged Title IX violation against CSD.  Id. ¶¶ 150-151, 160.

Thomas also asserts that there is a history of racial disparity of Black parents and

children in CSD.  Id. ¶¶ 154-156.

In their motion for summary judgment, Defendants contend that Thomas has failed to produce evidence of intentional discrimination by CSD against Jane Doe, who is Black, based on the fact that John Doe, who also is Black, has White parents.  Defs.' Br. at 30-31.  Defendants also assert that Thomas has failed to demonstrate that Jane Doe was similarly situated to someone in an unprotected class and was treated differently because of her race.  Id. at 31-35.  In response, Thomas insists that she has produced evidence of discriminatory intent through a report documenting disparity in educational opportunities for middle and high school students in CSD between 2015-18 and because there is evidence that Thomas's calls to CSD staff went unanswered, while, at the same time, calls from John Doe's father were responded to.  Pl's Resp. at 38-39.  Thomas also cites to Jefferson's statement to Bell that one "should be careful about believing" families that are homeless.  Id. at 40-41.

Under Title VI, "[n]o person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  42 U.S.C. § 2000d.  Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1.

To state a Title VI claim, a plaintiff must establish discriminatory intent.

Burton v. City of Belle Glade, 178 F.3d 1175, 1202 (11th Cir. 1999); see also

Elston v. Talledega Bd. of Educ., 997 F.2d 1394, 1405 n.11 (11th Cir. 1993)

(citing Alexander v. Choate, 469 U.S. 287, 293 (1985)) (recognizing that "Title VI

itself provides no more protection than the equal protection clause—both

provisions bar only intentional discrimination."). "Discriminatory intent may be

established by evidence of such factors as substantial disparate impact, a history of

discriminatory official actions, procedural and substantive departures from the

norms generally followed by the decision-maker, and discriminatory statements in

the legislative or administrative history of the decision." Id., 997 F.2d at 1406

(11th Cir. 1993) (citing Village of Arlington Heights v. Metropolitan Hous. Dev.

Corp., 429 U.S. 252, 265 (1977)).

In Adams, decided just weeks ago, the Eleventh Circuit joined other circuits

"in holding that to prevail on a Title VI claim for student-on-student race based

harassment, a plaintiff must prove that the defendants were deliberately indifferent

to the harassment." Adams, 2023 WL 5659895, at *9.

> The statutes operate in the same manner—"conditioning an offer of
> federal funds on a promise by the recipient not to discriminate." As a
> result, just like a school district engages in intentional discrimination
> and is liable under Title IX when it is "deliberately indifferent to known
> acts of student-on-student sexual harassment," a school district engages
> in intentional discrimination and is liable under Title VI when it is

> deliberately indifferent to known acts of student-on-student racial
> harassment.

Id. (citations omitted).  Because the plaintiffs in Adams failed to submit evidence

that the defendants acted with deliberate indifference under Title IX, the Title VI

claim also failed "because the record does not support that the defendants acted

even with deliberate indifference" and accordingly "no reasonable jury could

conclude that the defendants' actions amounted to intentional discrimination[.]"

Id.

Similarly, because there is no evidence in this case that CSD acted with

deliberate indifference in their response to the sexual assault allegation, Thomas's

Title VI claim fails in accordance with the precedent established by Adams.

However, out of an abundance of caution, and because Thomas's Title VI claim

involves actions taken by CSD towards Jane Doe rather than arising from student-

on-student racial discrimination as in Adams, the Court will consider Thomas's

arguments.

### 1.   John Doe is not a similarly situated comparator, and John Doe's father received similar treatment as Thomas.

Thomas argues that Jane Doe was treated differently than John Doe because

she had a Black parent rather than a White parent.  Pl.'s Resp. at 39.  However,

Jane Doe and John Doe were not similarly situated.  John Doe was a student

accused of sexual harassment, and that fact alone precludes any argument that he was similarly situated to Jane Doe.  See Carr v. Bd. of Regents of Univ. Sys. of Ga., 249 F. App'x 146, 149-50 (11th Cir. 2007) (concluding that the plaintiff failed to present a genuine issue of material fact that the defendant treated the plaintiff differently because of race in violation of Title VI where the White student comparators were not similarly situated to the Black plaintiff).  Additionally, to the extent that Thomas argues that John Doe and Jane Doe are similarly situated because they both made reports of being sexually assaulted in the bathroom, John Doe's report was made *after* he had been accused by Jane Doe of being the perpetrator.[22]

No evidence has been presented that Jane Doe and John Doe were treated differently after their parents reported the assaults against them.  Both allegations of assault in the bathroom resulted in additional bathroom monitoring and referrals to DFCS.  Although John Doe's father was alerted to the DFCS referral when he arrived at Oakhurst, Thomas was also made aware of DFCS's involvement the day

---

[22] John Doe was adopted by a White family and any resources provided to John Doe's parents, such as books about raising a child of a different race, are not indicative of any similarity between John Doe and Jane Doe.  Jefferson Dep. I at 58-59 (describing resources she suggested to John Doe's parents when they requested recommendations).

the Incident was reported because she was interviewed at the hospital by a DFCS

worker.  Because Jane Doe and John Doe are not similarly situated comparators,

Thomas has failed to present evidence which would establish a Title VI violation.[23]

> **2.  The history of racial disparity and Jefferson's comments do not create a genuine dispute of material fact regarding discriminatory intent or impact.**

Thomas argues that she has raised a genuine issue of material fact regarding

disparate impact based on a report documenting disparity in "educational and

discipline outcomes" among middle and high schoolers in CSD from 2015 to 2018.

Pl.'s Resp. at 39.  But this case arises from an alleged sexual assault committed by

an elementary school student, and there is nothing in the record about any negative

academic outcomes or discipline imposed based upon race at the elementary school

level.  Moreover, Thomas fails to show how an alleged history of racial

disproportionality in disciplinary and academic outcomes in middle and high

---

[23] Thomas argues that CSD departed from established norms in response to the Incident, Pl.'s Resp. at 40-41, but her argument fails because (1) Thomas has not identified the norms that were deviated from; and (2) her rehashed arguments regarding CSD's failure to abide by Title IX requirements, as proscribed by the OCR Report, and that DFCS reporting differed between John and Jane Doe based on the race of their parents, have been considered and rejected by the Court, as discussed above.

schools relate in any way to the response to the reporting of an alleged sexual assault by a five-year-old in Kindergarten.

Finally, Thomas argues that Jefferson's statement to Bell about the lack of credibility of homeless families is evidence of discriminatory intent that somehow calls into question CSD's response to the Incident.  First, the comment about homeless families not being believed because they are looking for a financial payout did not make reference to a particular race.  Text Messages Between Ben Bell and Nicole Jefferson at 2; Jefferson Dep. I at 140; Jefferson Dep. II at 57-58. Second, her statement cannot be imputed to all other CSD personnel because Roaden was the administrator who was directing the investigation and had the decision-making authority.  See Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, 980 F.3d 821, 836 (11th Cir. 2020) ("[W]e won't impute the discriminatory intent of one or a few decisionmakers to the entire group—let alone, as here, of a subordinate *non*-decisionmaker to the final decisionmakers."). (emphasis in original).  Thus, Jefferson's statement alone, even if it could be perceived to have a racially discriminatory component, is insufficient to attribute discriminatory intent to CSD in its response to the Incident.

Accordingly, because there is no genuine dispute of material fact as to whether CSD violated Title VI, Thomas's claim in Count II fails, entitling Defendants to summary judgment as to that count.

### C.   Dude and Fowler are Entitled to Summary Judgment on Counts III and IV Based on Qualified Immunity.

Defendants contend that because both Dude and Fowler were engaged in discretionary activity when responding to Thomas's report of the Incident and Thomas has failed to show that qualified immunity should not apply in this case, they are entitled to summary judgment on Counts III and IV.  Defs.' Br. at 36-39. In response, Thomas asserts that Defendants have not met their burden to show that the actions they performed were in the scope of their duties and, even if that burden was met, there are genuine issues of material fact as to whether they violated clearly established rights.  Pl.'s Resp. at 42-46.

"It is well established that [42 U.S.C. §] 1983 itself creates no substantive rights; it merely provides a remedy for deprivations of federal rights established elsewhere." Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir. 1987) (citing City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985)).  To sustain a cause of action based on § 1983, a litigant must establish two elements: (1) that she suffered a deprivation of a right, privilege, or immunity protected by the U.S. Constitution or federal law, and (2) that the act or omission causing the

deprivation was committed by a person acting under color of state law. Livadas v. Bradshaw, 512 U.S. 107, 132 (1994); Arrington v. Cobb Cnty., 139 F.3d 865, 872 (11th Cir. 1998). "[S]ection 1983 imposes liability only 'for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.'" Wideman, 826 F.2d at 1032 (quoting Baker v. McCollan, 443 U.S. 137, 146 (1979)). Accordingly, "[i]n any § 1983 action, a court must determine 'whether the Plaintiff has been deprived of a right secured by the Constitution and laws of the United States.'" Glenn v. Brumby, 663 F.3d 1312, 1315 (11th Cir. 2011) (quoting Baker, 443 U.S. at 146). "Absent the existence of an underlying constitutional right, no section 1983 claim will lie." Wideman, 826 F.2d at 1032.

To avoid individual liability in a claim under § 1983, school officials may invoke the defense of qualified immunity, which "offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sherrod v. John Doeson, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To claim qualified immunity, a defendant must first show he or she was performing a discretionary function. Moreno v. Turner, 572 F. App'x 852, 855

(11th Cir. 2014) (citing <u>Whittier v. Kobayashi</u>, 581 F.3d 1304, 1308 (11th Cir.

2009)).

> Instead of focusing on whether the acts in question involved the
> exercise of actual discretion, we assess whether they are of a type that
> fell within the employee's job responsibilities.  Our inquiry is two-fold.
> We ask whether the government employee was (a) performing a
> legitimate job-related function (that is, pursuing a job-related goal),
> (b) through means that were within his power to utilize.

<u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265-66 (11th Cir. 2004)

(citation omitted).

"Once discretionary authority is established, the burden then shifts to the

plaintiff to show that qualified immunity should not apply."  <u>Edwards v. Shanley</u>,

666 F.3d 1289, 1294 (11th Cir. 2012) (quoting <u>Lewis v. City of W. Palm Beach</u>,

561 F.3d 1288, 1291 (11th Cir. 2009)).  A plaintiff demonstrates that qualified

immunity does not apply by showing: "(1) the defendant violated a constitutional

right, and (2) the right was clearly established at the time of the alleged violation."

<u>Whittier</u>, 581 F.3d at 1308.

A constitutional right is clearly established "only if its contours are

'sufficiently clear that a reasonable official would understand what he is doing

violates that right.'"  <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1332 (11th Cir. 2003)

(quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).  "When we consider

whether the law clearly established the relevant conduct as a constitutional

violation at the time that [the government official] engaged in the challenged acts,

we look for 'fair warning' to officers that the conduct at issue violated a

constitutional right." Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citing

Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)). There are three

methods to show that the government official had fair warning:

> First, the plaintiffs may show that a materially similar case has already
> been decided. Second, the plaintiffs can point to a broader, clearly
> established principle that should control the novel facts of the situation.
> Finally, the conduct involved in the case may so obviously violate the
> constitution that prior case law is unnecessary. Under controlling law,
> the plaintiffs must carry their burden by looking to the law as
> interpreted at the time by the United States Supreme Court, the
> Eleventh Circuit, or the [relevant state supreme court].

Terrell v. Smith, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (quotation marks,

citations, and alterations omitted).

The first method "looks at the relevant case law at the time of the violation;

the right is clearly established if 'a concrete factual context [exists] so as to make it

obvious to a reasonable government actor that his actions violate federal law.'"

Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011) (alterations in

original) (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1333 (11th Cir. 2008)).

While the facts of the case need not be identical, "the unlawfulness of the conduct

must be apparent from pre-existing law." Coffin, 642 F.3d at 1013; see also

Gennusa v. Canova, 748 F.3d 1103, 1113 (11th Cir. 2014) (citation and internal

quotation marks omitted) ("We do not always require a case directly on point before concluding that the law is clearly established, but existing precedent must have placed the statutory or constitutional question beyond debate.").  "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (citation and internal quotation marks omitted).

The second and third methods, known as "obvious clarity" cases, exist when "case law is not needed" to demonstrate the unlawfulness of the conduct or where the existing case law is so obvious that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Vineyard, 311 F.3d at 1351.  Such cases are rare. See, e.g., Santamorena v. Ga. Military Coll., 147 F.3d 1337, 1340 n.6 (11th Cir. 1998) (noting that "these exceptional cases rarely arise").

### 1. Dude and Fowler were engaged in a discretionary function.

To be eligible for qualified immunity, Dude and Fowler must establish that they were "engaged in a 'discretionary function' when [they] performed the acts of which the plaintiff complains." Holloman, 370 F.3d at 1264 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In determining whether a defendant was engaged in a discretionary function for qualified immunity purposes, courts "look

47

to the general nature of the defendant's action, temporarily putting aside the fact

that it may have been committed for an unconstitutional purpose, in an

unconstitutional manner, to an unconstitutional extent, or under constitutionally

inappropriate circumstances." Id. at 1266.

Although initially apparently conceding that Dude and Fowler were

"officials with authority to take corrective measures in response to the student-on-

student sexual harassment in CSD and Oakhurst Elementary School," Second Am.

Compl. ¶ 136, Thomas now asserts that there is some dispute as to "whether they

were performing those duties within the scope of their authority" because of

certain actions Thomas alleges they did not take. Pl.'s Resp. at 37. But "the

proper scope of the inquiry is whether investigating and reporting sexual

harassment complaints," as well as supervising students and school personnel,

"generally fell within [Dude's and Fowler's] duties and authority." See C.C. ex

rel. Andrews v. Monroe Cnty. Bd. of Educ., 299 F. App'x 937, 940 (11th Cir.

2008) (reversing denial of qualified immunity to a principal where the district court

had found the principal failed to show he acted within the scope of his

discretionary authority). Thomas does not dispute that supervising students and

school personnel or investigating and reporting sexual harassment complaints fell

within Dude's and Fowler's duties and authority and, indeed, both of them have

demonstrated that they were engaged in discretionary functions when they performed the acts of which Thomas complains. Therefore, the burden shifts to Thomas to show that their conduct violated a constitutional right that was clearly established at the time of the alleged violation.

### 2. Thomas fails to meet her burden of showing a violation of a clearly established constitutional right.

The evidence that Thomas presents in an effort to show that Dude and Fowler discriminated against her based on her sex and race in violation of her right to equal protection is the issuance of the OCR Report, the failure of Fowler to accede to Thomas's demand that John Doe be removed from the classroom, and the misrepresentation to Oakhurst families that CSD had investigated the Incident and determined it did not happen. Pl.'s Resp. at 45-46. But Thomas has failed to present any Supreme Court or Eleventh Circuit precedent to show that Dude and Fowler's actions were clearly established constitutional violations. In fact, there is clearly established law stating otherwise. First, the OCR Report's conclusion that CSD employees failed to comply with Title IX does not establish deliberate indifference, as required for a Title IX or Title VI claim. Gebser, 524 U.S. at 291-92; see also A.P. v. Fayette Cnty. Sch. Dist., No. 21-12562, 2023 WL 4174070, at *11 (11th Cir. June 26, 2023) (noting that a student's "equal protection claim against the school district and principal—like her Title IX sex discrimination claim

49

against the school district—required a showing of deliberate indifference to her sexual assault report.") (internal quotations omitted).  Second, Thomas cannot bring a claim based on the school officials' failure to choose her preferred course of action over its own.  Garrett, 824 F. App'x at 964-65.  Finally, a school district is not deliberately indifferent when, after it receives a sexual assault report, it conducts a reasonable investigation and determines, based on the record, that there is not enough evidence to support the allegation.  Davis, 233 F.3d at 1373-74.

Because Thomas has failed to demonstrate that Dude or Fowler violated a constitutional right, and that any such right was clearly established at the time of the alleged violation, Dude and Fowler are entitled to qualified immunity, and Defendants' motion for summary judgment is granted as to Counts III and IV.

## V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment [Doc. 105] is **GRANTED**.  It is further **ORDERED** that Defendants' Motion to Exclude Expert Testimony of Tom Rawlings [Doc. 136] is **DENIED AS MOOT**.

The Clerk is **DIRECTED** to **CLOSE** the case.

**IT IS SO ORDERED** this 20th day of September, 2023.

MARK H. COHEN
United States District Judge